**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Court No. 20-00074 |

## ORDER

Upon reading Plaintiff's motion for summary judgment, upon consideration of the response thereto, and upon consideration of other papers and proceedings had herein, it is hereby:

ORDERED that Plaintiff's motion for summary judgment hereby is granted; and it is further

ORDERED that judgment be entered in favor of Plaintiff that the imported merchandise in issue is properly classifiable as claimed in subheading 8547.90.0020, HTSUS; and it is further

ORDERED that the entries covered by this civil action shall be reliquidated with a refund of duties plus interest as provided by law.

_____
Timothy C. Stanceu, Judge

Dated: _____, 2022
        New York, NY

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

|  |  |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC., | |
| Plaintiff, | |
| v. | Court No. 20-00074 |
| UNITED STATES, | |
| Defendant. | |

**PLAINTIFF'S MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, Plaintiff hereby moves that the Court grant Plaintiff's motion for summary judgment, overrule U.S. Customs and Border Protection's classification of the merchandise at issue, enter judgment in favor of plaintiff that the imported merchandise in issue is properly classifiable in subheading 8547.90.0020, HTSUS, and order that the entries covered by this civil action shall be re-liquidated with a refund of duties plus interest as provided by law.

The reasons in support of this motion are set forth in the attached statement of material facts and memorandum in support of the motion which is made part of this motion.

WHEREFORE, Plaintiff respectfully moves this Court for an Order granting Plaintiff's motion for summary judgment.

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811

/s/ R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**SANDLER TRAVIS & ROSENBERG, P.A.**
675 Third Avenue, Suite 1805
New York, NY 10178
(212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill

*Attorneys for Plaintiff*

Dated:  June 3, 2022

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC., | |
| Plaintiff, | |
| v. | Court No. 20-00074 |
| UNITED STATES, | |
| Defendant. | |

**PLAINTIFF'S STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Pursuant to Rules 56(a) and 56.3(a) of the Rules of the United States Court of International Trade, Plaintiff Shamrock Building Materials, Inc. ("Shamrock" or "Plaintiff") hereby submits the statement of facts as to which there is no genuine issue to be tried.  Plaintiff respectfully submits that there are no material facts as to which there exists a genuine issue to be tried and the issues are amendable to resolution through a dispositive motion for summary judgment.  Pursuant to Rule 56.3(a), Shamrock provides a short and concise statement, in numbered paragraphs, of the material facts as to which it contends there is no genuine issue to be tried.  As required by Rule 56(c) and 56.3(c), Shamrock cites to admissible evidence and particular parts of materials in the record, including depositions, documents, affidavits, or other materials.

The material undisputed facts of this case are as follows:

1.      This action involves the classification of electrical metallic tubing ("EMT") finished conduit and intermediate metal conduit ("IMC") produced by Conduit S.A. de C.V d/b/a RYMCO ("RYMCO"), which Plaintiff imported from Mexico (collectively "subject conduit").

Plaintiff's Disclosure of Expert Testimony at 6:11-13, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Mar. 4, 2022) ("Gotro Report") (attached hereto as **Exhibit I**); Deposition of Dr. Jeffrey T. Gotro at 77:17-78:3, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Mar. 31, 2022) ("Gotro Dep.") (attached hereto as **Exhibit II**).

2.      The imported subject conduit consists of welded carbon steel tubing that is galvanized on the exterior surface.  Deposition of Dr. Athanasios Meliopoulos at 34:22-25, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Jan. 6, 2022) ("Meliopoulos Dep.") (attached hereto as **Exhibit III**);  Deposition of Dr. Joshua E. Jackson at 45:24-46:3, 79:12-16, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Dec. 3, 2021) ("Jackson Dep.") (attached hereto as **Exhibit IV**);  Plaintiff's Response to Defendant's First Request for Production Number 28 at Exhibit 45, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Apr. 8, 2021) ("U.S. Corrosion Report") (attached hereto as **Exhibit V**).

3.      The interior surface of the imported electrical conduit is coated with a layer of organic epoxy enamel ("epoxy coating").  Gotro Report p. 7:1-4.

4.      RYMCO produced the subject conduit and applied the epoxy coating to the interior of the subject conduit, but RYMCO itself did not manufacture the epoxy coating.  Gotro Dep. 77:21-78:2; Gotro Report at 6:11-17.

5.      A different company, Pintura Diamex S.A., supplied the epoxy coating to RYMCO, who then applied it to the subject conduit.  Gotro Dep. at 78:11; Gotro Report at 6:11-17, 12:12-15.

6.      Dr. Jeffrey T. Gotro interpreted raw test data taken from samples of subject conduit to determine the chemical composition of the epoxy coating on the interior of the subject conduit. Gotro Dep. at 83:5-86:6.

7.     Dr. Gotro is an expert in polymers who has extensive experience developing epoxy and thermosetting resins for electrical and electronic applications, and who has experience with epoxy resins that line the interior of steel pipe.  Gotro Dep. at 25:1-2, 33:14-35:7; Gotro Report at 36:1-44:22, 3:23-4:2.

8.     Epoxy and melamine are both of a specific class of polymers called "thermosetting plastics."  Gotro Dep. at 190:16-191:13; Gotro Report at 13:7.

9.     Silicone is a polymer.  Gotro Dep. at 81:7.

10.     Dr. Gotro has developed epoxy resins for insulating use in mainframe computers, thermosetting polymers ("thermosets") for use as electrically insulating semiconductor substrate, and electrically insulating adhesives for electronic applications.  Gotro Dep. at 22:7-20, 23:4-20.

11.     Dr. Gotro is the inventor or co-inventor for twelve U.S. patents related to electrically insulating thermoset formulations.  Gotro Dep. at 42:18-19; Gotro Report at 3:25-26.

12.     From 2017 to present, Dr. Gotro has been a member of the Institute of Electrical and Electronic Engineers Electronics Packaging Society, which focuses on the resins, adhesives, circuit boards and coatings that go into making electronic "packages," including the polymers and metals that hold semiconductor chips or computer chips.  Gotro Dep. at 41:18-22, 46:15-19.

13.     Counsel for Plaintiff submitted two samples of the subject conduit to SGS Polymer Solutions, Inc. ("SGS"), an accredited third-party testing laboratory in Christiansburg, Virginia, at the directive of Dr. Gotro to test the chemical makeup of the epoxy coating. Gotro Dep. 108:9-109:10; Gotro Report at 7:18-22, 8:6-10:11, 12:19-13.2.

14.     SGS removed a section of each subject conduit sample and conducted Fourier Transform Infrared Spectroscopy ("FTIR"), a method to determine the chemical structure of materials, on the subject conduit samples.  Gotro Report at 7:18-9:7.

15.     SGS also collected additional coating samples by opening the length of the subject conduit and collecting coating samples from eight locations within each sample of the subject conduit.  SGS then performed FTIR analyses on each of the sixteen samples of removed coating. Dr. Gotro Report at 9:8-10:11.

16.     The eighteen FTIR spectra that resulted from the spectroscopies that SGS conducted are detailed in Appendices B and C of Dr. Gotro's expert report.  Gotro Report at 26-35;  Gotro Dep. at 120:6.

17.     Chemical species exhibit characteristic peaks at specific wavenumbers in FTIR data, which is how specific chemicals can be identified from a sample containing them.  Gotro Report p. 12:21-13:2.

18.     Epoxy, melamine formaldehyde, and polysiloxane ("silicone") have certain peaks in FTIR data.  Gotro Report at 14:6-7, 14:20-21, 15:11-13.

19.     Dr. Gotro examined the FTIR spectra obtained from the interior of the coated pipe and determined that the epoxy coating on the interior of the subject conduit consists of organic silicone-modified thermosetting polymers: specifically epoxy and melamine with a polydimethylsiloxane (silicone) additive.  Gotro Report at 7:1-4, 12:8-9, 13:4-6, 20:1-3; Gotro Dep. 212:16-213:6.

20.     Dr. Gotro testified that the results of the FTIR analyses which SGS performed, and which are reflected in Dr. Gotro's expert report, found that the coating on the interior of the subject conduit consists of epoxy, melamine and silicone.  Gotro Dep. at 83:5-9, 94:8-11, 111:5-7, 113:10-114:-6.

21.     Stoved epoxy resin is a mixture of epoxy and other resins that form a cured thermoset insulating coating.  Gotro Report at 21:28-29.

22.     Epoxy, melamine, and silicone are materials known to be electrically insulating. Gotro Report 7:5-6.

23.     Scientific literature regarding electrical testing performed on epoxy, melamine and silicone conclude that epoxy, melamine, and silicone are insulating materials.  Gotro Dep. at 216:5-12.

24.     The U.S. Department of Commerce National Bureau of Standards published report that states, "silicones can be added to epoxy resins for strong, heat-resistant, electrical insulating coatings."  Gotro Dep. at 155:12-14, 156:6-11; 203:19-204:7.

25.     Dr. Gotro testified that he agreed with the statement in the publication from the U.S. Department of Commerce that "silicones can be added to epoxy resins for strong, heat-resistant, electrical insulating coatings," and that such statement would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 203:19-204:7.

26.     A white paper published by Masterbond Inc. states that "all epoxy systems are inherently good insulators, especially when evaluated by dielectric strength, volume resistivity, dielectic constant and the dissipation factor.  They are outstanding electrical insulators." Plaintiff's Production of Documents in Response to Defendant's Subpoena of Dr. Gotro at Shamrock001930-35, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Mar. 23, 2022) ("Masterbond White Paper") (attached hereto as **Exhibit VI**).

27.     Masterbond is a manufacturer and supplier of epoxies and coatings used for insulating applications.  Gotro Dep. at 177:3-9; Gotro Report at 21:35.

28.     Dr. Gotro testified that he finds the Masterbond White Paper to be authoritative. Gotro Dep. 177:4-6.

29.     Dr. Gotro testified that descriptions of epoxy in the Masterbond White Paper apply to the epoxy in the interior coating at issue in this case.  Gotro Dep. 217:1-6.

30.     Masterbond states in a separate technical bulletin that "epoxies are 'go to materials' when first rate electrical insulation values are needed."  Gotro Report at 22:8-9.

31.     Masterbond's technical bulletin lists the resistivity of certain of its epoxy and silicone products as $10^{12}$ to $10^{13}$ ohm-meters.  Gotro Report at 22:3-7.

32.     A report from the Japanese Institute for Advanced Industrial Science and Technology ("AIST") states that "epoxy resin is usually used as starting material for insulating coating resins."  Gotro Dep. at 143:12-19, 202:22-203:4.

33.     Dr. Gotro testified that he agreed with the statement in the publication from AIST that "epoxy resin is usually used as starting material for insulating coating resins," and that such statement would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 203:5-16.

34.     The Institute of Electrical and Electronic Engineers ("IEEE") Electrical Insulation Magazine ("IEEE Insulating Varnish Overview") published an overview of electrical insulating varnishes in which the author, Daniel Sassano, notes that "the resins are used today in solventless electrical insulating varnishes that are mostly epoxies."  Gotro Dep. at 205:17-206:1.

35.     The IEEE Insulating Varnish Overview also states:

The purpose of an electrical insulating varnish is to perform a protective resin film over and throughout the main electrical structural components and insulations of electrical apparatus in order to contribute to the total mechanical strength and the electrical, thermal, and chemical resistance.

Gotro Dep. at 148:4-14; 205:6-16.

6

36.     Dr. Gotro testified that he agreed with those same quotes from the IEEE Insulating Varnish Overview, and that they would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 205:6-206:12.

37.     Hexion, an epoxy resin manufacturer, states in an article ("Hexion Article") that "epoxy resins" have "excellent mechanical and electrical insulating properties."  Gotro Dep. at 171:4-21; Gotro Report at 21:30-34.

38.     The Hexion Article talks about epoxies "used as an electrical insulating resin." Gotro Dep. at 172:16-17.

39.     The Hexion Article describes applications where "epoxy is a coating or encapsulate that would insulate the components."  Gotro Dep. at 173:4-6.

40.     A company called MG Chemicals stated in a document that "insulating varnishes are resins like epoxies or alkyds used to protect high-voltage machines such as transformer, motors, and generators from electrical failure.  They are applied over electrical conductors to provide a layer of electrical insulation and prevent shorting."  Gotro Dep. at 146:20-147:3.

41.     The definition of "epoxy" from Wikipedia states that "epoxies are known for their excellent adhesion, chemical and heat resistance, good to excellent mechanical properties, and very good electrical insulating properties."  Gotro Dep. at 192:4-9.

42.     The definition of "epoxy" from Wikipedia states that "epoxy has a wide range of applications" including use as "high tension electrical insulators."  Gotro Dep. at 191:19-192:3.

43.     Dr. Gotro testified that he agrees with the statement that the definition of epoxy from Wikipedia and that such definition would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 192: 10-21.

7

44.     The Wikipedia article for silicones states that they are used in "thermal and electrical insulation."  Gotro Dep. at 194:21-195:13.

45.     Dr. Gotro also testified that he agreed with the statement from Wikipedia that silicones are used in electrical insulation and that statement would be widely recognized as accurate in the scientific community.  Gotro Dep. at 194:8-15.

46.     The Wikipedia article on silicones references Ullman's Encyclopedia of Industrial Chemistry for the proposition that one of the major categories of application for silicones are electrical insulation.  Gotro Dep. 195:21-196:6.

47.     Dr. Gotro testified that Ullman's Encyclopedia of Industrial Chemistry is a widely recognized authority.  Gotro Dep. at 195:17-18.

48.     Dr. Gotro testified that he agreed with the statement that one of the major applications for silicones is electrical insulation, and that such statement would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 196:14-197:1.

49.     The Wikipedia definition of "melamine" defines it as a hard thermosetting plastic material made by polymerization.  Gotro Dep. at 194:1-7.

50.     Dr. Gotro testified, based on his experience, that he agreed with the definition of melamine from Wikipedia and that it would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 194:8-15.

51.     An article entitled "Plastic Definition and Examples in Chemistry," authored by Dr. Anne Marie Helmenstine, states that "plastics are usually poor conductors of heat and electricity.  Most are insulators with high dielectric strength."  Gotro Dep. at 201:1-13.

52.     Dr. Gotro testified that he agrees with the statement that "plastics are usually poor conductors of heat and electricity.  Most are insulators with high dielectric strength," and that

8

such statement would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 201:13-21.

53.     A chemistry website states that "the distinction between insulators and semiconductors is arbitrary and, from the point of view of metalinsulator transitions, all semiconductors are insulators."  Gotro Dep. at 206:16-207:6.

54.     Dr. Gotro testified, based on his experience, that he agreed with the statement that "the distinction between insulators and semiconductors is arbitrary and, from the point of view of metal-insulator transitions, all semiconductors are insulators," and that it would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 207:7-16.

55.     Thermosets are commonly used for insulation.  Gotro Dep. at 186: 14-187:1.

56.     Dr. Gotro testified that:

"Epoxies and other thermoset resins that are insulating are used as a coating material in various applications and . . . that insulating material are used extensively in printed circuit boards to prevent the flow of electrons between the circuit lines and the circuit boards and other components."

Gotro Dep. at 202:13-21, 185:13-20.

57.     Dr. Gotro opined on the electrical properties of the epoxy coating based on its chemical composition, his extensive experience developing electrically insulating epoxies, and a large amount of literature that supports that the epoxy, melamine and silicone components are electrically insulating.  Gotro Dep. at 112:19-113:9, 115:15-18; 132:14-17; 161:14-16.

58.     Dr. Gotro testified that epoxy resin, melamine and silicone are electrically insulating.  Gotro Dep. 86:10-87:7, 188:8-9; Gotro Report at 7:5-6.

59.     Dr. Gotro testified that the material composed of epoxy, melamine and silicone is insulating.  Gotro Dep at 115:4, 187:13-22; Gotro Report at 7:7-8.

60.     Resistivity is a material property.  Gotro Dep. 101:15-16; Meliopoulos Dep. at 70:24-25.

61.     Dr. Gotro testified that "resistivity" is the amount of electricity a material can resist.  Gotro Dep. at 102:14-16.  It is the ability of a material to resist the passage of electrical current under specified conditions of applied voltage, temperature, and time.  Gotro Dep. at 174:7-9.

62.     Dr. Gotro defined electrical "resistance" as "an electrical measurement. It's just the resistance to flow," and it "is the resistance of flow through the material." Gotro Dep. 102:18-19, 101:16-17.

63.     Dr. Gotro testified that "resistance of the material for flow is really governed by the material property of volume resistivity." Gotro Dep. 103:10-12.

64.     From an electrical point of view, materials can be characterized as conductors or insulators according to the material's resistivity.  Gotro Dep. 103:10-12, 116:20-117:4; Gotro Report at 20:14-21:6; Meliopoulos Dep. at 20:21-21:4, 44:10-11.

65.     Whether a material is an "insulator" or a "conductor" is not sharply demarcated. Gotro Report at 21:2-3.

66.     Resistivity is measured on a unit volume of material.  Gotro Dep. at 214:5-7.

67.     Dr. Gotro testified as follows regarding resistivity: "It's calculated based on a unit volume in the test.  So it's measured and then it's tested, but the volume resistivity stays the same whether it's a block or it's a coating."  Gotro Dep. at 214:21-215:2.

68.     Dr. Gotro testified that "the volume resistivity {of a material} doesn't change, for example, if you use it in a circuit board or you use it in a lining in a pipe."  Gotro Dep. at 214:8-10.

69.     The same material will have the same resistivity anywhere.  Meliopoulos Dep. at 71:4-5.

70.     The resistivity of epoxy, melamine and silicone have been determined by laboratories applying voltage to those materials.  Gotro Dep. at 215:13-16.

71.     The resistivity of those materials are reflected in scientific literature.  Gotro Dep. at 215:17-216:4.

72.     The resistivity of epoxy is $10^{12}$ to $10^{13}$ ohm-meters.  Gotro Report at 20:11-17, 22:5-6.

73.     The resistivity of melamine and silicone is $10^{12}$ ohm-meters.  Gotro Report at 20:11-17, 22:6-7.

74.     Based on the literature that Dr. Gotro reviewed, all of the tests that those laboratories have actually performed by applying voltage to epoxy, melamine and silicone, and his experience with materials science, Dr. Gotro testified that epoxy, melamine and silicone are insulating materials.  Gotro Dep. 216:5-12.

75.     Dr. Gotro testified that he agrees with the definition of the term "insulate" from Google, which defines the term as to "prevent the passage of electricity to or from 'something' by covering it in a nonconducting material."  Gotro Dep. at 197:5-12.

76.     Dr. Gotro testified, based on his experience, that he agreed with the definition of "insulate" in Google and that it would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 197:19-198:5.

77.     When asked about the Google definition of "insulate," Dr. Meliopoulos testified that to "prevent the passage of electricity to or from (something) by covering it in a nonconducting material" is a "correct definition."  Meliopoulos Dep. at 42:22-43:6.

78.     Dr. Gotro testified that it is "correct" that "electrically insulating means stopping the flow of electrons by using {a} material."  Gotro Dep. at 62:17-20.

79.     The Wikipedia definition of "Insulator (electricity)" states that "materials such as glass, paper, and Teflon, have high resistivity and are good electrical insulators.  Gotro Dep. at 199:4-8.

80.     The Wikipedia definition of "Insulator (electricity)" states that "a much larger class of materials, even though they have lower bulk resistivity, are good enough to prevent significant current from flowing at normally used voltage and, thus, are employed for insulation for electrical wiring and cables."  Gotro Dep. at 199:9-15.

81.     The Wikipedia definition of "Insulator (electricity)" states that "a perfect insulator does not exist because even insulators contain small amounts of mobile charges, 'charge carriers,' which can carry current."  Gotro Dep. at 198:13-18.

82.     Dr. Gotro testified, based on his experience, that he agreed with the definition "Insulator (electricity)" from Wikipedia, and that those quoted definitions and statements would be widely recognized as accurate in the chemical and scientific community.  Gotro Dep. at 200:7-19.

83.     Cellulosics (paper, cotton, etc.), at about 50% relative humidity ("RH"), have a resistivity of approximately $10^9$ ohm-meters.  Gotro Report at 20:11.

84.     Dr. Joshua E. Jackson of U.S. Corrosion Services tested whether there was a drop in voltage when measuring voltage from the surface of the epoxy coating through the volume of the epoxy coating and the wall of the subject conduit to the outer diameter steel surface.  Jackson Dep. at 140:20-22; U.S. Corrosion Report at Shamrock000530, Shamrock000534-35, Shamrock000537.

85.     The results of the U.S. Corrosion Services test found that "there's no voltage measured across the coating when you apply 1.5 volts."  Jackson Dep. at 140: 20-22; U.S. Corrosion Report at Shamrock000534-37.

86.     The testing methodology that Dr. Jackson used for the tests conducted by U.S. Corrosion Services "tried to duplicate" the "testing that had been done by the Customs lab," *i.e.*, the U.S. Customs and Border Protection laboratory.  Jackson Dep. at 138:5-15.

87.     The methodology that Dr. Jackson used in the voltage analysis that U.S. Corrosion Services conducted on the subject conduit was "derived" from similar testing that the Customs lab used.  Jackson Dep. at 151:16-18.

88.     The testing methodology that Dr. Jackson used in the voltage analysis that U.S. Corrosion Services conducted on the subject conduit "duplicated the Customs testing."  Jackson Dep. at 154:5-13.

89.     It was Dr. Jackson's understanding with regard to the U.S. Corrosion Services testing "that the people at the Customs lab conducted a similar type of test as far as the methodology goes."  Jackson Dep. at 154:14-18.

90.     Dr. Jackson testified that "when he applied less than 1600 grams of pressure, there was no reading of electrical conduction . . . or no voltage."  Jackson Dep. at 153:4-7.

91.     Dr. Jackson testified that U.S. Corrosion Services "got repeatable readings" from its testing when it "applied that little pressure."  Jackson Dep. at 153:4-11.

92.     Dr. Jackson testified that the repeatability of his readings was "how we know" that "there was enough surface contact to get an accurate reading of the electrical transfer or lack thereof."  Jackson Dep. at 153:8-11.

93.     Dr. Jackson testified that "in the voltage drop test," U.S. Corrosion Services tried "to duplicate the same amount of pressure on both samples."  Jackson Dep. 150:19-21.

94.     Dr. Jackson conducted a testing of the amount of pressure that it took to achieve a voltage measurement through the coating.  Jackson Dep. at 150:25-151:3; U.S. Corrosion Report at Shamrock000531, Shamrock000536-37.

95.     Dr. Jackson testified that he "wanted to demonstrate what {he} was seeing when {he} was doing the testing, which is that if you do it and you're not putting a lot of force, then you don't penetrate through the coating apparently and then you don't have any voltage show up."  Jackson Dep. at 153:22-154:4.

96.     Dr. Jackson wanted to "understand what might be was causing a difference in the results that they {i.e., the Customs laboratory} were reporting versus what {he} was seeing in the lab."  Jackson Dep. 154:8-13.

97.     Dr. Jackson placed a scale underneath the probes and then measured the pressure while touching the probes to see how much pressure was required to get a signal, and then how much pressure it took before the signal jumped from zero up to 1.5 volts.  Jackson Dep. at 150:2-8; U.S. Corrosion Report at Shamrock000537.

98.     Dr. Jackson testified that:

"I could take the probe and push down with that sharp tip and get through and all of a sudden I would see a {voltage} reading.  Whereas, if I wasn't using the sharp tip and I wasn't putting a lot of pressure, then I would see no reading."

Jackson Dep. 152:5-9.

99.     Dr. Jackson testified that the "logical conclusion" is that "if you use too much pressure, then all of a sudden you see a reading."  Jackson Dep. at 154:11-13.

100.     Dr. Jackson concluded that the sharp tip of the electrode could penetrate or pierce the coating.  Jackson Dep. at 151:22-152:1.

14

101.    Dr. Jackson determined that the amount of pressure applied accounted for the differences in the results of the US. Corrosion test versus the Customs lab test.  Jackson Dep. at 154:8-18.

102.    In the U.S. Corrosion Services analysis, Dr. Jackson found that:

When you test it using a light pressure, you don't see any voltage coming through from the battery, which indicates that it's resisting.  When you apply enough pressure, then you start to see a voltage show up that matches the battery's voltage.

Jackson Dep. at 147:9-13.

103.    Dr. Jackson concluded that, "with light pressure . . . 1.55 volts did not transfer through the interior diameter coating."  Jackson Dep. 147:14-17; U.S. Corrosion Report at Shamrock000534-37.

104.    Dr. Jackson supervised testing of the subject conduit at G2MT Laboratories LLC ("G2MT").  Jackson Dep. at 111:19; *see also* Plaintiff's Responses to the Defendant's First Requests for Production at Exhibit 3, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Feb. 23, 2021) ("G2MT Report") (attached hereto as **Exhibit VII**).

105.    G2MT conducted a "four-point test" that "found that the interior diameter coating produced 70 to 120 milliohms of electrical resistance."  Jackson Dep. at 125:18-21; G2MT Report at Shamrock000025.

106.    An "ohm" is a "measure of resistance."  Jackson Dep. at 130:19-20.

107.    In its electrical resistance testing and abrasion testing, G2MT compared the subject conduit with uncoated pipe.  Jackson Dep. at 71:14-15; G2MT Report at Shamrock000025-29.

108.    The "four-point test found that the uncoated pipe had an electrical {resistance} of 2.5 milliohms."  Jackson Dep. at 129:6-8; G2MT Report at Shamrock000025.

109.    The uncoated pipe had "no apparent interior coating," while the "Shamrock one did appear to have an interior coating."  Jackson Dep. at 71:8-11, 71:23-73:2.

15

110.   Shamrock imported electrical conduit, other than the subject conduit, from RYMCO that was galvanized with zinc on the interior surface rather than being coated with the epoxy coating as "rigid" conduit.  Rule 30(b)(6) Deposition of Michael Gambee at 37:8-12, 38:4-39:19, 117:19-22, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Oct. 13, 2021) ("Gambee Dep.") (attached hereto as **Exhibit VIII**).

111.   Shamrock refers to the uncoated electrical conduit that is galvanized with zinc on the interior surface, and which does not have the epoxy coating on the interior surface, as "rigid" conduit.  Gambee Dep. at 37:8-12, 38:4-39:19, 117:19-22.

112.   Rigid conduit is produced using a "hot-dipped" process whereby zinc, rather than an epoxy coating, is applied to both the interior and exterior surfaces of the rigid conduit.  Gambee Dep. at 117:19-22; 120:1-5, 77:8-78:9.

113.   The subject conduit is produced using an "in-line" manufacturing process whereby additional processing is performed on the subject conduit to apply the epoxy enamel coating onto the interior surface.  Gambee Dep. at 41:6, 75:22-76:3, 76:22-77:2,; 117:8-22, 119:22-120:16.

114.   Mr. Gambee testified that G2MT tested the subject conduit, and compared the subject conduit "against other tubes that were not coated on the inside" and "that were zinc coated on the interior."  Gambee Dep. at 200:22-201-3.

115.   Shamrock's understanding is that G2MT "tested the RYMCO tubes and he tested the Rigid tubes."  Gambee Dep. at 201:14-15.

116.   G2MT conducted a "two-point test" that "found that the interior diameter coating produced 0.7 and 1.2 ohms of electrical resistance."  Jackson Dep. at 125:22-25, 128:18-20; G2MT Report at Shamrock000025.

117.    The "two-point test found the uncoated pipe had an electrical {resistance} of 1.2 ohms." Jackson Dep. at 128:15-17; G2MT Report at Shamrock000025.

118.    Dr. Jackson testified that the subject conduit provides a higher electrical resistance than uncoated pipe. G2MT Report at Shamrock000025; Jackson Dep. at 100:3-5, 102:13-15, 131:1-132:4.

119.    Dr. Jackson testified that "since" the subject conduit "has a higher electrical resistance than the uncoated material, it's providing electrical insulation in that sense compared to an uncoated material. So, it has some electrical insulating properties." Jackson Dep. at 193:2-8.

120.    When it was reviewing which tariff code to use, Shamrock determined that the rigid conduit should be classified pursuant to Heading 7306, HTSUS. Gambee Dep. at 39:9-14.

121.    When it was reviewing which tariff code to use, Shamrock determined that the subject conduit "needed to be imported under" Heading 8547, HTSUS "because of the differences in the way it's manufactured and the way that it is coated on the interior." Gambee Dep. at 39:9-19.

122.    For G2MT's abrasion testing, two wires were fed through bent subject conduit and uncoated conduit, and then the wires were subsequently examined to measure the degree of abrasion damage and wear. Jackson Dep. at 69:11-14, 192:13-14; 193:7-8; G2MT Report at Shamrock000025.

123.    Dr. Jackson testified that G2MT was "looking at the insulation in regards to wear and abrasion . . . of the wire that's being run through the conduit." Jackson Dep. at 69:11-14.

124.    The results demonstrate that wire run through the subject conduit had less damage than wire run though the uncoated conduit. Jackson Dep. at 69:11-14, 71:8-72:21, 192:13-14; 193:7-8; G2MT Report at Shamrock000025-29.

17

125.    Dr. Jackson testified that the epoxy coating is "a protective coating," and that "it provides protection from abrasion and wear."  Jackson Dep. at 193:7-8.

126.    The interior coating reduces friction, so when wires are pulled through the coating, or run through the coating, it does not damage the wires.  Gambee Dep. at 86:8-13.

127.    Shamrock's customers need to have a product that protects the wiring during installation.  Gambee Dep. at 61:9-16.

128.    Dr. Jackson testified that the epoxy "coating has insulating properties."  Jackson Dep. at 192:24-193:1.

129.    Dr. Jackson testified that:

I see a difference between something being an insulator strictly speaking from an electrical point of view versus having insulating properties. First of all, insulating is a more generic term that includes multiple different forms of insulation besides just electrical insulation. So, you can have insulation in the form of protective insulation that protects something. For example, protecting from wear and abrasion, which is what the coating clearly does in this case. And then you can have thermal protection. We didn't find much thermal insulation difference between these two. And you can have electrical insulation. So, there's multiple different forms. I didn't believe that this coating is an insulator strictly by the definition of insulators. And I don't know the exact value of how high it has to be but I know you have to have a pretty high resistance for something to be strictly speaking an insulator. But it can still be insulating compared to something else if it provides a higher resistance.

Jackson Dep. at 192:6-23.

130.    Dr. Gotro agreed that physically insulating is another definition of the term "insulating."  Gotro Dep. at 62:5-12.  When asked whether "there are any other definitions of insulating," Dr. Gotro testified that "in the case of the conduit in this case, the internal coating, which is thermoset polymer, it can also protect the wire when it's being pulled through the conduit."  Gotro Dep. at 62:5-12.

131.    The silicone in the epoxy coating "lower{s} the coefficient of friction in the epoxy-melamine resins."  Gotro Report at 15:14

132.    Mr. Gambee testified that the epoxy coating "applies to two of the definitions of {the term} insulated . . . the transfer of electrons, as well as the protection aspect of the definition of insulating."  Gambee Dep. at 87:2-5, 94:17-95:2.

133.    When asked whether "the term insulation" can "have other meanings besides electrical insulation," Dr. Athanasios Meliopoulos testified "yes, of course."  Meliopoulos Dep. at 46:21-24.

134.    Dr. Meliopoulos testified that, "in jargon, you can say, I'm insulated from the weather."  Meliopoulos Dep. at 46:24-25.

135.    Dr. Meliopoulos then agreed that the term insulation "can have other meanings besides electrical insulation" and said that "in lay terms, yes, people . . . can use it for other purposes."  Meliopoulos Dep. at 47:1-6.

136.    When asked whether he would "agree that epoxy by itself is insulating," Dr. Meliopoulos testified: "in pure form, yes."  Meliopoulos Dep. at 21:19-21.

137.    Dr. Meliopoulos testified that "silicone is an insulator . . . in pure form." Meliopoulos Dep. at 21:22-25; *see also* Defendant's Disclosure of Expert Testimony at 7, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Oct. 20, 2021) ("Meliopoulos Report") (attached hereto as **Exhibit IX**).

138.    The epoxy coating has a higher electrical resistance than the steel on which it is applied.  Meliopoulos Dep. at 34:22-25.

139.    When asked whether he agreed with the statement from the Japanese Institute for Advanced Industrial Science and Technology that "epoxy resin is usually used as a starting material for insulating coating resin," Dr. Meliopoulos testified that "these statements are correct." Meliopoulos Dep. at 56:6-17.

140.    Dr. Meliopoulos testified that he agreed with the statement from the U.S.

Department of Commerce publication which reads, "Silicone-modified resins that are the basis for

durable coatings combining many of the desirable properties of each component, and include

combinations of silicones with epoxy resins for strong, heat-resistant, electrical insulating coatings."

Meliopoulos Dep. at 57:5-15.

141.    Dr. Meliopoulos testified that he agreed with the following statements from the

IEEE publication authored by Daniel Sassano:

> The purpose of an electrical insulating varnish is to form a protective resinous film
> over and throughout the main electrical structural components and insulations of
> electrical apparatus in order to contribute to the total mechanical strength, and the
> electrical, thermal, and chemical resistance. . . . the resins are used today in solventless
> electrical insulating varnishes are mostly epoxies or unsaturated polyesters.

Meliopoulos Dep. at 57:19-58:11.

142.    The proper way to determine whether a material is electrically insulating is to

measure the resistivity of the material.  Meliopoulos Report at 7.

143.    To measure the resistivity of a material, a substantial amount of the material is

needed (for example, a sample of one-inch cube as indicated in Figure 1 above) as well as

precision equipment.  Meliopoulos Dep. at 66:5-10; Meliopoulos Report at 7.

144.    "The resistivity in order to be measured requires {a} specific arrangement to

measure the resistivity of the material. And you need to have enough material to have repeatable

and reliable measurement of the resistivity."  Meliopoulos Dep. at 71:9-14.

145.    Dr. Meliopoulos testified that he "did not have sufficient coating material to

determine the coating material's electrical resistivity."  Meliopoulos Dep. at 66:12-17;

Meliopoulos Report at 7.

146.     Dr. Meliopoulos testified that to do a "repeatable, acceptable measurement method to determine the resistivity of the material," he "will need . . . more material."  Dr. Meliopoulos Dep. at 68:11-14.

147.     Dr. Meliopoulos testified that it is "correct" that "the coating material has unknown resistivity."  Meliopoulos Dep. at 67:18-24; Gotro Dep. at 175:15-17.

148.     Resistivity is not typically measured on a thin coating.  Gotro Dep. at 227:13-18.

149.     Dr. Gotro testified that the method that Dr. Meliopoulos used to "indirectly estimate" the coating's resistivity in his report did not "measure the volume resistivity according to the standard definition" or "the typical way to measure volume resistivity" that Dr. Meliopoulos outlined in his report.  Gotro Dep. at 226:16-227:18.

150.     The epoxy coating is not a conductor of electricity.  Meliopoulos Dep. at 75:23; Meliopoulos Report at 8.

151.     When asked "if the interior of the {subject} conduit tubing was lined with paper or paperboard instead of the materials used by Plaintiff to coat the interior of the tubing in issue, would {he} consider paper or paperboard to be insulating material," Dr. Meliopoulos testified that he would not consider the paper or paperboard to be insulating material.  Meliopoulos Dep. at 29:15-20.

152.     Dr. Gotro disagreed with Dr. Meliopoulos's statement that paperboard was not an insulating material.  Gotro Dep. at 190:12-15.

153.     Shamrock attempted to learn information about the epoxy coating from the coating manufacturer, Pinturas Diamex, so that it could provide that information to CBP, as CBP had requested in the administrative proceedings below.  Gambee Dep.at 88:2-90:16; Gotro Dep. at 82:7-10.

154.    Pinturas Diamex stated that the epoxy enamel's main components are epoxy, melamine and silicone, but declined to provide the precise composition due to the information being a proprietary trade secret.  Gotro Dep. at 95:17-96:15, 106:8-13.

155.    Mr. Gambee testified that "protective insulating coating" as used by Pinturas Diamex to describe the epoxy coating on the subject conduit means "it insulates the interior of the tubes . . . from the transfer of electrons, as well as damage to the wires being pulled through the runs of conduit."  Gambee Dep. at 96:15-22.

Plaintiff respectfully submits that there is no genuine dispute for the foregoing facts.

Respectfully submitted,

**Morris Manning & Martin LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811

/s/ R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**Sandler Travis & Rosenberg, P.A.**
675 Third Avenue, Suite 1805
New York, NY 10178
 (212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill

*Attorneys for Plaintiff*

Dated:  June 3, 2022

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

|  |  |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC.,<br><br>              Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>              Defendant. | Court No. 20-00074 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811

/s/ R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**SANDLER TRAVIS & ROSENBERG, P.A.**
675 Third Avenue, Suite 1805
New York, NY 10178
 (212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill

*Attorneys for Plaintiff*

Dated:  June 3, 2022

# <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................... 2

STATUTES INVOLVED .................................................................................................. 6

QUESTIONS PRESENTED.............................................................................................. 7

STANDARD OF REVIEW ............................................................................................... 7

SUMMARY OF ARGUMENT ........................................................................................ 9

ARGUMENT .................................................................................................................... 9

     Introduction............................................................................................................... 9

    I.     The Subject Conduit Is Properly Classifiable Under Subheading 8547.90.0020, HTSUS Because It Is "Lined With An Insulating Material." .............................. 12

         A.     The Undisputed Facts in the Record Establish That the Subject Conduit Is Lined With An Insulating Material........................................................... 12

         B.     The Common Meaning of the Term "Insulating Material." .................... 18

         C.     Case Law and CBP Rulings Support Shamrock's Classification and CBP's Classification of the Subject Conduit Is Inconsistent with Precedent and Its Own Rulings. ......................................................................................... 24

    II.    Defendant Has Failed to Demonstrate the Subject Conduit Should Not Be Classified Under Subheading 8547.90.0020, HTSUS, and Misreads the Meaning And Intent of The Language of That Provision. .................................................. 30

    III.    The Testimony in this Case Demonstrates That the Epoxy Coating Is Electrically Insulating................................................................................................................. 32

    IV.    While It Is Clear That the Epoxy Coating Is Electrically Insulating, the Subject Conduit Would Still Be Classified As "Lined With an Insulating Material" Even if the Epoxy Coating Is Not Electrically Insulating............................................. 34

CONCLUSION................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)...................................................................................8

*Amcor Flexibles Singen Gmbh v. United States*,
   425 F.Supp.3d 1287 (U.S. Ct. Int'l Trade 2020) ....................................11

*Application of Gustav Widmer, Hans Batzer and Edwin Nikles*,
   353 F.2d 752 (C.C.P.A. 1965) .......................................................26, 31, 32

*B.F. Goodrich Co. v. United States*,
   38 Cust. Ct. 72 (1957) ....................................................................... *passim*

*Baxter Healthcare Corp. of P.R. v. United States*,
   182 F.3d 1333 (Fed. Cir. 1999)................................................................11

*BenQ Am. Corp. v. United States*,
   646 F.3d 1371 (Fed. Cir. 2011).................................................................10

*Carl Zeiss, Inc. v. United States*,
   195 F.3d 1375 (Fed. Cir. 1999).................................................................11

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................8

*Devon Tape Corp. v. United States*,
   57 Cust. Ct. 507 (1966).............................................................................23

*Dolly, Inc., v. United States*,
   27 CIT 1597, 293 F. Supp. 2d 1340 (2003)..............................................10

*E.T. Horn Co. v. United States*,
   367 F.3d 1326 (Fed. Cir. 2004).................................................................11

*Govesan Am. Corp. v. United States*,
   25 C.I.T. 1142 (U.S. Ct. Int'l Trade 2001) ..............................................11

*Inter-Maritime Forwarding Co. v. United States*,
   70 Cust. Ct. 133 (1973)...................................................................... *passim*

*Jarvis Clark Co. v. United States*,
   733 F.2d 873 (Fed. Cir. 1984)....................................................................9

*La Crosse Tech., Ltd. v. United States,*
   723 F.3d 1353 (Fed. Cir. 2013)........................................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986).......................................................................................8

*Myers v. United States,*
   969 F. Supp. 66 (Ct. Int'l Trade 1997) ...........................................................18

*Naftone, Inc. v. United States,*
   67 Cust. Ct. 341 (Cust. Ct. 1971)........................................................ *passim*

*Processed Plastics Co. v. United States,*
   473 F.3d 1164 (Fed. Cir. 2006)........................................................................9

*Russell Stadelman & Co. v. United States,*
   242 F.3d 1044 (Fed. Cir. 2001)......................................................................11

*Schlumberger Tech. Corp. v. United States,*
   845 F.3d 1158 (Fed. Cir. 2017).......................................................................9

*Sears Roebuck and Co. v. United States,*
   790 F. Supp. 299 (Ct. Int'l Trade 1992) ...................................................11, 12

*The Pillsbury Co. v. United States,*
   431 F.3d 1377 (Fed. Cir. 2005)......................................................................10

*United States v. Pan Pac. Textile Group Inc.,*
   27 CIT 925, 276 F. Supp. 2d 1316 (2003) ......................................................8

*Warner-Lambert Co. v. United States,*
   407 F.3d 1207 (Fed. Cir. 2005).......................................................................9

*Wheatland Tube Company v. United States,*
   560 F. Supp. 3d 1337 (Ct. Int'l Trade 2022) .................................................18

**Statutes**

19 U.S.C. § 1862.......................................................................................................7

28 U.S.C. § 2640(a) .................................................................................................9

Harmonized Tariff Schedule of the United States (HTSUS)

   Subheading 7306.30.1000..................................................................................1, 6

   Subheading 7306.30.5028..................................................................................1, 6

   Subheading 8547.90.0020............................................................................ *passim*

3

**Other Authorities**

H.R. Rep. No. 100–576, 549 (1988), reprinted in 1988 U.S.C.C.A.N. 1547 ...............................11

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC., | |
| Plaintiff, | |
| v. | Court No. 20-00074 |
| UNITED STATES, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Plaintiff Shamrock Building Materials, Inc. ("Shamrock" or "Plaintiff") hereby files this brief in support of its motion for summary judgment.  Pursuant to Rule 56.3, Plaintiff annexes to its motion for summary judgment its statement of material facts as to which there are no genuine issues to be tried ("SMF").

U.S. Customs and Border Protection ("CBP") classified the subject conduit pursuant to subheading 7306.30.1000 of the Harmonized Tariff Schedule of the United States ("HTSUS"), or subheading 7306.30.5028, HTSUS, with 25 percent section 232 duties *ad valorem* at the time of entry.  Plaintiff claims that the imported articles should be classified pursuant subheading 8547.90.0020, HTSUS, free of duty at the time of entry.  Representative samples of the electrical conduit were transmitted by CBP to the Court and are in the possession of the Clerk of the Court. *See* ECF No. 16.

For the reasons set forth below, Plaintiff's motion for summary judgment should be granted.

**BACKGROUND**

There are three types of electrical conduit relevant to this dispute:  electrical metallic tubing finished conduit ("EMT"), intermediate metal conduit ("IMC"), and rigid metal conduit ("rigid conduit").  SMF paras. 1-2, 110-11.  This action involves the classification of RYMCO-brand EMT and IMC produced by Conduit S.A. de C.V., which Plaintiff imported from Mexico (collectively "subject conduit").  SMF para. 1.  The subject conduit consists of welded carbon steel tubing that is galvanized.  SMF para. 2.  The interior surface of the subject conduit is coated with a layer of organic epoxy coating ("epoxy coating").  *E.g.*, SMF paras. 3, 5, 15, 19, 20, 109, 113, 132.  The interior epoxy coating consists of epoxy, melamine, and silicone.  SMF paras. 19-20.  This epoxy coating distinguishes the subject conduit from rigid conduit.  Unlike the subject conduit, rigid conduit is merely galvanized on the interior with zinc without any additional processing.  SMF paras. 110-13.  The manufacture of subject conduit is different from the manufacture of rigid.  The subject conduit is produced using an "in-line" manufacturing process whereby, unlike the rigid conduit, additional processing is performed on the subject conduit to apply the epoxy coating onto the interior surface.  SMF paras. 112-13.

Shamrock is not the manufacturer of the subject conduit.  The subject conduit was produced by Conduit S.A. de C.V d/b/a RYMCO ("RYMCO").  RYMCO produced the subject conduit and applied the epoxy coating to the interior of the subject conduit, SMF paras. 1, 4, but RYMCO itself did not manufacture the epoxy coating.  A company called Pintura Diamex supplied the epoxy coating to RYMCO, who then applied it to the subject conduit.  SMF paras. 4-5, 113, 153-54.  Shamrock purchased and imported the subject conduit from RYMCO.  SMF para. 1.  In response to requests for information from CBP, Shamrock asked Pinturas Diamax, through RYMCO, about the composition and properties of the interior coating.  SMF para. 153.  Pinturas Diamex stated that the

epoxy coating's "main components" are epoxy, melamine and silicone, but declined to provide the precise composition due to the information being a proprietary trade secret.  SMF para. 154.

Throughout the administrative procedures below and in the course of this litigation, five separate sets of tests have been conducted on the epoxy coating.  First, Shamrock had an independent third party laboratory, G2MT Laboratories, LLC ("G2MT"), conduct abrasive and electrical analyses on the subject conduit.  SMF paras. 104-09, 114-17, 122-25.  Dr. Joshua E. Jackson supervised the testing of the subject conduit at G2MT.  SMF para. 104.  For abrasion testing, two wires were fed through bent subject conduit and uncoated conduit, and then the wires were subsequently examined to measure the degree of abrasion damage and wear.  SMF para. 122. The results demonstrate that wire run through the subject conduit had less damage than wire run though the uncoated conduit, *i.e.*, the type of conduit that Shamrock refers to as "rigid" conduit. SMF paras. 107, 109-11, 114-115, 124-26, 129.  G2MT also compared electrical resistance testing on subject conduit versus rigid conduit.  SMF paras. 105, 107-09, 111, 114-19.  G2MT found, after conducting "two-point" electrical measurements that the electrical resistance of the subject conduit was higher than the electrical resistance of rigid conduit.  Specifically, G2MT found the electrical resistance of the subject conduit to be 0.7 to 1.2 ohms whereas the electrical resistance of rigid conduit was 0.2 ohms.  SMF paras. 116-17.  G2MT also conducted "four-point" electrical resistance measurements, and found that the subject conduit exhibited 70 to 120 milliohms whereas the rigid conduit exhibited 2.5 to 3.0 milliohms.  SMF paras. 105, 108.

Thus, when Shamrock determined which tariff code to use when entering the electric conduit that it imported from RYMCO, Shamrock determined that the subject conduit – EMT and IMC – needed to be imported under 8547.90.0020, HTSUS because of the epoxy coating on the interior of the subject conduit and the differences in its manufacture from rigid conduit.  SMF para.

121.  Shamrock determined that rigid conduit, which was merely lined on the interior with a zinc coating, should be classified pursuant to Heading 7306, HTSUS.  SMF paras. 110-12, 120.  Thus, the rigid conduit is relevant to the classification at issue because it exemplifies the type of conduit that is not lined on the interior with an insulating material and contrasts with the subject conduit that is lined on the interior with an epoxy coating.

Second, prior to liquidation, CBP measured the voltage through the wall of the subject conduit using a 1.5 volt battery and a two-prong Fluke multimeter placing one probe on the outside surface and the other on the interior surface.  SMF paras. 84, 86-89.  In the third set of tests on the subject conduit, Dr. Jackson, who had left G2MT and was now CEO of another independent third party company, U.S. Corrosion Services, LLC, replicated CBP's voltage testing methodology.  *Id*. However, unlike CBP, Dr. Jackson ensured that the electrical probe measured the properties of the interior epoxy coating rather than the underlying steel substrate.  U.S. Corrosion Services ensured that the point of the electrical probe did not puncture the interior epoxy coating.  SMF paras. 90-102.  It further ensured that the probe made contact with the epoxy coating, but that pressure was not applied so as to receive an electrical reading from the underlying steel.  *Id*.  After replicating CBP's own voltage testing methodology and controlling to capture the properties of the epoxy coating, the results of the U.S. Corrosion Services test found that there was no voltage measured through the epoxy coating.  SMF paras. 85, 90, 101-03.

Fourth, CBP called an alleged expert, Dr. Athanasios Meliopoulos, to conduct electrical testing on the subject conduit and opine on its insulating qualities.  Dr. Meliopoulos alleged a specific threshold resistivity that a material allegedly must have before it is characterized as an "insulator" as opposed to a "conductor" of electricity.  SMF para. 64. Specifically, Dr. Meliopoulos claimed that insulators have a resistivity of at least $10^{12}$ ohm-meters.  Defendant's Disclosure of

4

Expert Testimony at 4, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Oct. 20, 2021) ("Meliopoulos Report") (attached hereto as **Exhibit IX**).  Additionally, Dr. Meliopoulos testified that he would need a substantial volume of the epoxy coating to determine the material's resistivity; that he did not have sufficient material to determine its resistivity; and therefore he could not actually determine the resistivity of the epoxy coating.  SMF paras. 142-147.  Nevertheless, Dr. Meliopoulos tested the electrical resistance, and used the resistance measurements to "indirectly estimate" the resistivity of the coating material.  Meliopoulos Report at 8.  He then concluded that the epoxy coating was allegedly a "semi-conductor" material.  *Id*.  In other words, Dr. Meliopoulos found that the coating material is *not* a conductor of electricity.

Fifth, Shamrock called an expert on polymers and thermosetting plastics (for example, epoxy) with experience developing epoxy resins for insulating applications.  SMF paras. 7, 10-12.  Dr. Gotro had a third party laboratory, SGS Polymer Solutions, conduct chemical tests on the interior epoxy coating.  SMF paras 13-16.  Dr. Gotro, a widely recognized scientific authority, interpreted the test results from SGS Polymer Solutions to determine the composition of the epoxy coating and opined on the material properties of the epoxy coating.  SMF paras. 19-20.  His observations and conclusions are based on his experience, as well as sources from scientific literature and the coating industry.  SMF paras. 7, 10-12, 22-23, 25, 33, 36, 43, 45, 48, 50, 52, 54, 57, 74, 76, 82.  Dr. Gotro concluded and testified that:  (1) the coated inner surfaces were organic and more specifically silicone modified thermosetting polymers; (2) the coated inner surfaces consisted of epoxy and melamine with a polydimethylsiloxane (silicone) additive; (3) compositions containing epoxy, melamine, and silicone additives are known to be electrically insulating; and (4) the inner coating consisting of epoxy, melamine and silicone is electrically insulating.  SMF paras. 19-20, 22-23, 57-59, 74.  In fact, the electrical resistivities of epoxy, melamine and silicone

are each at least $10^{12}$ ohm-meters, which even meet and exceed the $10^{12}$ ohm-meter threshold alleged by Dr. Meliopoulos as the requirement for a material to be considered an insulator.  SMF paras. 70-74.

## STATUTES INVOLVED

<u>Classified Under</u>:

CBP classified the electrical conduit pursuant to subheading 7306.30.1000, HTSUS, as:

> Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel:
>
>> Other, welded, of circular cross section, of iron or nonalloy steel:
>>
>>> Having a wall thickness of less than 1.65 mm;

or pursuant to subheading 7306.30.5028, HTSUS, as:

> Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel:
>
>> Other, welded, of circular cross section, of iron or nonalloy steel:
>>
>>> \*       \*       \*
>>
>> Having a wall thickness of 1.65 mm or more:
>>
>>> \*       \*       \*
>>
>> Other
>>
>>> \*       \*       \*
>>
>>> Other:
>>>
>>>> With an outside diameter not exceeding 114.3 mm:
>>>>
>>>>> Galvanized:
>>>>>
>>>>>> \*       \*       \*
>>>>>
>>>>> Internally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit.

At the time the merchandise was imported, merchandise imported from Mexico that was classified under subheadings 7306.30.1000 or 7306.30.5028 was subject to a 25 percent duty imposed pursuant to section 232 of the Trade Expansion Act of 1962, *as amended*, 19 U.S.C. § 1862.

6

<u>Claimed Under</u>:

Plaintiff claims that the imported merchandise should be classified under subheading 8547.90.0020, HTSUS, as

\*        \*        \*

Electrical conduit tubing and joints therefor, of base metal lined with insulating material:

\*        \*        \*

Other

\*        \*        \*

Electrical conduit tubing and joints therefor, of base metal lined with insulating material:

Conduit tubing

At the time of importation, merchandise from Mexico classified under subheading 8547.90.0020 was not subject to section 232 duties and was duty free under the North American Free Trade Agreement ("NAFTA").

## QUESTIONS PRESENTED

The issue presented is whether the RYMCO brand electrical metallic tubing finished conduit ("EMT") and intermediate metal conduit ("IMC") produced by Conduit S.A. de C.V. that Plaintiff imported from Mexico is properly classifiable pursuant to subheading 8547.90.0020, HTSUS.

## STANDARD OF REVIEW

Pursuant to Rule 56 of the United States Court of International Trade ("CIT"), summary judgment is appropriate if, based upon the record (including depositions, documents, affidavits, admissions, interrogatory answers), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT Rule 56(a) and (c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (under Rule 56(c), summary

7

judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").  In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted, drawing all inferences against the moving party.  *See United States v. Pan Pac. Textile Group Inc.,* 27 CIT 925, 927, 276 F. Supp. 2d 1316, 1319 (2003); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial.  *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).  The movant may satisfy this burden by noting that the party who will bear the ultimate burden of proof at trial cannot support an essential element of its claim. *See, e.g., Celotex,* 477 U.S. at 322-23.  Here, summary judgment for Plaintiff is appropriate because there is no genuine dispute as to the merchandise at issue.

Shamrock submits that to be classified under subheading 8547.90.0020, the tubing must be lined with insulating materials, *i.e.*, materials that have the property of being insulating. There is no genuine factual dispute that the subject tubing is coated with a coating composed of epoxy, melamine, and silicone together with other materials.  Nor is there any genuine factual dispute that epoxy, melamine, and silicone have insulating properties.  As a matter of law, the subject conduit at issue is classifiable in subheading 8547.90.0020, HTSUS, as a matter of law, because it is lined with a material that is insulating.  Therefore, Plaintiff's motion for summary judgment should be granted.

This Court reviews classification decisions by Customs via a two-step analysis.  The Court will first construe the relevant tariff headings, which is a question of law, and then decide, based upon the facts, under which of those headings the subject articles fall.  *Schlumberger Tech.*

*Corp. v. United States*, 845 F.3d 1158, 1162 (Fed. Cir. 2017) (citing *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016)); *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1168-69 (Fed. Cir. 2006) (citing *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).  This Court is charged with making findings of fact and conclusions of law *de novo*.  28 U.S.C. § 2640(a).  However, the Court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)), and therefore must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

## SUMMARY OF ARGUMENT

The issue in this case is very simple: whether the subject conduit is lined with insulating material.  The essential material facts in this case are not in dispute.  The subject conduit is lined with epoxy resin, melamine and silicone. Those materials are universally recognized in scientific, technical, and lexicographic authorities as insulating materials, and, in particular, electrically insulating materials.  These authorities corroborate the expert opinion testimony of Shamrock's eminently qualified expert witness that these materials are insulating.  Therefore, the subject conduit is properly classified as claimed under subheading 8547.90.0020, HTSUS.

## ARGUMENT

**Introduction.**

The classification of merchandise under the HTSUS is governed by the General Rules of Interpretation ("GRIs"), which are applied in numerical order.  *BenQ Am. Corp. v. United States*,

646 F.3d 1371, 1376 (Fed. Cir. 2011) (citing *N. Am. Processing Co. v. United States*, 236 F.3d

695, 698 (Fed. Cir. 2001)); *The Pillsbury Co. v. United States*, 431 F.3d 1377, 1379 (Fed. Cir.

2005).  GRI 1 instructs that, "for legal purposes, classification shall be determined according to the

terms of the headings and any relative section or chapter notes."  GRI 1; *see also Dolly, Inc., v.*

*United States*, 27 CIT 1597, 1601, 293 F. Supp. 2d 1340, 1343 (2003).  GRI 2(a) covering

incomplete or unfinished articles has no application here.  GRI 2(b) provides that "any reference

in a heading to a material shall include a reference to mixtures or combinations of that material

or substance with other materials."

　　　To determine the correct classification for imported merchandise, the Court must first

interpret the terms of the competing headings, including any relevant section or chapter notes,

and may consult the non-binding Explanatory Notes, where applicable.  Where an "imported

article is described in whole by a single classification heading or subheading, then that single

classification applies, and the succeeding GRIs are inoperative." *La Crosse Tech., Ltd. v. United*

*States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013).  Only after a determination at the heading level is

made, "the Court [may] look to the subheadings to find the correct classification for the

merchandise at issue." *Id*.

　　　Tariff terms are defined according to the language of the headings, the relevant section and

chapter notes, the Harmonized Commodity Description and Coding System's Explanatory Notes

("Explanatory Notes" or "ENs"), available lexicographic sources, and other reliable sources of

information.  "When a tariff term is not defined in either the HTSUS or its legislative history, the

term's correct meaning is its common or dictionary meaning." *Russell Stadelman & Co. v. United*

*States*, 242 F.3d 1044, 1048 (Fed. Cir. 2001) (citing *Rohm & Haas Co. v. United States*, 727 F.2d

1095, 1097 (Fed. Cir. 1984)).  "Absent contrary legislative intent, HTSUS terms are to be

'construed [according] to their common and popular meaning.'" *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999) (quoting *Marubeni Am. Corp. v. United States*, 35 F.3d 530, 534 (Fed. Cir. 1994)).  "To assist it in ascertaining the common meaning of a tariff term, the Court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information." *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333, 1337-38 (Fed. Cir. 1999) (quoting *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988)); *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999); *see also Amcor Flexibles Singen Gmbh v. United States*, 425 F.Supp.3d 1287, 1295 (U.S. Ct. Int'l Trade 2020) (citing *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (2001)).

The Court will typically look to a dictionary definition to find a "common meaning" and then turn to the Explanatory Notes.  *See, e.g.*, *Govesan Am. Corp. v. United States*, 25 C.I.T. 1142, 1379-82 (U.S. Ct. Int'l Trade 2001).  The Explanatory Notes "provide a commentary on the scope of each heading of the Harmonized System" and are "generally indicative of proper interpretation of the various provisions."  H.R. Rep. No. 100–576, 549 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1582; *see also E.T. Horn Co. v. United States*, 367 F.3d 1326, 1329 (Fed. Cir. 2004).  For example, in *Sears Roebuck and Co. v. United States*, the Court consulted *The Electronics and Nucleonics Dictionary* as a "scientific authority" in defining a television camera. 790 F. Supp. 299, 301-02 (Ct. Int'l Trade 1992).  In *Govesan*, the Court looked to *Van Nostrand's Scientific Encyclopedia* for a definition of paint in a dispute regarding whether epoxy powder coatings qualified as paint.  *Id*. at 1380-81.  The Court noted that it had previously accepted *Van Nostrand*'s definition, which explains that "[p]aints are available for decorative, protective and other purposes."  *Id*. at 1381.  For the purposes of that case, the Court was

unsatisfied with this definition of paint and turned to the Explanatory Notes for a definition of "powder paints."  *Id.*

## I.

## The Subject Conduit Is Properly Classifiable Under Subheading 8547.90.0020, HTSUS Because It Is "Lined With An Insulating Material."

**A.**     **The Undisputed Facts in the Record Establish That the Subject Conduit Is Lined With An Insulating Material.**

The critical legal determination in this case whether the electrical conduit is "lined with an insulating material" as used in the Harmonized Tariff Schedule subheading 8547.90.0020. 8547.90.0020, HTSUS applies to "electrical conduit tubing and joints therefor, of base metal *lined with an insulating material* . . . conduit tubing."  The merchandise at issue in this case is unquestionably electrical conduit tubing of base metal as the merchandise consists of welded carbon steel tubing.  SMF paras. 2, 138.  Shamrock submits that the subject conduit is lined with an insulating material.  The record establishes without contradiction that the interior surface of the subject conduit is coated with a layer comprised of epoxy, melamine, and silicone. Additionally, epoxy, melamine, and silicone are materials that possess insulating properties. Accordingly, the electrical conduit of base metal is "lined with an insulating material."

### 1.     **Expert Witness Testimony Establishes That the Subject Conduit Is Lined With An Insulating Material.**

Shamrock had two samples of subject conduit sent to SGS Polymer Solutions, Inc. ("SGS"), which conducted Fourier Transform Infrared Spectroscopy ("FTIR") analyses to determine the chemical structure of the coating on the interior of the subject conduit samples.  SMF paras. 13-14. Specifically, SGS removed sections of the subject conduit and conducted an FTIR on the sampled sections.  SMF para. 14.  SGS also collected additional coating samples by opening the length of the subject conduit and carefully collecting coating samples from eight locations within each sample of

the subject conduit.  SMF para. 15.  SGS then performed FTIR analyses on each of the sixteen samples of removed coating and the two cut sections of the subject conduit.  SMF para. 15. Chemical species exhibit characteristic peaks at specific wavenumbers in FTIR data, and in this manner, the FTIR results provide a "fingerprint" of the chemical structures in the sampled coating from the subject conduit.  SMF para. 17-18.  In other words, the unique set of FTIR peaks identify the specific chemical components of the tested sample.  The eighteen FTIR spectra that resulted from the spectroscopies that SGS conducted are detailed in Appendices B and C of Dr. Gotro's expert report.  SMF para. 16.

Dr. Jeffrey T. Gotro interpreted the raw data in his expert report and testified regarding the results of that analysis.  SMF paras 6, 19, 20.  Dr. Gotro is an expert in polymers and thermosets with extensive experience developing epoxy and thermosetting resins for electrical and electronic applications.  SMF para. 7.  Dr. Gotro has developed epoxy resins for insulating use in mainframe computers, thermosetting polymers for use as electrically insulating semiconductor substrate, and electrically insulating adhesives for electronic applications.  SMF para. 10.  He is the inventor or co-inventor for twelve U.S. patents related to electrically insulating thermoset formulations.  SMF para. 11.  From 2017 to present, Dr. Gotro has been a member of the Institute of Electrical and Electronic Engineers Electronics Packaging Society, which focuses on the resins, adhesives, circuit boards and coatings that go into making electronic "packages," including all the polymers and metals that hold semiconductor chips or computer chips.  SMF para. 12.  Silicone is a polymer.  SMF para. 9. Epoxy and melamine are a specific class of polymers called "thermosetting plastics."  SMF para. 8. Accordingly, Dr. Gotro is well qualified to testify regarding the materials that make up the epoxy coating and the properties of the epoxy coating.  Moreover, Dr. Gotro has experience with epoxy resins that line the interior of steel pipe.  SMF para. 7.

Epoxy, melamine formaldehyde, and polysiloxane ("silicone") have certain peaks in FTIR data.  SMF para. 18.  Dr. Gotro examined the FTIR spectra obtained from the interior of the coated pipe to determine the chemical composition of the epoxy coating.  SMF paras. 6, 19-20.  Based on the FTIR analysis, Dr. Gotro found that the internal coating on the subject conduit contained epoxy, melamine, and silicone components.  SMF para. 19-20.  Dr. Gotro testified that the results of those FTIR analyses that SGS performed, and which are reflected in Dr. Gotro's expert report, confirmed that that the coating on the interior of the subject conduit contains epoxy, melamine and silicone.  SMF para. 20.  The results of his analyses are summarized in Appendix C of his report.  SMF para. 16.  Dr. Gotro concluded in his report that: (1) the coated inner surfaces were organic and more specifically silicone-modified thermosetting polymers, and (2) the coated inner surfaces consisted of epoxy, melamine with a polydimethylsiloxane (silicone) additive.  SMF para. 19-20.

The epoxy, melamine and silicone that line the interior of the subject conduit have material properties that render them individually and collectively insulating.  Materials may be characterized as conductors or insulators according to the material's *resistivity*.  SMF paras. 63-64, 142.  The resistivity of epoxy is $10^{12}$ to $10^{13}$ ohm-meters.  SMF para. 72.  The resistivity of both melamine and silicone is $10^{12}$ ohm-meters.  SMF para. 73.  Dr. Gotro explained in his report that the three components in the epoxy coating have resistivity in the range of $10^{12}$ to $10^{13}$ ohm-meters.  SMF paras. 72-73.  He also provided the resistivity of similar commercially available epoxies in his report at Table 2, which also corroborates that epoxy coatings have resistivities between $10^{12}$ to $10^{13}$ ohm-meters.  SMF para. 31.  The resistivity of epoxy, melamine and silicone fall into the range of resistivities for insulators, as that range was even alleged by Dr. Meliopoulos.  The resistivity of each material - epoxy, melamine and silicone - conclusively demonstrates that insulating materials line the interior of the subject conduit.

14

Resistivity is a material property.  SMF para. 60.  The resistivity of a material—in this case, the $10^{12}$ to $10^{13}$ ohm-meters resistivities that epoxy, melamine, or silicone have—does not change.  SMF paras. 67-69.  Even as Dr. Meliopoulos testified, "the same material will have the same resistivity anywhere."  SMF para. 69.  This is true whether it is in a circuit board, a block of the material, or even a coating that lines a pipe.  SMF para. 67-68.  The resistivity of epoxy, melamine, and silicone have been extensively studied in academia and are known in scientific authorities and the coating industry to be insulating.  SMF para. 70-71.  The resistivity of epoxy, melamine and silicone in such scientific literature are determined by laboratories that actually apply a voltage to those materials.  SMF para. 70.

Dr. Gotro thus concluded that "compositions containing epoxy, melamine, and silicone additives are known to be electrically insulating," SMF paras. 22, 41, 58-59, and that "the inner coating consisting of epoxy, melamine and silicone provides electrical insulation," SMF paras. 58-59.  Dr. Gotro testified that epoxy resin, melamine and silicone are electrically insulating, and that the material composed of epoxy, melamine and silicone is insulating.  SMF paras. 57-59, 74. Dr. Gotro was able to determine the electrical properties of the epoxy coating based on its chemical composition, his extensive experience developing electrically insulating epoxies, and a large amount of literature that uniformly holds that the epoxy, melamine and silicone components are electrically insulating.  *E.g.*, SMF paras. 22-57, 70-74.

### 2. Scientific Authorities Fully Support the Testimony That Epoxy, Melamine and Silicone Are Electrically Insulating Materials.

Scientific authorities unanimously agree that epoxy is an insulating material.  The U.S. Department of Commerce National Bureau of Standards states that epoxy resins form "strong, heat-resistant electrical insulating coatings" when combined with silicone.  SMF para. 24-25.  A white paper published by Masterbond—an authoritative manufacturer and supplier of similar

coatings used in insulating applications—states that "*all* epoxy systems are inherently good insulators, especially when evaluated by dielectric strength, volume resistivity, dielectric constant and the dissipation factor.  They are outstanding electrical insulators."  SMF para. 26-29.  The National Institute for Advanced Industrial Science and Technology, a Japanese research institute, describes epoxy resin as the "starting material for insulating coating resins," which supports that epoxies are typically used to form insulating resins.  SMF paras. 32-33.  The Institute of Electrical and Electronic Engineers ("IEEE") Electrical Insulation Magazine published an overview of electrical insulating varnishes.  In that article, the author notes that, "the resins that are used today in solventless electrical insulating varnishes are mostly epoxies."  SMF para. 34, 36.  The same article also notes that:

> The purpose of an electrical insulating varnish is to perform a protective resin film over and throughout the main electrical structural components and insulations of electrical apparatus in order to contribute to the total mechanical strength and the electrical, thermal, and chemical resistance.

SMF para. 35.  Dr. Gotro testified that he agreed with the above mentioned statements from the referenced publications, and that those statements would be widely recognized as accurate in the chemical and scientific community.  SMF para. 36.  Dr. Meliopoulos agreed with the characterization of epoxy from the Department of Commerce, National Institute for Advanced Industrial Science and Technology, and the IEEE magazine.  SMF paras. 139-41.

Moreover, as the CBP Office of Laboratories and Scientific Services has stated, "epoxy resins have gained wide acceptance in electrical applications due to their exceptional combination of properties such as toughness, adhesion, chemical resistance and superior electrical properties."  HQ 951321 (July 28, 1992) (attached as **Exhibit X**).  Additionally, the Plastics Technology Handbook states that:

> The main attributes of properly cured epoxy systems are outstanding adhesion to a wide variety of substrates, including metals and concrete; ability to cure over a wide

temperature range; very low shrinkage on cure; excellent resistance to chemicals and corrosion; excellent electrical insulation properties; and high tensile, compressive, and flexural strengths. In general, the toughness, adhesion, chemical resistance, and corrosion resistance of epoxies suit them for protective coating applications. . . . For electrical and electronic applications epoxy formulations are available with low or high viscosity, unfilled or filled, slow or fast curing at low or high temperatures. Potting, encapsulation, and casting of transistors, integrated circuits, switches, coils, and insulators are a few electrical applications of epoxies.

*Id.* (citing Manas Chanda & Salil K. Roy, Plastics Technology Handbook at 462-63 (1987)).

The coating industry similarly agrees that epoxy coatings are insulating. Hexion, a resin manufacturer, states that epoxy resins have excellent mechanical and electrical insulating properties, and are used as electrical insulating material in electrical and electronic application and in sealants, coatings, and encapsulations. SMF paras. 37-39. MG Chemcials describes "insulating varnishes" with explicit reference to epoxy: "insulating varnishes are resins like epoxies or alkyds used to protect high-voltage machines such as transformer, motors, and generators from electrical failure. They are applied over electrical conductors to provide a layer of electrical isolation and prevent shorting." SMF para. 40. As Masterbond explains: "epoxies are 'go to materials' when first rate electrical insulation values are needed." SMF para. 30. Dr. Gotro testified that thermosets, such as epoxy, melamine, and silicone, are commonly used for insulating purposes, and that epoxies and other thermoset resins that are insulating are used as coating materials in various applications. SMF paras. 55-56. One such application is that insulating materials, including epoxies, are used extensively in printed circuit boards to prevent the flow of electrons between the circuit lines and the circuit boards and other components. SMF para. 56. Dr. Gotro testified that he agrees with the definition of epoxy from Wikipedia which notes that epoxies are known for their excellent adhesion, chemical and heat resistance, good to excellent mechanical properties and very good electrical insulating properties, and further

17

testified that he believes that description to be widely recognized as accurate in the scientific community.  SMF para. 41-43.

Dr. Gotro testified that he agreed with the Wikipedia article that described silicones as "heat resistant" and "used in thermal and electrical insulation."  SMF paras. 44-48.  Dr. Gotro also testified that he agreed with the statement from Wikipedia that silicones are used in electrical insulation and that statement would be widely recognized as accurate in the scientific community.  SMF paras. 44-48.  Similarly, Dr. Gotro testified that he agreed with the Wikipedia definition of melamine which defined melamine as a hard thermosetting plastic material made by polymerization.  SMF para. 49-50.

**B.      The Common Meaning of the Term "Insulating Material."**

Heading 8547 provides for "electrical conduit tubing and joints therefor, of base metal lined with insulating material."  Heading 8547, HTSUS.  Additionally, the Court has noted that, "As a general matter, electrical conduit tubing made of base metal and lined with an insulating material is classified generally in subheading 8547.90.0020."  *Wheatland Tube Company v. United States*, 560 F. Supp. 3d 1337, 1340 (Ct. Int'l Trade 2022).  The heading and subheading are therefore *eo nomine* provision without any reference to use of the electrical conduit.  *See Myers v. United States*, 969 F. Supp. 66, 73 (Ct. Int'l Trade 1997) (finding a provision without "use" language to be an *eo nomine* provision).  The General Notes and the chapter and section notes do not define the term "insulating material" as used in Heading 8547 or Subheading 8547.90.  The Court may accordingly consult lexicographic and scientific authorities, and the relevant Explanatory Note to determine the meaning of "insulating material."

Pursuant to the Explanatory Note to Heading 8547, "the tubing of this group consists of . . . rigid metal tubing (usually iron or steel) coated or lined on the inside with insulating material."  Explanatory Note 85.47 (attached hereto as **Exhibit XI**).  According to the

18

Explanatory Note, "this group covers the metal tubing used in permanent electrical installations (e.g., house wiring) as insulation and protection for the wires, provided it has an interior lining of insulating material." *Id.* The Explanatory Note to Heading 8547 also lists materials that are considered "insulating materials." It states, "the insulating material may be special electrically insulating varnish, paper or paperboard, rubber, plastics, etc." *Id.* The Explanatory Note reaffirms its list of insulating materials by explaining that, "the heading also excludes tubing wholly of insulating material (*e.g.*, of rubber, plastics, braided textile yarns, or glass fibre yarns)." *Id.*

The term "insulating" refers to the connotation of providing a protective layer between an underlying article and something harmful. Google defines "insulate" as "{to} *protect* from unpleasant effects or elements of something." *Insulate*, Google available at https://www.google.com/search?q=insulate+definition (emphasis added) (attached hereto as **Exhibit XII**). Google also defines it as "{to} *protect* (something) by interposing material that prevents the loss of heat or the intrusion of sound." *Id.* The synonyms of "insulate" include *protect*, shield, screen, cushion, buffer, cocoon, wrap, separate, sequester, isolate, cover, and coat. *Id.* Merriam-Webster defines "insulate" as "to place in a detached situation," and the Merriam-Webster online thesaurus provides that "insulate" means "to keep or set apart from others." *Insulate*, Merriam Webster Dictionary available at https://www.merriam-webster.com/dictionary/insulate (attached hereto as **Exhibit XIII**); *Insulate*, Merriam Webster Thesaurus available at https://www.merriam-webster.com/thesaurus/insulate (attached hereto as **Exhibit XIV**). The Cambridge Dictionary defines "insulate" as "to protect someone or something from harmful experiences or influences." *Insulate*, Cambridge Dictionary available at https://dictionary.cambridge.org/us/dictionary/english/insulating (attached hereto as **Exhibit**

XV).  The term "insulate" is a broad concept that has many connotations including heat, sound, or electricity but it is not limited to these applications, or any one of these applications individually.

The use of the term "insulating materials" has been used in classification provisions since the Tariff Act of 1922, and when interpreting the Tariff Act of 1930, the Court acknowledged the broad protective meaning of the term "insulating" as used in the statutory term "insulating materials."  In *B.F. Goodrich Company v. United States*, the Court found that cylindrical sponge rubber was used for "insulating" purposes because it was ultimately fastened around the perimeter of car doors "so that, when the door was closed against it, wind, dust, and rain would be kept out, and the vibration of the door would be absorbed."  *B.F. Goodrich Co. v. United States*, 38 Cust. Ct. 72, 73 (1957).  The Court thus found that the rubber "weather stripping" was properly classifiable as, "insulating materials, wholly or partly manufactured, composed wholly or in chief value of rubber."  *Id.*

In the electrical context, which is merely one aspect of the term, Google defines "insulate" as "{to} prevent the passage of electricity to or from (something) by covering it in a nonconducting material."  SMF paras. 75-77.  This definition of "insulate" is widely recognized as accurate in the chemical and scientific community.  SMF paras. 76-77.  Additionally, Merriam-Webster also defines "insulate" as "to separate from conducting bodies by means of nonconductors so as to prevent transfer of electricity, heat, or sound."  *Insulate*, Merriam Webster Dictionary available at https://www.merriam-webster.com/dictionary/insulate.  Dr. Gotro testified that "electrically insulating" means stopping the flow of electrons by use of a material.  SMF para. 78-82 (referencing the definition of "insulator (electricity)" attached here to

as **Exhibit XVI**).  The material property that distinguishes an insulator from conductors is "resistivity."  SMF paras. 63-64.

"Resistivity" is the "ability of a material to resist the passage of an electric current under specified conditions of applied voltage, temperature and time." SMF para. 61.  Dr. Gotro testified that "resistivity" is the amount of electricity a material can resist.  SMF para. 1.  "Resistivity" is a property of a material.  SMF para. 60.  It is measured on a unit volume of material, SMF para. 60, and requires a specific arrangement and sufficient amount of material to conduct the measurement, SMF paras. 143-47.  Once a material's resistivity is determined, that same material will have the same resistivity anywhere.  SMF paras. 67-69.  It does not vary as the shape of the material changes—whether the material is a block or coating.  SMF paras. 67-69.  "Resistivity" should not be confused with electrical "resistance."  "Resistance" is an electrical measurement of the resistance to the flow of electricity through a material and is measured in ohms, whereas "resistivity" is measured on a volume basis, *i.e.*, ohm-meters.  SMF paras. 62, 66, 106.  Dr. Gotro testified that the electrical resistance of a material is governed by the material property of resistivity.  SMF paras. 63, 143.

Materials may be characterized in the electronics field as conductors or insulators according to the material's resistivity, not resistance.  SMF paras. 63, 143.  Whether a material is an "insulator" or a "conductor" is not sharply demarcated.  SMF para. 65.  Dr. Meliopoulos claims that insulators have a resistivity of at least $10^{12}$ ohm-meters and conductors have a resistivity of $10^{-6}$ ohm-meters or less.  Meliopoulos Report at 4.  Dr. Meliopoulos's characterizations do not represent the meaning dictated by the Tariff Schedule, which does not specify a minimum threshold of resistivity for a material to be considered "insulating," and neither does it require that the quality of "insulating" be electrical.  For example, the Explanatory

Note to Heading 8547 provides that the, "insulating material may be special electrically insulating varnish, *paper or paperboard*, rubber, plastics, etc."  Explanatory Note 85.47 (emphasis added).  Yet, paper has a resistivity of $10^9$ ohm-meters at fifty percent relative humidity ("RH"), SMF para. 83, 151, and thus would not be an "insulator" according to the $10^{12}$ minimum threshold proposed by Dr. Meliopoulos—even when wet.

The Court has found certain materials to be electrically "insulating."  In *Naftone, Inc. v. United States*, the Court found that a 5- to 12-micron thin film made from a solution of polycarbonate resin, to which certain unnamed solvents had been added, was an "electric insulating material" despite not being properly classifiable as an "electrical insulator of rubber or plastics" pursuant to TSUS item 773.30.  67 Cust. Ct. 341, 346, 348 (1971).  One witness in that case testified that the term "insulator" means, "it prevents the current from flowing from one electrode to another."  *Id.* at 343.  Another testified that the words "insulator and dielectric," which the witnesses used interchangeably, mean that "it does not conduct electricity." *Id.* at 343, 344 n.3.  The Court cited air, paper, mica, oil, resins, ceramics, or glass" as examples of "insulating materials."  *Id.* at 344 n.3.  The Court then found that the polycarbonate film to be an insulating material by virtue of its design and properties as well as its application separating capacitors from electrodes.  *Id.* at 344-45.  The properties of the film included dielectric strength, the dissipation factor, and the physical properties of the material such as tensile strength, shrinkage, and thickness.  *Id.* at 343-344.  Despite finding the polycarbonate film to be an insulating material, the Court determined that TSUS item 773.30 applied only to "articles or devices" that are "insulators," but "not to the electrical insulating material from which they are made."  *Id.* at 346.

Following the holding in *Naftone*, in *Inter-Maritime Forwarding Co. v. United States*, the

Court found pressure-sensitive electrical tape to be "insulating material," but that it was not, "an

electrical insulator of rubber or plastic" pursuant to TSUS item 773.30."  *Inter-Maritime*

*Forwarding Co. v. United States*, 70 Cust. Ct. 133, 134 (1973); *see also Devon Tape Corp. v.*

*United States*, 57 Cust. Ct. 507 (1966) (finding that similar thermoplastic tape was properly

classifiable by similitude to insulating materials composed wholly or in chief value of rubber).

The importer in *Inter-Maritime* testified that the tape was made of two electrical insulating

materials:  a polyethylene film and a natural rubber thermoplastic adhesive that contained

inorganic fillers, tackifiers and plasticizers.  *Id.*  The importer also testified that the tape's

properties included high dielectric breakdown, high insulation resistance, and that it is resistant

to moisture, chemicals, oils, aging, and dry-out.  *Id.*

The parties in *Inter-Maritime* agreed that the merchandise at issue was "plastic pressure-

sensitive tape chiefly used for electrical insulation purposes," but disagreed whether the

merchandise fell within TSUS 773.30 for "electrical insulators of rubber or plastic" or whether it

was more specifically provided for as pressure-sensitive tape pursuant to TSUS 790.55.  *Id.* at

136.  The Court then noted that the term "insulator" had been defined by lexicographers and

technical authorities "broadly" as, "as substance or material that is a non-conductor of electricity,

heat or sound, which is used to inhibit or stop the passage of electric current."  *Id.* at 137.

Another dictionary defined "insulator" as, "a substance that is a non-conductor of electricity,

heat or sound, as cotton gutta-percha, silk, and rubber, the dielectrics most commonly used for

covering wires conveying electric currents."  *Id.* at 138.  The Court ultimately concluded that the

term "electrical insulator of rubber or plastic" as used in TSUS 773.30 was limited to certain

equipment in the industry known as an "insulator," and that the electrical tape was not such a

device but rather an "insulating material." *Id.* at 139-40.  The Court concluded that "insulating material" is "material used for insulating purposes or from which an insulator may be made." *Id.* at 140.

*Goodrich*, *Naftone* and *Inter-Maritime* demonstrate that the term "insulating material," as defined in the Tariff Act and the TSUS, is broader than the articles and devices that were properly classifiable as an "electrical insulator" pursuant to the TSUS.  *Id.* at 137, 141.  The Court found a polycarbonate film and a thermoplastic tape to be electrically insulating material because each was composed of "nonconducting" materials without noting a minimum resistivity that the merchandise had to meet to be considered "insulating," and also found a rubber strip to be "insulating" without regard to its electrical properties because it protected the interior of cars from external conditions.  There is no genuine dispute that epoxy, melamine and silicone or that the epoxy coating they comprise on the interior of the subject conduit have insulating properties and are materials from which insulators are regularly made as demonstrated in the testimony throughout this case as well as extensive scientific and industry sources.  *E.g.*, SMF paras. 22-59, 70-74, 136-37, 139-141.

**C.    Case Law and CBP Rulings Support Shamrock's Classification and CBP's Classification of the Subject Conduit Is Inconsistent with Precedent and Its Own Rulings.**

The epoxy, melamine and silicone that line the subject conduit is used for insulating purposes and are materials from which an insulator may be made.  *See Inter-Maritime*, 70 Cust. Ct. at 140.  The Explanatory Note to Heading 85.47 lists materials that are considered insulating for purposes of the Heading, and explicitly lists plastics as an insulating material for purposes of the Heading.  Specifically, Explanatory Note 85.47 provides that "the insulating material may be specially insulating varnish, paper or paperboard, rubber, *plastics*, etc."  Explanatory Note 85.47 (emphasis added).  Further, the Explanatory Note reaffirms that plastics are considered an

24

insulating material.  It states, "the Heading excludes tubing wholly of *insulating material* (*e.g., . . . plastics*)."  Explanatory Note 85.47 (emphasis added).  The Explanatory Note clarifies that Heading 8547 considers plastics to be insulating without any indication that the plastic on the interior of the conduit must meet a certain minimum resistivity threshold to be considered "insulating."  That is because plastics are colloquially recognized to have insulating qualities, especially among the chemical and scientific community.  SMF paras. 51-54.  As one article entitled, "Plastic Definition and Examples in Chemistry" by Dr. Anne Marie Helmenstine states, "plastics are usually poor conductors of heat and electricity."  SMF paras. 51-52.  Epoxy and melamine are unquestionably plastics, SMF paras. 8, 49, and are in the epoxy coating that lines the subject conduit.  *See* GRI 2(b) ("Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances.").  Since the epoxy and melamine that line the subject conduit are plastics and plastics are explicitly listed as insulating materials for purposes of Heading 8547, the subject conduit is thus lined with an insulating material as that term is used in Heading 8547 and its Explanatory Note.  This fact alone proves that Shamrock's merchandise is properly classifiable as claimed under Heading 8547.

CBP has found that steel conduit fittings that are lined with plastic are properly classified pursuant to Heading 8547.  In HQ 966525, CBP considered the proper classification for "steel fittings for electrical conduits" that are "lined internally with a plastic insulating material."  HQ 966525 (Sept. 17, 2004) (attached as **Exhibit XVII**); *see also* HQ 966526 (Sept. 17, 2004) (attached as **Exhibit XVIII**).  CBP concluded that "*plastic*-lined fittings that are threaded are classified under subheading 8547.90.0030" and "*plastic*-lined fittings that are not threaded are classified under subheading 8547.90.0040."  *See* HQ 966525; HQ 966526.  Additionally, in

N290590, CBP similarly found that iron screw connectors were properly classified under Heading 8547 because the connectors featured a *thermoplastic* material.  N290590 (Oct. 19, 2017) (attached as **Exhibit XIX**) (emphasis added).  CBP has thus recognized and found that *plastic* is an insulating material when it lines the interior of electrical conduit fittings or iron connectors.  The same Heading 8547 provision applies to electrical conduit tubing.

Additionally, as unequivocally supported by the materials and statements presented above, epoxy is a material independently recognized in literature and the industry as insulating, SMF paras. 24-29, 34, 36, 41-43, 54, 70-74, 136, 139-141; this fact has also been recognized in case law as such.  One witness testified in *Inter-Maritime* that he "was familiar" with electrical insulators, and explicitly named epoxy as one such chemical.  *Inter-Maritime*, 70 Cust. Ct. at 135.  The U.S. Court of Customs and Patent Appeals has described "mixtures containing epoxy compounds" as "especially valuable as insulating compounds for electrical purposes" when reversing a board decision as to an epoxy ester patent application.  *Application of Gustav Widmer, Hans Batzer and Edwin Nikles*, 353 F.2d 752, 753 (C.C.P.A. 1965).  There can be no question as to the insulating quality of epoxy as evidenced by the fact that even Dr. Meliopoulos testified that epoxy, and silicone, were insulating.  SMF paras. 136-37, 139-141.

The epoxy coating shares many properties with the resin and tape found to be insulating materials in *Naftone*, *supra*, and *Inter-Maritime*, *supra*.  The polycarbonate resin with additives in *Naftone*, *supra*, had high dielectric constant, dielectric strength, dissipation factor, high insulation resistance, high resistance to moisture, and increased tensile strength.  *Naftone*, *supra*, at 342-45.  The tape in *Inter-Maritime*, *supra*, was made from polyethylene film and a thermoplastic adhesive that contained inorganic fillers and its properties included high dielectric breakdown, high insulation resistance, and that it is resistant to moisture, chemicals, oils, aging,

and dry-out.  *Inter-Maritime*, *supra*, at 134.  The epoxy coating has similar qualities because "all epoxy systems are inherently good insulators, especially when evaluated by dielectric strength, dielectric constant and the dissipation factor."  SMF paras. 26-29.  Again, "most plastics," such as epoxy and melamine, "are insulators with high dielectric strength."  SMF paras. 8, 51-52. Additionally, epoxy has excellent chemical and heat resistances, good to excellent mechanical properties and very good electrical insulating properties.  SMF paras. 35, 37, 41.

CBP has found that electrical conduit lined with an epoxy resin is properly classifiable pursuant to 8547.90.0020.  In Ruling N306508, CBP examined the classification of "EMT/UL 797 white conduit tubing" that is "made up of steel with an exterior coating of zinc and an interior coating of stoved epoxy resin."  N306508 (Feb. 21, 2020) (attached as **Exhibit XX**). The conduit and coating examined in N306508 is nearly identical to the subject conduit and epoxy coating at issue in this case.  Both are a mixture of epoxy and other materials that form a thermoset coating.  SMF paras. 8, 19, 21, 49, 55-56, 130.  In N306508, CBP conducted testing on samples of the imported conduit and determined that the appropriate test to conduct on the merchandise was a chemical analysis of the epoxy coating.  The "testing concluded that the interior coating is made up of an organic resin compound, *which would act as an electrical insulator*."  N306508.  CBP concluded that the applicable subheading for the EMT/UL797 white conduit tubing is 8547.90.0020, HTSUS, the same provision that Shamrock claims here. Accordingly, CBP recognized that the relevant quality of the coating for purposes of determining whether the internal lining is an "insulating material" is the material from which the internal lining is derived.  In N306508 and here, that material is epoxy, an organic compound that acts as an electrical insulator.

Moreover, epoxy has a resistivity of $10^{12}$ to $10^{13}$ ohm-meters, and melamine and silicone have resitivities of $10^{12}$ ohm-meters.  SMF paras. 72-73.  Each of these materials that make up the epoxy coating on the interior of the subject conduit are therefore "insulators" even as that category is alleged by Dr. Meliopoulos.  Meliopoulos Report at 4.  Compositions containing these three components, including the epoxy coating on the interior of the subject conduit, likewise would share these insulating properties.  Dr. Gotro concluded that the epoxy coating is electrically insulating given its component materials, their electrical properties, and his experience developing epoxy resins for electrical applications.  SMF paras. 7, 10-12, 22-23, 70-74.

However, the epoxy coating does not have to meet the "insulator" threshold that Dr. Meliopoulos alleges to be classified pursuant to Heading 8547.  Dr. Meliopoulos claims that a material must have a minimum of $10^{12}$ ohm-meters resistivity in order to be considered an "insulator."  Meliopoulos Report at 4.  However, Dr. Meliopoulos also testified that paper would not be an insulating material had it lined the interior of the subject conduit.  SMF para. 151.  Wet paper at fifty percent relative humidity has a resistivity of $10^9$ ohm-meters.  SMF para. 83.  $10^9$ ohm-meters is insufficient to render paper an "insulator" according to the criteria that Dr. Meliopoulos proposed.  Yet, paper is explicitly named as an insulating material in the Explanatory Note to Heading 8547.  Explanatory Note 85.47 ("The insulating material may be . . . *paper* or paperboard.") (emphasis added).  Further, paper is recognized as an electrical insulator in the chemical and scientific community, and there are materials with a lower resistivity than paper that "prevent significant current from flowing at normally used voltage, and thus are employed for insulation."  SMF para. 79-82.  The $10^{12}$ threshold proposed by Dr. Meliopoulos for a material to be characterized as an "insulator" does not mean the same thing as

the statutory term "insulating material" as it is used in Heading 8547, or as that term's meaning is commonly understood in the chemical and scientific community.  SMF para. 21.

Heading 8547 and the relevant chapter notes set no minimum resistivity threshold for a material to be considered an "insulating material."  As evidenced in the Explanatory Note, the Heading is focused on whether the *materials* that line subject conduit are recognized as "insulating materials."  The Explanatory Note lists paper or paperboard, rubber, plastics, and yarns as insulating material.  Explanatory Note 85.47.  This understanding is reinforced by the way the Court has interpreted the term and CBP has applied the Heading.  The Court defined insulating material as a, "*material* used for insulating purposes or *from which an insulator may be made*" in *Inter-Maritime*, *supra*, and reconciled the difference between insulator-articles versus insulating materials in *Naftone*, *supra*.  *Inter-Maritime*, *supra* at 140; *Naftone*, *supra* at 347.  In *Naftone*, the Court noted certain *materials* are understood to be insulating rather than looking to the resistivity threshold that distinguishes "insulators" from conductors.  *Naftone, supra* at 344 n.3 ("Electrical capacitors (or condensers) consist in principle of two conducting surfaces separated by an insulating material (dielectric), e.g., *air, paper, mica, oil, resins, ceramics, or glass*").  In Rulings HQ 966525, HQ 966526 and N306508, CBP was able to conclude that the material at issue was insulating simply because it was a plastic or an organic material.  Similarly, Dr. Gotro testified that he agreed with an internet publication that "the distinction between insulators and semiconductors is arbitrary and, from the point of view of metal-insulator transitions, all semiconductors are insulators" and that such statement would be widely accepted as accurate in the chemical and scientific community.  SMF paras. 53-54.

Epoxy, melamine and silicone, which indisputably line the subject conduit, are materials with insulating *material properties* from which insulator may be made and which are used as insulators.  *E.g.*, SMF paras. 60, 66-74.  Both the Court and CBP have found them to be such.

## II.

**Defendant Has Failed to Demonstrate the Subject Conduit Should Not Be Classified Under Subheading 8547.90.0020, HTSUS, and Misreads the Meaning And Intent of The Language of That Provision**.

As demonstrated, it is undisputed that the interior coating of the subject conduit consists of epoxy resin, silicone and melamine and that as a result, the epoxy coating is, as a matter of law, insulating material.  Defendant has produced no evidence to establish that the coating is not insulating material.  Instead, Defendant's whole case is built on a misreading of the classification provision.

The theory of the case advanced by Defendant is based on a faulty premise.  The operative language of the statutory provision is "Electrical conduit tubing . . . of base metal *lined with insulating material*."  8547.90.0020, HTSUS (emphasis added.).  Defendant ignores that statutory language and builds its case on what amounts to a statutory term that does not exist, namely, "Electrical conduit tubing . . . of base metal *which is electrically insulated*."  This is why Defendant relies on the testimony and report of a purported expert with only electrical credentials, rather than chemical expertise, one who is totally incompetent to testify on the operative chemical composition of the coating.  While the evidence produced by Shamrock clearly demonstrates that the epoxy coating is electrically *insulating*, whether the subject conduit itself is electrically *insulated* is not the issue.  The issue is whether the materials used in the manufacture of the coating are insulating materials.  Overwhelming lexicographic and scientific authority document that the three active ingredients in the lining material are both electrically and physically insulating.  Whether the tubing itself is electrically insulated or the degree to

which the conduit is electrically insulated is irrelevant under the language of the claimed provision.

As argued in Plaintiff's pending Motion in Limine, the common meaning of the term insulating materials in this case is a question of law to be decided by the Court. Plaintiff's Motion in Limine at 6, *Shamrock Building Materials, Inc. v. United States*, Ct. Int'l Trade No. 20-00074 (Apr. 11, 2022), ECF No. 41. The overwhelming lexicographic and scientific authority on which Dr. Gotro was questioned in his deposition, SMF paras. 23-82, make it clear that the materials in the epoxy coating would fall within the definitions of insulate or insulating. Copies of those definitions have been discussed above, and are attached hereto as **Exhibits XII** to **XVI**. *See also* SMF paras. 75-82. Additional lexicographical authority and case law, which support that epoxy possesses insulating properties, have been extensively discussed, including the U.S. Court of Customs and Patent Appeals, the CBP Office of Laboratories and Scientific Services, the U.S. Department of Commerce National Bureau of Standards, the Institute of Electrical and Electronic Engineers, and even witness testimony in *Inter-Maritime*, *supra*. *See Inter-Maritime*, *supra* at 135; *Application of Gustav Widmer*, 353 F.2d at 753; HQ 951321; SMF paras. 24-25, 34-36. All of these authorities support the conclusions of Dr. Gotro in his testimony and report that the inner coating of epoxy resin, melamine and silicone possess material properties that are insulating. The undisputed facts in this case establish that the epoxy coating consists of these three materials, and the common meaning of the term insulating, as a matter of law, embraces the epoxy coating as insulating material.

**III.**

**The Testimony in this Case Demonstrates That the Epoxy Coating Is Electrically Insulating**.

The epoxy coating in fact demonstrates insulating properties as applied on the subject conduit.  Dr. Jackson demonstrated that the epoxy coating prevents the flow of electrons through the coating.  Tests that Dr. Jackson performed on the subject conduit reveal that zero volts flow through the epoxy coating when he attempted to provide a charge of approximately one and a half volts to the subject conduit.  SMF paras. 84-85.  According to Dr. Jackson's testimony, "there {is} no voltage measured across the coating when you apply 1½ volts" to the epoxy coating.  SMF paras. 84-85.  Importantly, Dr. Jackson affirmatively ensured that the voltage analysis that U.S. Corrosion Services conducted measured the electrical properties of the coating material and not the underlying steel substrate.  Dr. Jackson ensured that the point of the electrical probe did not puncture the interior epoxy coating and ensured that the probe made contact with the epoxy coating, but that pressure was not applied so as to receive an electrical reading from the underlying steel.  SMF paras. 90-103.

Additionally, in a separate test, Dr. Jackson found that the epoxy coating has a higher electrical resistance than rigid conduit.  Specifically, the raw data in that "four-point" test revealed that "the uncoated pipe exhibited an electrical resistance of 2.5-3.0 milliohms, while coated pipe exhibited an electrical resistance that ranged between 70-120 milliohms"  SMF paras. 105, 107-09, 118-19.  Similarly, "two-point" electrical resistance testing demonstrated that the uncoated pipe measured 0.2 ohms and the coated subject conduit measured 0.7-1.2 ohms.  SMF paras. *Id*.

Even Dr. Meliopoulos found the epoxy coating had insulating properties.  Dr. Meliopoulos testified that epoxy and silicone are insulating.  SMF paras. 136-37.  He concluded

32

that the epoxy coating exhibits electrical resistance, even if it is only slight.  Meliopoulos Report at 3 ("To the extent that the interior coating resists any electrical current, it is very slight.").  He testified that the epoxy coating has a higher electrical resistance than the steel on which it is applied.  SMF para. 138.  Using his "indirect estimates," Dr. Meliopoulos alleges that the epoxy coating is a semiconductor because its resistivity is allegedly between $10^{-5}$ and $10^{1}$ ohm-meters despite reporting that the epoxy coating's resistivity is "unknown" and testifying that he would have needed more coating material to do a "repeatable, acceptable measurement . . . to determine the resistivity" of the epoxy coating.  Meliopoulos Report at 8; *see also* SMF paras. 142-50.  Accordingly, the epoxy coating is *not* a "conductor" of electricity, even as that term is alleged by Dr. Meliopoulos.  SMF para. 150.

In *Inter-Maritime*, *supra*, the Court and several lexicographic sources defined the term "insulator" as a "non-conductor of electricity."  *Inter-Maritime*, *supra* at 137 ("The term 'insulator' has been defined by lexicographers and technical authorities, broadly, as a substance or material that is a *non-conductor* of electricity, heat or sound, which is used to inhibit or stop the passage of electric current.") (emphasis added).  The definitions in *Inter-Maritime*, *supra*, reflect the common meaning and "correct definition" of the statutory term, "insulate," in the electrical context which is defined as "{to} prevent the passage of electricity to or from (something) by covering it in a *nonconducting* material."  SMF paras. 75-77 (emphasis added).  Merriam-Webster defines "insulate," in part, as "to separate from conducting bodies by means of *nonconductors* so as to prevent transfer of electricity, heat, or sound."  *Insulate*, Merriam Webster Dictionary available at https://www.merriam-webster.com/dictionary/insulate (emphasis added).  This is corroborated by testimony in *Naftone*, *supra*, when an electrical engineer testified as follows: "Q. When you use the words "insulator or dielectric" what do you mean?  A.

I mean that it does *not conduct* electricity." *Naftone*, *supra*, at 343 (emphasis added).  At a minimum, the epoxy coating is a non-conducting material that has a higher electrical resistance than the steel to which it is applied in the subject conduit.  SMF paras. 138, 150.  The epoxy coating accordingly provides a layer of material that resists electrical current better than the underlying substrate, and thereby inhibits the passage of electrical current.  *See* SMF para. 80.

In the coating industry, the purpose of "electrical insulating varnish is to form a protective resin film over and throughout the main electrical structural components and insulations of electrical apparatus in order *to contribute* to the total mechanical strength and the electrical, thermal, and chemical resistance."  SMF paras. 35-36 (emphasis added).  Additionally, insulating varnishes are, "applied over electrical conductors to provide *a layer* of electrical isolation and prevent shorting."  SMF para. 40 (emphasis added).  Consistent with the coating industry, that is precisely the purpose that the epoxy coating serves, and what the results of Dr. Jackson's tests and the conclusions of Dr. Meliopoulos demonstrate.  The epoxy coating provides *a layer* of *non-conducting* material that *contributes* to the electrical resistance and *inhibits* the flow of electricity through or along it, in addition to providing mechanical, chemical, and abrasive protection.

## IV.

### While It Is Clear That the Epoxy Coating Is Electrically Insulating, the Subject Conduit Would Still Be Classified As "Lined With an Insulating Material" Even if the Epoxy Coating Is Not Electrically Insulating.

The epoxy coating's inherent protective qualities mean that the coating is independently "insulating" by its protective qualities.  As noted, the Court found that weather stripping was an "insulating material" when it was applied to car doors to keep wind, dust, and rain out and absorb vibrations in *B.F. Goodrich Company v. United States*.  *B.F. Goodrich Co*., *supra*, at 73.  Dr. Meliopoulos testified that, "in lay terms," "of course" insulation has other meanings besides

the electrical context, including insulation "from the weather."  SMF paras. 133-35.  CBP has

applied this same interpretation of the term "insulating material" for purposes of Heading 8547.

Particularly, in Ruling N290590, CBP found that iron screw connectors were properly

classifiable pursuant to 8547.90.0030 when the connectors featured "a thermoplastic insulator"

that "serve{d} *to protect* the electrical conductors *from abrasion* as they emerge from the

conduit raceway."  N290590 (attached as **Exhibit XIX**) (emphasis added).  Protective insulation

is all that CBP required for the connectors in N290590.  There were no electrical tests or

properties required for the plastic material to be classified pursuant to Heading 8547 in that case.

Similarly, CBP also found that steel tubing lined "with an interior teflon coating" would be

properly classifiable pursuant to 8547.90.0020 where the coating "insulated and protected the

wiring."  NY I84073 (Aug. 12, 2002) (attached as **Exhibit XXI**).  In other words, the term

"insulating material" does not connote that the material be "insulating" electrically as opposed to

the other applications of the broad term, "insulate."  Google, Merriam-Webster, and the

Cambridge Dictionary , as well as the Court in *Goodrich*, each define "insulate" with broad

references to "protection" and include in their respective definitions thermal and sonic

applications of the term "insulate."  Moreover, CBP's own rulings find that merchandise is

properly classifiable pursuant to Heading 8547 where the material *protects* wiring and

conductors that are run through the merchandise.  *See* N290590; NY I84073.

The epoxy coating indisputably insulates the wires that are run through the subject

conduit by protecting them.  The test results from Dr. Jackson's analyses demonstrate that the

epoxy coating reduces the damage and abrasion to wires as they are pulled through the subject

conduit.  SMF paras. 122, 124,-25, 129.  As Dr. Jackson testified:

> Insulating is a more generic term that includes multiple different forms of insulation
> besides just electrical.  So you can have insulation in the form of protective

35

> insulation that protects something.  For example, protecting from wear and abrasion, which is what the coating clearly does in this case. . . . It has some electrical insulating properties and then it's also a protective coating.  So, it provides protection from abrasion and wear.

SMF paras. 125, 128.  Mr. Michael Gambee, the president of Shamrock, testified that Shamrock's "customers need to have a product that protects the wiring during installation. . . . The interior coating reduces friction so that when wires are pulled through the coating, . . . it {does not} damage them."  SMF paras. 126-27.  Dr. Gotro testified that the coating "can protect the wire when it's pulled through the conduit," and testified that physically insulating is another definition of the term "insulate."  SMF para. 130.  As he noted in his report, the silicone in the material "lower{s} the coefficient of friction in the epoxy-melamine resins."  SMF para. 131.  Therefore, the epoxy coating is physically insulating as that term's common meaning is understood.

As summarized by the president of Shamrock, "our epoxy coating applies to two of the definitions of insulate{} . . . the transfer of electrons as well as the protection aspect of the definition of insulating."  SMF para.132.  The epoxy coating "insulates the interior of the tubes from . . . from the transfer of electrons, as well as damage to the wires being pulled through the runs of conduit." SMF para. 155.  Accordingly, the epoxy coating on the interior of the subject conduit is conclusively an "insulating material" without regard to electrical properties and the subject conduit is appropriately classified under Heading 8547.  Just like the plastic and Teflon in N290590 and NY I84073, the epoxy coating "insulates and protects wiring from abrasion" as it is run through the subject conduit, consistent with the Court's holding in *Goodrich*, *supra* regarding application of the term "insulating material."  Moreover, such an application is consistent with the term "insulating," even as Dr. Meliopoulos recognized the term is meant "in lay terms."  SMF paras. 133-35.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves that the Court grant plaintiff's motion for summary judgment, overrule U.S. Customs and Border Protection's classification of the merchandise at issue, enter judgment in favor of Plaintiff that the imported merchandise in issue is properly classifiable in subheading 8547.90.0020, HTSUS, and order that the entries covered by this civil action shall be re-liquidated with a refund of duties plus interest as provided by law.

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811

/s/ R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**SANDLER TRAVIS & ROSENBERG, P.A.**
675 Third Avenue, Suite 1805
New York, NY 10178
 (212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill

*Attorneys for Plaintiff*

Dated:  June 3, 2022

37

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 10,989 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ R. Will Planert
R. Will Planert

Dated:  June 3, 2022