UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____
                                                          :
SHAMROCK BUILDING MATERIALS, INC.     :
                                                          :
                              Plaintiff,          :          Court No. 20-00074
                                                          :
               v.                                     :
                                                          :
THE UNITED STATES,                           :
                                                          :
                              Defendant.       :
_____ :

## **ORDER**

      Upon reading plaintiff's motion for summary judgment, defendant's cross-motion for

summary judgment, and the parties' response thereto; and upon consideration of other papers and

proceedings had herein, it is hereby

      **ORDERED** that plaintiff's motion be, and hereby is denied, and it is further

      **ORDERED** that defendant's cross-motion be, and hereby is granted, and it is further

      **ORDERED** that summary judgment be, and hereby is, entered for defendant, the United

States, and it is further

      **ORDERED** that this action is dismissed.


                                    _____
                                    Timothy C. Stanceu, Senior Judge

Dated: _____
      New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*

_____
                                        :
SHAMROCK BUILDING MATERIALS, INC.       :
                                        :
                     Plaintiff,         :          Court No. 20-00074
                                        :
            v.                          :
                                        :
THE UNITED STATES,                      :
                                        :
                     Defendant.         :
_____ :

## **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States, pursuant to Rule 56 of the Rules of the United States Court

of International Trade, cross-moves this Court for summary judgment against plaintiff,

Shamrock Building Materials, Inc.  Summary judgment in favor of defendant is appropriate

because there are no genuine issues of material fact, and defendant is entitled to judgment in its

favor as a matter of law, as explained in the accompanying memorandum of law.

WHEREFORE, defendant respectfully moves this Court to enter an order granting its cross-motion for summary judgment and dismissing this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:     /s/ Peter A. Mancuso
PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-0484 or 9230
*Attorneys for Defendant*

Of Counsel:
MATHIAS RABINOVITCH
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: August 11, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*

_____

|  |  |  |
|---|---|---|
| | : | |
| SHAMROCK BUILDING MATERIALS, INC. | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00074 |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____ :

**MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE
GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-0484 or 9230
*Attorneys for Defendant*

Of Counsel:
MATHIAS RABINOVITCH
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: August 11, 2022

## TABLE OF CONTENTS

STATEMENT OF THE CASE ...................................................................................... 1

I.   Nature Of The Case ............................................................................................ 1

II.  Nature Of The Merchandise ............................................................................... 3

    a.   The Physical Characteristics, Purpose, And Use Of The Electrical Conduit ............ 3

    b.   Interior Coating Of The Electrical Conduit ............................................... 6

QUESTIONS PRESENTED .......................................................................................... 8

SUMMARY OF ARGUMENT ...................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.   STANDARD OF REVIEW .................................................................................. 9

II.  THE ELECTRICAL CONDUIT IS PRIMA FACIE CLASSIFIABLE IN HEADING 7306,
HTSUS, BECAUSE IT IS STEEL TUBING .................................................. 11

III. THE ELECTRICAL CONDUIT CANNOT BE CLASSIFIED IN HEADING 8547, HTSUS,
BECAUSE IT LACKS A LINING OF INSULATING MATERIAL ............................... 12

    A.  The Common Meaning Of "Insulating Material" in Heading 8547 Is To Prevent The
Flow Of Electricity ................................................................................. 12

    B.  The Interior Coating Of Shamrock's Electrical Conduit Does Not Prevent The Flow Of
Electricity ............................................................................................... 18

        1.  Shamrock's Corporate Documents Show That The Interior Coating Of The
Electrical Conduit Does Not Prevent The Flow Of Electricity ................... 18

        2.  Electrical Testing Performed On The Interior Coating Of The Electrical Conduit
Shows That It Does Not Prevent The Flow Of Electricity ......................... 21

IV.  THE COURT SHOULD DISREGARD THE CONCLUSIONS OF SHAMROCK'S
PURPORTED EXPERT WITNESSES WITH REGARD TO THE ELECTRICAL
PROPERTIES OF THE INTERIOR COATING .......................................... 35

    A.  Dr. Joshua Jackson ................................................................................. 35

    B.  Dr. Jeffery Gotro .................................................................................... 37

V.    THE ELECTRICAL CONDUIT IS EXCLUDED FROM CLASSIFICATION IN HEADING 8547 BECAUSE THE INTERIOR COATING IS DESIGNED TO PREVENT CORROSION, NOT TO PREVENT THE FLOW OF ELECTRICITY .....42

VI.   SHAMROCK'S RELIANCE ON ADMINISTRATIVE RULINGS IS MISPLACED..44

CONCLUSION ....................................................................................................................46

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..........................................................................................................9

*B.F. Goodrich Co. v. United States,*
    387 Cust. Ct. 72 (1957)...................................................................................................16

*Bausch & Lomb, Inc. v. United States,*
    148 F.3d 1363 (Fed. Cir. 1998) ...................................................................................9, 12

*C.J. Tower & Sons v. United States,*
    673 F.2d 1268 (CCPA 1982)..........................................................................................13

*Camelbak Prods., LLC v. United States,*
    649 F.3d 1361 (Fed. Cir. 2011) ......................................................................................11

*Chemtall, Inc. v. United States,*
    878 F.3d 1012 (Fed. Cir. 2017) ......................................................................................10

*Curry v. Royal Oak Enterprises, LLC,*
    2013 WL 3196390 (E.D.P.A. 2013)............................................................................39, 41

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)..................................................................................................*passim*

*Dell Prods. LP v. United States,*
    642 F.3d 1055 (Fed. Cir. 2011) ......................................................................................10

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003) ............................................................................ 13

*EOS of N. Am. v. United States,*
    911 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ....................................13, 15, 21

*Ford Motor Co. v. United States,*
    926 F.3d 741 (Fed. Cir. 2019) ........................................................ 11

*Fuji Am. Corp. v. United States,*
    519 F.3d 1355 (Fed. Cir. 2008) ...................................................... 10

*Inter-Maritime Forwarding Co., Inc. v. United States,*
    70 Cust. Ct. 133 (1973) .............................................................. 17, 18

*Kahrs Int'l, Inc. v. United States,*
    713 F.3d 640 (Fed. Cir. 2013) ...................................................... 9, 10

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
    543 U.S. 50 (2004) ...................................................................... 13

*Len–Ron Mfg. Co. v. United States,*
    334 F.3d 1304 (Fed. Cir. 2003) ...................................................... 13

*Lerner New York, Inc. v. United States,*
    908 F. Supp. 2d 1313 (Ct. Int'l Trade 2013) ................................. 10, 44

*Libas, Ltd. v. United States,*
    193 F.3d 1361 (Fed. Cir. 1999) ...................................................... 39

*MetChem, Inc. v. United States,*
    513 F.3d 1342 (Fed. Cir. 2008) ...................................................... 44

*Mita Copystar Am. v. United States,*
    21 F.3d 1079 (Fed. Cir. 1994) ........................................................ 13

*Naftone, Inc. v. United States,*
    67 Cust. Ct. 341 (1971) .............................................................. 17, 18

*Orlando Food Corp. v. United States,*
    140 F.3d 1437 (Fed. Cir. 1998) ...................................................... 10

*Phone-Mate, Inc. v. United States,*
    690 F. Supp. 1048 (Ct. Int'l Trade 1988),
    *aff'd,* 867 F.2d 1404 (Fed. Cir. 1989) ............................................. 9

*Pillowtex Corp. v. United States,*
   171 F.3d 1370 (Fed. Cir. 1999) ........................................................9

*Simod Am. Corp. v. United States,*
   872 F.2d 1572 (Fed. Cir. 1989) ......................................................13

*Smith v. Ford Motor Co.,*
   215 F.3d 713 (7th Cir. 2000) ..........................................................22

*Texas Apparel Co. v. United States,*
   698 F. Supp. 932 (Ct. Int'l Trade 1988)
   *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) ..............9

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991) ..........................................................21

*United States v. Frazier,*
   387 F. 3d 1244 (11th Cir. 2004) ................................................36, 37

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ........................................................................44

*Universal Elecs., Inc. v. United States,*
   112 F.3d 488 (Fed. Cir. 1997) ......................................................9, 21

## Statutes

19 U.S.C. § 1514(a) ..........................................................................44

19 U.S.C. § 1515 ..............................................................................44

19 U.S.C. § 1862 ................................................................................3

28 U.S.C. § 1581(a) ..........................................................................44

28 U.S.C. § 2640(a)(1) ......................................................................44

## Rules

Fed. R. Evid. 702 ....................................................................*passim*

USCIT Rule 30(b)(6) ..........................................................................2

USCIT Rule 73.1(b) ...........................................................................................................4


**Harmonized Tariff Schedule of the United States**

General Rules of Interpretation ('GRIs')

    GRI 1 ...............................................................................................................10, 12

    GRI 2 ......................................................................................................................10

    GRI 2 - 6 .................................................................................................................10

    GRI 6 ......................................................................................................................10

Section XV.....................................................................................................16, 42, 44

Chapter 73 ........................................................................................................11

Heading 7306 ................................................................................................*passim*

    Subheading 7306.30.........................................................................................2, 3

    Subheading 7306.30.10.......................................................................................2

    Subheading 7306.30.50.......................................................................................3

Section XVI .......................................................................................................13

    Chapter 85 .....................................................................................................13, 15

    Heading 8547 .............................................................................................*passim*

    Subheading 8547.90.00 ....................................................................................2, 3

Section XXII

  Chapter 99

    Subheading 9903.80.01 ......................................................................................3

**Other Authorities**

Explanatory Note to Chapter 73, HTSUS ...........................................................11

  Explanatory Note 73.06 .................................................................................12

Explanatory Notes to Chapter 85, HTSUS............................................................14

Explanatory Note 85.47 ......................................................................................16, 42, 43

*Ampere*, Merriam-Webster
    https://www.merriam-webster.com/dictionary/ampere (visited August 11, 2022) ................ 28

*Conductor*, THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS
    TERMS, 238 (Fifth ed. 1993) ................................................................................................ 20

*Insulating*, Oxford English Dictionary
    https://www.oed.com/view/Entry/97228 (visited August 10, 2022) ..................................... 14

*Insulating*, Merriam-Webster
    https://www.merriam-webster.com/dictionary/insulating (visited August 10, 2022) ............. 14

*Insulate*, Cambridge Online Dictionary
    https://dictionary.cambridge.org/us/dictionary/english/insulating (visited August 10, 2022) . 14

*Insulating Material*, THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND
    ELECTRONICS TERMS, 654 (Fifth ed. 1993) .................................................................... 14, 20

*Varnish*, Merriam-Webster
    https://www.merriam-webster.com/dictionary/varnish (visited August 11, 2022) ................ 42

CBP Rulings

    HQ 966525 (September 17, 2004) ....................................................................................... 44

    N290590 (October 19, 2017) ............................................................................................... 44

    N306508 (February 21, 2020) ........................................................................................ 44, 45

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*

_____

|  |  |  |
|---|---|---|
| SHAMROCK BUILDING MATERIALS, INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00074 |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____ :

### MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, the United States (the Government), respectfully submits this memorandum in support of its cross-motion for summary judgment. We respectfully request that this Court enter judgment classifying the electrical conduit under Heading 7306, Harmonized Tariff Schedule of the United States (HTSUS), which covers "Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."

### STATEMENT OF THE CASE

#### I.  Nature Of The Case

This case concerns the tariff classification of electrical metallic tubing conduit (EMT) and intermediate metallic conduit (IMC) (collectively referred to as electrical conduit) imported by plaintiff, Shamrock Building Materials, Inc. (Shamrock), through the port of Laredo, Texas, from June 1, 2018 to October 22, 2018. Compl. ¶ 8; Summons at Schedule of Protest (*Dkt.* No. 1).

When the merchandise entered the country, Shamrock classified it as "Electrical conduit tubing and joints therefor, of base metal lined with insulating material" under Heading 8547, HTSUS.  Pl. Ex. VIII (Transcript of the deposition of Mr. Michael Gambee[1] (Gambee Tr.) at 281:7–10); Compl. ¶ 33.  Specifically, Shamrock classified the electrical conduit under subheading 8547.90.00, which provides for:

| 8547 | Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during molding solely for the purposes of assembly, other than insulators of heading 8546; electrical conduit tubing and joints therefor, of base metal lined with insulating material: |
|---|---|
| 8547.90.00 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4.6% |

Shamrock imported the electrical conduit from Mexico and claimed duty-free treatment under the North American Free Trade Agreement (NAFTA).  Compl. ¶ 34.  In approximately August of 2018, U.S. Customs and Border Protection (CBP) began reviewing Shamrock's classification of the electrical conduit.  After verifying the nature of the imported merchandise, CBP classified the electrical conduit (depending on wall thickness) at liquidation under either subheading 7306.30.10, HTSUS, which provides as follows:

| 7306 | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: |
|---|---|
| 7306.30 | Other, welded, of circular cross section, of iron or nonalloy steel: |
| 7306.30.10 | Having a wall thickness of less than 1.65 mm. . Free |

---

[1] Mr. Gambee is currently the president and part owner of Shamrock and is responsible for overseeing the operations of the company.  Pl. Ex. VIII (Gambee Tr. at 21:22–22:20, 153:5–10).  He has held the position of president since 2006.  *Id.* (Gambee Tr. at 22:15–20).  Shamrock designated Mr. Gambee to testify on its behalf pursuant to USCIT Rule 30(b)(6).

or under 7306.30.50, HTSUS, which provides as follows:

| 7306 | | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: |
|------|--|--|
| 7306.30 | | Other, welded, of circular cross section, of iron or nonalloy steel: |
| 7306.30.50 | | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Free |

Both subheadings of 7306 are duty-free, but at the time the electrical conduit was entered, merchandise classifiable under Heading 7306 and imported from Mexico was subject to a 25 percent duty imposed pursuant to section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) (section 232 duties). *See* Subheading 9903.80.01, HTSUS (2018 Rev. 5).

Shamrock decided to classify its merchandise in Heading 8547, HTSUS, because of the implementation of the section 232 duties. Pl. Ex. VIII (Gambee Tr. at 280:5–283:2). Prior to May 2018, Shamrock consistently classified similar imports of electrical conduit under Heading 7306, HTSUS, as "Other tubes, pipes and hollow profiles . . . of iron or steel." *Id.* (Gambee Tr. at 280:5–282:1).

After CBP liquated the electrical conduit under Heading 7306, HTSUS, Shamrock protested the liquidation, claiming classification in subheading 8547.90.00, HTSUS, which does not carry section 232 duties. Compl. ¶¶ 33, 34, 48. CBP denied the protests. Compl. ¶ 48. In its complaint, Shamrock continues to claim that the merchandise is classifiable under subheading 8547.90.00, HTSUS. Compl. ¶¶ 33.

## II. <u>Nature Of The Merchandise</u>

### a. <u>The Physical Characteristics, Purpose, And Use Of The Electrical Conduit</u>

The subject electrical conduit consists of hollow concentric tubes constructed of steel. Pl. Ex. VIII (Gambee Tr. at 37:13–22); Def. Ex. 1 (Plaintiff's Resp. to Defendant's First Set of

Interrogatories (Pl. Resp. to Rogs.) No. 3). It is sold in ten-foot lengths, at varying diameters, and is threaded at both ends. Pl. Ex. VIII (Gambee Tr. at 41:1–18, 45:2–21). Each ten-foot piece of electrical conduit can be connected to another with a steel threaded coupling. *Id.* (Gambee Tr. at 44:2–45:21). Shamrock provided pieces of the electrical conduit to the Government during discovery, which are being submitted to the Court with this cross-motion for summary judgment.[2] Def. Ex. 2 (samples of imported merchandise); (Def. Ex. 3 (Plaintiff's Resp. to Defendant's First Request for Production of Documents and Things (Pl. Resp. to RFP) No. 25).

Once coupled together, the pieces of electrical conduit form a "raceway" used to route electrical wires from one location to another. Pl. Ex. VIII (Gambee Tr. at 108:9–109:6); Def. Ex. 1 (Pl. Resp. to Rogs. No. 6). In addition to routing the wires, the electrical conduit serves to contain the electrical wires once installed in the conduit tubing and to provide physical protection from damage due to outside or external forces. Pl. Ex. VIII (Gambee Tr. at 111:3–19). The electrical wires that are contained within the electrical conduit carry a minimum of 120 volts of electricity. Def. Ex. 5 (Affidavit of Dr. Sakis Meliopoulos[3] (Meliopoulos Aff.) ¶ 18).

Shamrock does not produce its electrical conduit but rather purchases it from a company named Rymco (also known as Conduit S.A. de C.V.). Pl. Ex. VIII (Gambee Tr. at 49:4–50:10).

---

[2] The samples provided by Shamrock are not ten feet in length. Def. Ex. 2. They appear to be cut on both ends and do not exhibit the threading that would typically appear on each end of a finished piece of electrical conduit. *Id.* Shamrock also produced photographs of similar electrical conduit that is uncut, in finished form, and installed in an industrial setting. Def. Ex. 4. In addition, CBP obtained samples of the merchandise from certain entries at issue in this action. These samples were provided to the Court pursuant to USCIT Rule 73.1(b). *See Dkt.* No. 16.

[3] As explained below, Dr. Meliopoulos is a professional electrical engineer, teaches electrical engineering at the university level, and tested the imported conduit to determine certain aspects of its electrical properties.

Rymco manufactures the electrical conduit by rolling flat pieces of steel into the shape of a tube and welding the seam together. *Id.* (Gambee Tr. at 75:15–76:21). Once the shape is formed, the steel tube is coated on the outside with zinc and on the inside with epoxy enamel (the interior coating). *Id.* (Gambee Tr. at 46:6–11). The zinc coating galvanizes the product to prevent rust. Pl. Ex. VIII (Gambee Tr. at 77:15–78:6). The interior coating provides for the "easy installation of wire" by protecting against damage to the wiring by reducing friction when the wires are pulled through the interior of the steel tube and it stops corrosion. Def. Ex. 6 (product brochure); Compl. ¶ 16; Pl. Ex. VIII (Gambee Tr. at 86:8–19).

Shamrock considers the electrical conduit to be electrical equipment because it is sold exclusively to electrical contractors and distributors. *Id.* (Gambee Tr. at 49:16–19, 112:20–113:4). Shamrock's customers purchase the electrical conduit with the subject interior coating because it provides lubrication for the installation of electrical wires. *Id.* (Gambee Tr. at 61:1–16, 104:8–105:7).

Shamrock has a product brochure that advertises the features and benefits of the electrical conduit. Def. Ex. 6; Pl. Ex. VIII (Gambee Tr. at 106:17–107:7); Def. Ex. 3 (Pl. Resp. to RFP No. 21). Shamrock's product brochure states that the "interior coating insulates [the] wall to provide easy installation of wires;" that the electrical conduit provides the benefit of "[p]hysical and mechanical protection;" and, that the electrical conduit provides the benefit of "[s]ystem grounding." Def. Ex. 6. The term "insulate" in Shamrock's product brochure refers to the physical protection provided by the coating to prevent damage to the electrical wires during installation in the electrical conduit. Def. Ex 6; Pl. Ex. VIII (Gambee Tr. at 121:2–122:12).

System grounding refers to an electrical safety mechanism where, in the event of an electrical fault occurring inside of the electrical conduit (*i.e.*, a damaged or frayed electrical wire

5

making contact with the inner surface of the conduit), the interior wall of the conduit will conduct the stray electricity and provide a path for the electricity to run to ground.  Pl. Ex. VIII (Gambee Tr. at 141:17–143:19); Pl. Ex. IV (Transcript of the deposition of Dr. Joshua Jackson[4] (Jackson Tr.) at 39:12–40:11, 185:15–187:11); Def. Ex. 5 (Meliopoulos Aff. at ¶ 28).  A material that conducts electricity, does not provide electrical insulation.  Pl. Ex. IV (Jackson Tr. at 170:11–22); Def. Ex. 5 (Meliopoulos Aff. at ¶ 31).

Shamrock's product brochure also indicates that the electrical conduit complies with several electrical industry standards, including American National Standard (ANSI) C80.3, Underwriters Laboratory (UL) 797, and National Electrical Code (NEC) Article 358.  Def. Ex. 6; Pl. Ex. VIII (Gambee Tr. at 122:13–123:20, 155:4–17, 162:18–163:18, 171:14–22); Def. Ex. 1 (Pl. Resp. to Rogs. No 11).  According to the industry standards that govern the imported merchandise, electrical conduit is capable "for use as an equipment grounding conductor" and of providing "for the electrical continuity required of an equipment grounding conductor."  Def. Ex. 8 (UL 797 at sec. 3.6); Def. Ex. 9 (ANSI C80.3 at sec. 1); Def. Ex. 10 (NEC Art. 358.2).  For conduit to operate as an equipment grounding conductor its interior wall must be capable of conducting electricity in the event of an electrical fault occurring inside the conduit tubing.  Def. Ex. 5 (Meliopoulos Aff. ¶¶ 28–30).

b. **Interior Coating Of The Electrical Conduit**

Rymco does not produce the material used to coat the interior of the electrical conduit — this material is produced by a company named Pinturas Diamex.  Pl. Ex. VIII (Gambee Tr. at

---

[4] Dr. Jackson is CEO and senior metallurgist at U.S. Corrosion Services and previously held the title of CEO at G2MT Laboratories.  Pl. Ex. IV (Jackson Tr. at 20:25–21:6).  Shamrock retained Dr. Jackson to conduct testing on the subject conduit.  *Id.* (Jackson Tr. at 41:22–42:8).

90:17–91:6).  Pinturas Diamex refused to provide the exact formulation of the chemical composition of the interior coating.  Def. Ex. 3 (Pl. Resp. to RFP No. 9)).  However, as part of the administrative proceedings in this case, Shamrock provided a letter to CBP from Pinturas Diamex that expounded on the properties of the interior coating.

In the letter, Pinturas Diamex indicated that the interior coating, "with the proper application, [] forms protective insulating coating over the underlying material" (Def. Ex. 7 (Pinturas Diamex Letter Dated Oct. 12, 2018)) and "at the proper thickness and even application, will create a film with electrical insulating properties."  *Id.* (Pinturas Diamex Letter Dated Nov. 26, 2018).  There is no further information on the judicial record regarding how the interior coating is applied to the steel tubes; the intended thickness of the interior coating (other than what is observable in the samples exchanged in this litigation); whether the thickness of the interior coating is uniform throughout each piece of conduit; or whether the thickness of the interior coating is uniform from one piece of electrical conduit to another.  Pl. Ex. VIII (Gambee Tr. at 78:10–12, 80:2–83:10).

Given this lack of information from the manufacturer of the interior coating, the Government retained Dr. Sakis Meliopoulos to test the imported merchandise and determine whether the interior coating of the electrical conduit insulates against electricity.  *See*  Def. Ex. 5 (Report of Dr. Sakis Meliopoulos dated October 20, 2021 (Meliopoulos Report)).  Dr. Meliopoulos received a PhD in electrical engineering from the Georgia Institute of Technology in 1976.  *See id.* (Meliopoulos Report at Attachment A).  Since then, he has worked as a professional electrical engineer and is currently a professor at the Georgia Institute of Technology, School of Electrical and Computer Engineering in Atlanta, Georgia.  *See id.*  Over

his career, Dr. Meliopoulos has more than 47 years of experience in power system analysis (which includes the use of electrical conduit).[5]  *See id.*

Dr. Meliopoulos conducted electrical testing on the interior coating of the electrical conduit to determine whether it insulates against the flow of electricity.  Def. Ex. 5 (Meliopoulos Aff. ¶ 5).  As explained later below, he determined it did not.  *Id.*

## QUESTIONS PRESENTED

1.     Whether Shamrock's electrical conduit is classifiable in Heading 7306, HTSUS, as "Other tubes, pipes and hollow profiles . . . of iron or steel;"

2.     Whether Shamrock's electrical conduit is classifiable in Heading 8547, HTSUS, as "Electrical conduit tubing and joints therefor, of base metal lined with insulating material."

## SUMMARY OF ARGUMENT

Shamrock's electrical conduit tubing is *prima facie* classifiable in Heading 7306, HTSUS, because it consists of steel tubing.

The electrical conduit is precluded from classification in Heading 8547, HTSUS, because it is not lined with insulating material.  As shown by dictionaries, industry definitions, and the explanatory notes to the tariff, the common meaning of "insulating," as used in Heading 8547, is to prevent the flow of electricity.  Both parties performed electrical testing on the interior coating of the electrical conduit, and the record evidence shows that the coating does not prevent the flow of electricity.

---

[5] For a full recitation of Dr. Meliopoulos's experience, his *curriculum vitae* is attached as Attachment A to the Meliopoulos Report.  Def. Ex. 5.

# ARGUMENT

## I.    STANDARD OF REVIEW

On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted).  "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Trade 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted).

The Court may resolve a classification issue by means of summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  A classification decision is a question of law based upon two underlying steps.  First, the Court must determine the proper meaning of the tariff provisions at hand. *See Universal Elecs., Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997).  The second step is to determine whether the subject merchandise properly falls within the scope of the possible headings. *Id*.

The first step is a question of law, while the second step is one of fact. *Id*.; *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999).  Where there is no factual dispute regarding the nature, structure, and use of the imported merchandise, the classification issue collapses entirely into a question of law, and the Court reviews Customs' classification decision *de novo*. *See Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 643–45 (Fed. Cir. 2013) (citations omitted); *see also Bausch & Lomb*, 148 F.3d at 1365 ("[S]ummary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is.") (citation omitted).

In addition, "[t]he General Rules of Interpretation [(GRIs)] govern the interpretation of HTSUS classifications." *Dell Prods. LP v. United States*, 642 F.3d 1055, 1057 (Fed. Cir. 2011). GRI 1 provides that classification shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. The chapter and section notes of the HTSUS "are not optional interpretive rules but statutory law." *Lerner New York, Inc. v. United States*, 908 F. Supp. 2d 1313, 1318 (Ct. Int'l Trade 2013). In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs, 2 through 6, may then be applied in order. *See Kahrs Int'l, Inc.*, 713 F.3d at 644.

Once imported merchandise is determined to be classifiable under a particular heading, a court must look to the subheading to find the correct classification of the merchandise in question. *Lerner New York, Inc.*, 908 F. Supp. 2d at 1318 *citing Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Similar to the rules interpreting the headings, GRI 6 states that "classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules." Furthermore, the Additional U.S. Rules of Interpretation (ARIs) may be considered if applicable. *Lerner New York, Inc.*, 908 F. Supp. 2d at 1318. Finally, the court may also consider any relevant Explanatory Notes. *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008). "The [Explanatory Notes] provide persuasive guidance and are generally indicative of the proper interpretation, though they do not constitute binding authority." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1019 (Fed. Cir. 2017).

Because the material facts regarding the nature of the merchandise at issue are undisputed, and classification is therefore entirely a question of law, this case is ripe for summary judgment.

## II.    THE ELECTRICAL CONDUIT IS *PRIMA FACIE* CLASSIFIABLE IN HEADING 7306, HTSUS, BECAUSE IT IS STEEL TUBING

To interpret a heading under the HTSUS, the Court must first "assess whether the subject [h]eading[] constitute[s an] *eo nomine* or use provision[] because different rules and analysis will apply depending upon the heading type." *Ford Motor Co. v. United States*, 926 F.3d 741, 750 (Fed. Cir. 2019) (citations omitted) (alternations in original).  An *eo nomine* provision "describes an article by a specific name." *Id*.  "Absent limitation or contrary legislative intent, an *eo nomine* provision 'include[s] all forms of the named article[,]' even improved forms." *Camelbak Prods., LLC v. United States*, 649 F.3d 1361, 1364–65 (Fed. Cir. 2011) (citations omitted) (alternations in original).

Heading 7306 is an *eo nomine* provision because it covers "[o]ther tubes, pipe and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."  The subject electrical conduit is *prima facie* classified under this heading because it is steel tubing.

Classifying the merchandise under Heading 7306 is confirmed by the Explanatory Notes to Chapter 73, HTSUS.  General Explanatory Note to Chapter 73, HTSUS, provides as follows:

> For the purposes of this Chapter, the expression "tubes and pipes" and "hollow profiles" have the following meanings hereby assigned to them:
>
> (1) **Tubes and pipes**
>
> Concentric hollow products, of uniform cross-section with only one enclosed void along their whole length, having their inner and outer surfaces of the same form.  Steel tubes are mainly of circular, oval, rectangular (including square) cross-sections but in addition may include equilateral triangular and other regular convex polygonal

cross-sections. . . . They may be polished, coated, bent (including coiled tubing), threaded and coupled or not, drilled, waisted, expanded, cone shaped or fitted with flanges, collars or rings.

Here, the electrical conduit is made entirely of welded carbon steel, is of circular cross-section, is threaded at the ends, and coated on the inside and out.  Compl. ¶¶ 10, 11; Pl. Ex. VIII (Gambee Tr. at 44:2–45:7); Def. Ex. 2.  It is often referred to as steel tube or steel pipe.  Compl. ¶ 10; Pl. Ex. VIII (Gambee Tr. at 35:5–20).  Based on these undisputed facts, the subject electrical conduit is *prima facie* described by Heading 7306, HTSUS.

## III.   THE ELECTRICAL CONDUIT CANNOT BE CLASSIFIED IN HEADING 8547, HTSUS, BECAUSE IT LACKS A LINING OF INSULATING MATERIAL

Insulated electrical conduit tubing is classified under Heading 8547, not Heading 7306.  *See* Explanatory Note 73.06 (excluding "[i]nsulated electrical conduit tubing (heading 85.47)" from classification under heading 7306).  Heading 8547, HTSUS, covers "electrical conduit tubing and joints therefor, of base metal lined with insulating material."

As we demonstrate below, the common meaning of insulating material within the context of Heading 8547 is to prevent the flow of electricity.  Shamrock's electrical conduit cannot be classified in this provision because the interior coating of Shamrock's conduit does not prevent the flow of electricity.

### A.  The Common Meaning Of "Insulating Material" in Heading 8547 Is To Prevent The Flow Of Electricity

Under GRI 1, the Court must determine the appropriate classification "according to the terms of the headings and any relative section or chapter notes."  The meaning of a tariff term, a matter of statutory construction, presents a question of law.  *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1366 (Fed. Cir. 1998).

When a term is not defined in either the tariff or its legislative history, the terms of the HTSUS are construed according to their common commercial meanings. *Len–Ron Mfg. Co., Inc. v. United States,* 334 F.3d 1304, 1309 (Fed. Cir. 2003); *Mita Copystar Am. v. United States,* 21 F.3d 1079, 1082 (Fed. Cir. 1994). The common meaning of a term used in commerce is presumed to be the same as its commercial meaning. *Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576 (Fed. Cir. 1989). To ascertain the common meaning of a term, a court may consult "dictionaries, scientific authorities, and other reliable information sources" and "lexicographic and other materials." *C.J. Tower & Sons v. United States,* 673 F.2d 1268, 1271 (CCPA 1982); *Simod,* 872 F.2d at 1576.

Here, Heading 8547, HTSUS, covers "electrical conduit tubing and joints thereof, of base metal, lined with insulating material." The parties disagree over the proper interpretation of "insulating material" found in this provision.

First, "[s]tatuotry construction is a 'holistic endeavor.'" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 59 (2004) (citations omitted). "Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purpose." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 483 (2003) (Breyer, J. dissenting). Indeed, "[t]ariff acts must be construed to carry out the intent of the legislature, which is determined initially by looking at the language of the statute itself." *EOS of N. Am. v. United States*, 911 F. Supp. 2d 1311, 1318 (Ct. Int'l Trade 2013) (internal citation omitted).

Here, the drafters of heading 8547 did not use the term "insulating material" in isolation. Rather, it was used in conjunction with "electrical conduit tubing," which is a type of electrical equipment. Heading 8547 is included within Chapter 85 and Section XVI, HTSUS. Both Chapter 85 and Section XVI cover "Electrical Equipment." Similarly, the General Explanatory

Note to Chapter 85, which describes the "Scope and Structure of the Chapter," provides that "[t]his Chapter covers all electrical machinery and equipment." EN (A) to Ch. 85, HTSUS. Consequently, the term "insulating material" must be interpreted as it relates to electrical conduit tubing and electrical equipment.

The term "insulating" has several meanings. But within the context of electrical equipment, it is commonly defined as preventing the passage of electricity. For example, the Oxford English Dictionary defines "insulating," in relevant part, as "[t]o cut off or isolate from conducting bodies by the interposition of non-conductors, so as to prevent the passage of electricity or heat." https://www.oed.com/view/Entry/97228, last visited August 10, 2022. Similarly, Merriam-Webster defines "insulating," in relevant part, as "to separate from conducting bodies by means of nonconductors so as to prevent transfer of electricity, heat, or sound" (https://www.merriam-webster.com/dictionary/insulating last visited August 10, 2022) and the Cambridge Online Dictionary defines "insulate" as "to cover or surround something with a material or substance in order to stop heat, sound, or electricity from escaping or entering." https://dictionary.cambridge.org/us/dictionary/english/insulating, last visited August 10, 2022.

Industry specific definitions go further and quantitatively define what is required for a material to be considered "insulating." The New IEEE Standard Dictionary of Electrical and Electronics Terms defines "insulating material" as "[a] substance or body, the conductivity of which is zero or, in practice, very small." THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS, 654 (Fifth ed. 1993). Thus, the common thread through each of these authorities is that "insulating" is defined as stopping or preventing the flow of electricity.

14

Shamrock contends that "insulating material" of Heading 8547, HTSUS, should be interpreted broadly to include all forms of protection or separation, and not limited simply to protection from the transfer of electricity. Pl. Br. at 20 ("The term 'insulate' is a broad concept that has many connotations including heat, sound, or electricity but is not limited to these application, or any one of these applications individually."). Shamrock's interpretation, however, misses the mark because it fails to consider the common meaning of the term as it relates to the surrounding terms of the heading. Shamrock disregards the fact that the term is used in conjunction with "electrical conduit tubing," which is a type of electrical equipment. "Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best invokes the legislative intent." *EOS of N. Am.*, 911 F. Supp. 2d at 1318 (internal citation omitted).

Here, because Chapter 85 covers electrical equipment, merchandise is classified within this chapter due to its electrically conducting or insulating properties. For example, the Explanatory Notes to Chapter 85, HTSUS, provide that "[t]his Chapter covers: (7) Certain articles and materials which are used in electrical apparatus and equipment because of their *conducting or insulating properties*, such as insulated electric wire and assemblies thereof (heading 85.44), insulators (heading 85.46), insulating fittings and *metal conduit tubing with an interior insulating lining (heading 85.47)*." General Explanatory Note to Chapter 85, HTSUS (emphasis added).[6] By using the terms "conducting" and "insulating" in the same statutory framework, it is evident that the drafters of the tariff intended for the term "insulating" in Chapter 85 to be interpreted as preventing the flow of electricity.

---

[6] Heading 8547 itself also includes "*[i]nsulating* fittings for electrical machines, appliances or equipment, being fittings *wholly of insulating material* apart from any minor components of metal . . . *other than insulators* of heading 8546." Heading 8547, HTSUS, (emphasis added).

Indeed, the Explanatory Notes to Heading 8547 confirm that insulating material must provide electrical insulation.  Explanatory Note 85.47 provides that "[t]his group covers the metal tubing used in permanent electrical installations (*e.g.*, house wiring) as insulation and protection for the wires, **provided it has an interior lining of insulating material.**  Uninsulated metal tubing, often used for the same purpose, is **excluded (Section XV).**"[7] EN 85.47(B) (emphasis in the original).  EN 85.47 continues: "The insulating material may be *special electrically insulating* varnish, paper or paperboard, rubber, plastic, etc."  *Id.* (emphasis added).

Defining "insulating material" without regard to the context or surrounding terms of the heading would lead to illogical results.  For instance, in *B.F. Goodrich Co. v. United States*, 38 Cust. Ct. 72 (1957), the court was tasked with determining the proper classification of "Auto Weather Stripping."  *Id.* at 72.  The court found that it was classifiable as "insulating material" because it was "tacked or stapled or otherwise fastened around the perimeter of [a car] door so that, when the door was closed against it, wind, dust, and rain would be kept out and vibration of the door would be absorbed."  *Id.*  In other words, the court determined that the weather stripping was insulating material within the context of its purpose and use — *i.e.*, protection from weather. Because the weather stripping was designed and used for application on car doors to prevent the passage of "wind, dust, and rain," it was appropriate to define "insulating" in the context of weather.  Comparatively, evaluating the classification of the weather stripping based upon its ability to insulate against heat or electrically would be illogical because it is not used for that purpose.

---

[7] Section XV covers Heading 7306, which is the provision within which CBP liquidated the electrical conduit.

Accordingly, "insulating material" of Heading 8547, HTSUS, must be defined with an eye toward its intended purpose by the drafters of the tariff.  Here, Shamrock's electrical conduit is electrical equipment and thus to be classifiable in Heading 8547 the electrical conduit must be lined with material that insulates, *i.e.*, prevents, against the flow of electricity.

Still, Shamrock relies on two cases from this Court's predecessor to further support its legal arguments for classification in Heading 8547, HTSUS.  Pl. Br. at 22–23 (citing *Naftone, Inc. v. United States*, 67 Cust. Ct. 341 (1971) and *Inter-Maritime Forwarding Co., Inc. v. United States*¸ 70 Cust. Ct. 133 (1973)).  Shamrock argues these cases are instructive because the customs court distinguished between insulating material and articles properly classified as "insulators" in section 773.30 of the Tariff Schedule of the United States (TSUS).  However, the language of the tariff statute has changed, and *Naftone* and *Inter-Maritime Forwarding* are inapposite to the proper interpretation of the current version of the statute.

In both cases, the customs court found the article at issue to be insulating material because they did not conduct electricity.  However, the court concluded that the articles were not "insulators" of section 773.30, TSUS, because that term was found to have a specific meaning under the tariff as it was written at that time — *i.e.*, defining "insulators" as a piece of equipment designed to provide electrical insulation rather than the material that is used to create that equipment.  *Naftone, Inc.*, 67 Cust. Ct. at 347–48; *Inter-Maritime Forwarding Co., Inc.*¸ 70 Cust. Ct. at 139–40.  Thus, neither case is applicable because they do not discuss the current language of the statute, *i.e.*, "insulating material" as it is used in Heading 8547, HTSUS.  If anything, these two cases support the interpretation of the current tariff statute demonstrated by the Government as both found the products under review to be insulating material due to their ability to act as a

17

non-conductor of electricity.  *Naftone, Inc.*, 67 Cust. Ct. at 342–43; *Inter-Maritime Forwarding Co., Inc.*, 70 Cust. Ct. at 136.

### B.  The Interior Coating Of Shamrock's Electrical Conduit Does Not Prevent The Flow Of Electricity

#### 1.  Shamrock's Corporate Documents Show That The Interior Coating Of The Electrical Conduit Does Not Prevent The Flow Of Electricity

Shamrock advertises its electrical conduit to the electrical industry with a product brochure, which is the only document Shamrock uses to convey information regarding the features and benefits of the product.  Def. Ex. 6; Pl. Ex. VIII (Gambee Tr. at 106:17–107:7); Def. Ex. 3 (Pl. Resp. to RFP No. 21).  The product brochure is devoid of any reference to electrical insulation and does not state that the interior coating of the electrical conduit provides insulation against electricity.  Def. Ex. 6.  The only mention of insulation (the "[s]mooth interior coating insulates [the] wall to provide easy installation of wire") refers to the physical protection afforded to the electrical wires so as to prevent damage during installation.[8]  *Id.*; Pl. Ex. VIII (Gambee Tr. at 121:2–122:12).  The omission of information regarding the electrically insulating properties of the interior coating is significant because if the interior coating did provide insulation against electricity, other features of the conduit advertised in the product brochure would be inaccurate.

_____

[8] Electrical conduit is installed in ten-foot runs that are connected to another to form a raceway. Compl. ¶ 9, 13; Pl. Ex. VIII (Gambee Tr. at 44:2–45:21); Def. Ex. 1 (Pl. Resp. to Rogs. No. 6); Def. Ex. 4.  The electrical conduit raceway permits the electrical wires to be routed from one location to another and serves to protect the wires contained therein from external damage. Compl. ¶ 9; Pl. Ex. VIII (Gambee Tr. at 108:9–109:6, 111:3–19).  According to Shamrock, the electrical industry demands electrical conduit with interior coating that provides lubrication to aid in the installation of electrical wires. Ex. VIII (Gambee Tr. at 61:1–16, 104:8–105:7).  This coating allows the wires to be easily routed through hundreds of feet of electrical conduit, including 90-degree bends, without causing damage to the wires. *Id.* (Gambee Tr. at 104:8–105:7).

For example, Shamrock's product brochure states that the electrical conduit provides the benefit of "system grounding." Def. Ex. 6. System grounding refers to the flow of electrical current through the interior wall of the conduit back to the source, in the event of an electrical fault (*i.e.*, accidental contact between exposed wire contained inside the electrical conduit and the interior wall of the electrical conduit). Def. Ex. 5 (Meliopoulos Aff. ¶ 28–30) (Meliopoulos Report at 9–10). To provide "system grounding," the electrical resistance of the interior coating of the conduit must be low enough to allow the flow of a large current of electricity to circulate from the breaker to the wires inside the conduit and through the interior coating back to the source. *Id.* The circuit breaker connects the electrical wires installed inside the conduit to the electrical power source and when a high level of electricity flows through the circuit breaker, the breaker will detect the fault and will disconnect the circuit in a very short amount of time. *Id.* This safety mechanism protects humans from electrocution and prevents property damage. *Id.* (Meliopoulos Aff. ¶ 29).

In other words, if an electrical fault occurs within the electrical conduit, the interior wall will conduct electricity and allow the electricity to freely flow through the circuit breaker to disconnect the electrical circuit. *Id.* (Meliopoulos Aff. ¶ 30) (Meliopoulos Report at 3, 9–10). Because the interior wall of the electrical conduit conducts electricity, the interior coating of Shamrock's conduit necessarily cannot provide electrical insulation or stop the flow of electricity. *Id.* (Meliopoulos Aff. ¶ 31) (Meliopoulos Report at 3). This factual conclusion is undisputed. Pl. Ex. VIII (Gambee Tr. at 141:17–143:19); Pl. Ex. IV (Jackson Tr. at 39:12–40:11, 185:15–187:11).

In the electrical field, conductivity is the opposite of insulating. Pl. Ex. VIII (Gambee Tr. at 147:7–21); Pl. Ex. IV (Jackson Tr. at 170:11–22). A material that conducts electricity, does

not insulate against electricity.  THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS, 238 (Fifth ed. 1993) (defining a "conductor" as "[a] substance or body that allows a current of electricity to pass continuously along it).  The inverse is also true.  *Id.* at 654 (defining "insulating material" as "[a] substance or body, the conductivity of which is zero or, in practice, very small").  As Shamrock's corporate documents show, the interior coating of the electrical conduit conducts electricity and therefore does not provide electrical insulation.

That the interior coating cannot insulate against electricity is further confirmed by the electrical industry standards to which Shamrock's electrical conduit complies.  According to Shamrock, it's electrical conduit complies with several industry standards, including UL 797[9]; ANSI C80.3; and NEC Article 358.  Def. Ex. 6; Pl. Ex. VIII (Gambee Tr. at 122:13–123:20, 155:4–17, 162:18–163:18, 171:14–22); Def. Ex. 1 (Pl. Resp. to Rogs. No. 11).

All three applicable standards require that the interior coating of the electrical conduit conduct electricity.  For example, UL 797 defines electrical conduit as "for use as an equipment grounding conductor."  Def. Ex. 8 (UL 797 at Sec. 3.6).  Similarly, Article 358.60 of the NEC provides that the electrical conduit "shall be permitted as an equipment grounding conductor" (Def. Ex. 10) and ANSI C80.3 states that the electrical conduit should "provide for the electrical continuity required of an equipment grounding conductor."  Def. Ex. 9 (ANSI C80.3 at Sec. 1).  An equipment grounding conductor provides an electrical path to ground by conducting electricity in the event of a fault occurring inside of the electrical conduit.  Def. Ex. 5 (Meliopoulos Report at 3).  Electrical continuity is defined as the "ability of the various sections

---

[9] Affixed to each piece of electrical conduit sold by Shamrock is a label certifying that it complies with UL standards.  Def. Ex. 13.

of the conduit to allow the free flow of electric current from one 10-foot section of conduit to the next 10-foot section of the conduit." *Id.* (Meliopoulos Report at 10).

Shamrock's customers, which are exclusively electrical contractors and distributors, expect the electrical conduit to comply with UL 797 and rely on the standards set forth in UL 797 to inform their expectations as to the product that they are purchasing. Pl. Ex. VIII (Gambee Tr. at 157:3–15, 160:2–10); Def. Ex. 3 (Pl. Resp. to RFP No. 22). Moreover, Shamrock is not aware of any of its customers that purchase the electrical conduit specifically for the electrically insulating properties allegedly provided by the interior coating. Pl. Ex. VIII (Gambee Tr. at 160:21–161:4). Therefore, it would be a disservice to its customers — and potentially dangerous — if Shamrock were not to disclose that the interior coating insulated against electricity.

Plainly, Shamrock's advertisements and product information explaining the benefits of the electrical conduit and the electrical standards to which it complies establishes that the interior coating does not stop the flow of electricity, nor does it provide electrical insulation.

### 2. Electrical Testing Performed On The Interior Coating Of The Electrical Conduit Shows That It Does Not Prevent The Flow Of Electricity

There are two questions to be decided by the Court in this case: (1) whether the terms "insulating material" as used in Heading 8547, HTSUS, should be interpreted as preventing the flow of electricity; and (2) if so, whether the interior coating of Shamrock's electrical conduit serves that function. The first question is one of statutory interpretation, which is the province of the Court to decide — not an expert witness. *See Universal Elecs., Inc.*, 112 F.3d at 491; *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible."); *EOS N. Am.*, 911 F. Supp. 2d at 1326 (rejecting opinion testimony as to the definition of a tariff term because "[t]he proper meaning of

21

[a] term as used in the article description for heading 8463 . . . is a question of law for the court to decide, not a question of fact").

The second question is factual in nature, and the admission of expert testimony for this question is governed by Federal Rule of Evidence 702 and the standards articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court interpreted this rule to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "In other words, as a threshold matter 'a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citations omitted).

First, "[i]n analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Id.* at 718. This analysis includes ensuring that even a "'supremely qualified expert [does not] waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Id.* (citations omitted). Second, "[w]hen analyzing the relevance of proposed testimony, the district court must

consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Id.*

Thus, the admission of expert testimony is based on a three-fold analysis: (1) is the witness qualified in the relevant field; (2) is the witness's methodology reliable; and (3) is the proposed testimony relevant to a factual issue to be resolve in the case. Here, electrical testing conducted by experts retained by both parties establishes that the interior coating of the electrical conduit does not stop the flow of electricity.

The Government retained Dr. Sakis Meliopoulos to perform electrical testing on the interior coating of the electrical conduit to determine whether it provides insulation against the flow of electricity. Dr. Meliopoulos holds a Ph.D. in electrical engineering, which he obtained from the Georgia Institute of Technology in 1976. Def. Ex. 5 (Meliopoulos Report at Attachment A). Since then, he has worked as a professional electrical engineer in the field and is currently a professor at the Georgia Institute of Technology, School of Electrical and Computer Engineering in Atlanta, Georgia. *See id.* Over his career, Dr. Meliopoulos has more than 47 years of experience in power system analysis, which includes the use of electrical conduit. *See id.* He has performed numerous studies and he has published authoritative text books, all related to the field of electrical engineering. *See id.* He has published over 400 technical papers relating to electrical engineering and he has taught over 300 short courses/continuing education programs to practicing electrical engineers in addition to teaching regular classes at Georgia Tech. *See id.* He has consulted with most major utilities in the United States and abroad regarding power systems. *See id.* He holds three patents related to electrical engineering and power systems. *See id.* He has received numerous honors and awards for his achievements in the field of electrical engineering and is a Fellow in the Institute of Electrical and Electronics Engineers (IEEE). *See*

*id*.  He has mentored and graduated 42 students in the Georgia Tech Ph.D. program in electrical engineering.  *See id*.

Based upon Dr. Meliopoulos's knowledge, skill, experience, training, and education he is eminently qualified as an expert in the field of electrical engineering under Fed. R. Evid. 702. Thus, he is qualified to conduct electrical tests upon the interior coating of the electrical conduit and to advise the Court as to whether it insulates against electricity.

The electrical testing performed by Dr. Meliopoulos establishes that the interior coating of the electrical conduit does not stop the flow of electricity or provide electrical insulation.  Def. Ex. 5 (Meliopoulos Aff. ¶ 8); (Meliopoulos Report at 3).  Dr. Meliopoulos reached this conclusion by performing two steps: (1) conducting electrical testing on the samples of the electrical conduit to determine the electrical resistance provided by the interior coating; (2) using the electrical resistance, combined with the measured thickness of the interior coating, to indirectly calculate the electrical resistivity of the material that comprises the interior coating. *Id*. (Meliopoulos Aff. ¶ 9).

Electrical resistance and electrical resistivity are not the same.  Electrical resistance is an electrical quantity that measures how a material of a specific shape and dimension reduces or impedes the electrical current flow through it.  *Id*. (Meliopoulos Aff. ¶ 10).  Electrical resistance is measured in ohms.  *Id*.  On the other hand, electrical resistivity is a fundamental property of a material and is defined as the electrical resistance of a one-meter cube of the material.  *See id*. (Meliopoulos Aff. ¶ 10); (Meliopoulos Report at 4); *see also* Figure 1.



Measured Resistance R = ρ

1 m

Material of
Resistivity ρ

1 m

1 m

**Figure 1: Definition of Material Resistivity**

Def. Ex. 5 (Meliopoulos Report at 4).

Electrical resistivity is measured on a volume basis in ohms.meters.[10]  Def. Ex. 5

(Meliopoulos Aff. ¶ 10) (Meliopoulos Report at 4).  Once the electrical resistivity of a material is

known, that resistivity value can be used to determine the electrical resistance of any product

made up of that material in any geometric form or application.  *Id.* (Meliopoulos Aff. ¶ 11)

(Meliopoulos Report at 4–6).

In the electrical field, materials are classified as insulators, semiconductors, and

conductors based upon a range of electrical resistivities measured in terms of volume as

ohm.meters.  *Id.* (Meliopoulos Aff. ¶ 12) (Meliopoulos Report at 4); *see also* Table 1.

| Insulators | Semiconductors | Conductors |
|---|---|---|
| $10^{12}$ *to* $10^{20}$ *ohm.meters* | $10^{-5}$ *to* $10^{1}$ *ohm.meters* | $10^{-8}$ *to* $10^{-6}$ *ohm.meters* |

**Table 1: Range of Resistivities for Electrical Classification of Materials**

---

[10] Shamrock concurs with the above referenced definitions of electrical resistance and resistivity.
*See* Pl. Br. at 21.

Def. Ex. 5 (Meliopoulos Report at 4).

Dr. Meliopoulos was unable to directly measure the electrical resistivity of the material that comprises the interior coating because the Government was not provided with a sufficiently large enough sample. Def. Ex. 5 (Meliopoulos Aff. ¶ 13) (Meliopoulos Report at 7); *see also* Figure 1. However, Dr. Meliopoulos was able to indirectly calculate the resistivity of the material that comprises the interior coating by measuring the electrical resistance of the interior coating (which can be directly tested with the sample provided) and combining the results of those tests with measurements of the thickness of the coating obtained by Dr. Jackson.[11] *Id.* (Meliopoulos Aff. ¶ 13) (Meliopoulos Report at 8).

Dr. Meliopoulos's electrical testing and calculations resulted in two factual findings: (1) the interior coating of Shamrock's electrical conduit resists a very slight amount of electricity, and is insufficient to insulate against the amount of electrical current the interior coating would be subjected to under real word conditions in the event of an electrical fault occurring inside the electrical conduit; (2) the electrical resistivity of the interior coating, determined indirectly, falls into the range of a semi-conductor and therefore is not an insulator of electricity.[12] *Id.* (Meliopoulos Aff. ¶ 14) (Meliopoulos Report at 3, 6–8).

---

[11] As part of his analysis of the properties of the electrical conduit, Dr. Jackson used scanning electron microscopy (SEM) to measure the thickness of the interior coating of the electrical conduit. His measurements produced varying results which ranged from 13 microns to 60 microns thick. Def. Ex. 11 at sec. 6; Pl. Ex. V at 11. Dr. Meliopoulos utilized Dr. Jackson's measurements in conducting his calculation to determine the electrical resistivity of the interior coating.

[12] Dr. Meliopoulos estimates that for the material that comprises the interior coating to be an insulator of electricity, its resistivity must increase by the order of $10^{15}$ times. Def. Ex. 5 (Meliopoulos Aff. ¶ 14).

First, electrical testing permitted Dr. Meliopoulos to determine how much electricity the interior coating resists by applying electrical current to the material. *Id.* (Meliopoulos Aff. ¶ 16). Photographs and a full explanation of the testing procedures are supplied in Appendix A to Dr. Meliopoulos's Report. *Id.* (Report at Appx. A). The results of these tests establish that when applying various levels of voltage to the interior coating (0.034 to 0.219 volts, *i.e.*, 34–219 millivolts), the interior coating resists a very slight amount of electricity — approximately 3–14 milliohms (0.003–0.013 ohms) of resistance — depending on the amount of electrical current applied. *Id.* (Meliopoulos Aff. ¶ 17) (Meliopoulos Report at 21). The full results of Dr. Meliopoulos's electrical resistance testing are as follows:

Table A-1:  4" Conduit Sample Results

| Figure # | Voltage (mV) | Current (A) | Pressure | Impedance (mΩ) |
|---|---|---|---|---|
| 1 | 99.500 | 10.110 | low | 9.842 |
| 2 | 219.200 | 20.180 | low | 10.862 |
| 3 | 83.500 | 10.010 | high | 8.342 |
| 4 | 176.900 | 30.210 | high | 5.856 |

Table A-2: 1 ½" Conduit Sample Results

| Figure # | Voltage (mV) | Current (A) | Pressure | Impedance (mΩ) |
|---|---|---|---|---|
| 1 | 44.700 | 10.060 | low | 4.443 |
| 2 | 94.600 | 20.540 | low | 4.606 |
| 3 | 155.700 | 30.290 | low | 5.140 |
| 4 | 34.500 | 10.09 | high | 3.419 |
| 5 | 70.08 | 20.36 | high | 3.442 |
| 6 | 104.9 | 30.05 | high | 3.491 |

Table A-3: ¾" Conduit Sample Results

| Figure # | Voltage (mV) | Current (A) | Pressure | Impedance (mΩ) |
|---|---|---|---|---|
| 1 | 142.400 | 10.140 | very low | 14.043 |
| 2 | 189.400 | 20.360 | very low | 9.303 |
| 3 | 192.400 | 30.660 | very low | 6.275 |

*Id.* (Meliopoulos Report at 21).

Dr. Meliopoulos determined that based upon these very low electrical resistance values, in the event that the interior coating was subjected to the level of voltage supplied by a typical electrical wire contained within the electrical conduit (120 to 277 volts), approximately 20,000 Amperes[13] of current would flow through the electrical conduit resulting in disintegration of the interior coating. *Id.* (Meliopoulos Aff. ¶ 18) (Meliopoulos Report at 12). This testing plainly demonstrates that in the event of an electrical fault occurring inside the electrical conduit, the interior coating would not stop the flow of electricity.

Second, the electrical testing allowed Dr. Meliopoulos to indirectly determine the electrical resistivity of the material that comprises the interior coating and thus identify the proper electrical classification of the material. Dr. Meliopoulos used the values of electrical resistance established through his testing and the measurements of the thickness of the interior coating as determined by Dr. Jackson to compute the electrical resistivity of the interior coating material. *Id.* (Meliopoulos Aff. ¶ 20) (Meliopoulos Report at 8). The electrical resistance, R (or electrical resistivity depending on which value is known), can be determined using the following formula:

$$R = \rho \frac{\ell}{A},$$
*where*
$\rho$ is the resistivity of the material
$\ell$ is the thickness of the coating
$A$ is the surface of the coating material

---

[13] An Ampere is defined as "the practical meter-kilogram-second unit of electric current that is equivalent to a flow of one coulomb per second or to the steady current produced by one volt applied across a resistance of one ohm." https://www.merriam-webster.com/dictionary/ampere last visited August 11, 2022.

*Id.* (Meliopoulos Report at 5).

Dr. Meliopoulos used a median value of electrical resistance (8.342 milliohms, or 0.008342 ohms) derived from his testing (as an example) and plugged it into the above equation along with the ranges of thickness (13 and 60 microns) of the interior coating as measured by Dr. Jackson.  *Id.* (Meliopoulos Aff. ¶ 21) (Meliopoulos Report at 8).  For this calculation the measurement of the area of the electrode is A=0.000216 meter squared; the electrical resistance measurement is R=8.342 milliohms (0.008342 ohms); and, the range of coating thickness $\ell$=13–60 microns ($13 \times 10^{-6}$ meters and $60 \times 10^{-6}$ meters):

Coating thickness of 13 microns

$$\rho = R\frac{A}{\ell} = 0.008342\frac{0.000216}{13x10^{-6}}\Omega.m = 0.1386\Omega.m$$

Coating thickness of 60 microns

$$\rho = R\frac{A}{\ell} = 0.008342\frac{0.000216}{60x10^{-6}}\Omega.m = 0.03003\Omega.m$$

*Id.* (Meliopoulos Report at 8).

This computation permitted Dr. Meliopoulos to conclude that if the interior coating ranged from 13 to 60 microns thick (Dr. Jackson's measurements), the electrical resistivity of the interior coating ranged from 0.03003 to 0.1386 ohm.meters.  *Id.* (Meliopoulos Aff. ¶ 21–22) (Meliopoulos Report at 8).  These values equate to a resistivity measurement in the range of $10^{-2}$ to $10^{0}$ ohms.meters and when compared to the accepted values for the electrical classification of materials (*see* Table 1 *supra* Def. Br. at 25), the material that comprises the interior coating is considered a semiconductor.  Def. Ex. 5 (Meliopoulos Aff. ¶ 23) (Meliopoulos Report at 8).  Therefore, the interior coating does not insulate against electricity.  *Id.*

Dr. Meliopoulos also conducted a hypothetical computation to determine the level of electrical resistance required for the interior coating to be considered electrically insulating based

upon the thickness of the coating as measured by Dr. Jackson.  *Id.* (Meliopoulos Aff. ¶ 24) (Meliopoulos Report at 6).  This calculation assumed a patch (electrode) of cross-area one square inch, the thicknesses measured by Dr. Jackson (*i.e.*, 13 to 60 microns), and the coating material is insulating (assuming the lowest possible resistivity value to be considered an electrical insulator ($10^{12}$ ohm.meters)):

Coating thickness 13 microns

$$\ell = 13 \ \mu m = 13x10^{-6} \ m$$

$$A = \left(1 inch\right)^2 = \left(0.0254m\right)^2 = 0.0006452 \ m^2$$

$$R = \rho \frac{\ell}{A} = 10^{12} \ \Omega m \frac{13x10^{-6} \ m}{0.0006452 \ m^2} = 2.0141x10^{10} \ \Omega$$

Coating thickness 60 microns

$$\ell = 60 \ \mu m = 60x10^{-6} \ m$$

$$A = \left(1 inch\right)^2 = \left(0.0254m\right)^2 = 0.0006452 \ m^2$$

$$R = \rho \frac{\ell}{A} = 10^{12} \ \Omega m \frac{60x10^{-6} \ m}{0.0006452 \ m^2} = 9.296x10^{10} \ \Omega$$

*Id.* (Meliopoulos Report at 6).

This computation produced the following results: if the coating material is 13 microns thick, the interior coating would need to have a resistance of $2.0141 \times 10^{10}$ ohms and if 60 microns thick, the interior coating would need to have to a resistance of $9.295 \times 10^{10}$ ohms.  *Id.* (Meliopoulos Aff. ¶ 25) (Meliopoulos Report at 6).  These values are 20–92 billion ohms, which would be a minimum resistance value for the coating to provide electrical insulation.  *Id.* However, based upon the direct electrical testing conducted by Dr. Meliopoulos, the actual electrical resistance of the interior conduit is between 0.003–0.014 ohms.  *Id.* (Meliopoulos Aff. ¶ 25) (Meliopoulos Report at 21).  Thus, the interior coating does not exhibit a sufficient amount of electrical resistance to insulate against electricity.

Dr. Meliopoulos's conclusions are confirmed by the electrical testing performed on the electrical conduit by Dr. Jackson.  Dr. Jackson was retained by Shamrock to conduct electrical testing on the electrical conduit.  Pl. Ex. IV (Jackson Tr. at 41:22–42:8).  Dr. Jackson conducted three sets of electrical testing on the electrical conduit: four-point electrical resistance testing reflected in the G2MT Labs Report (G2MT Report) (Pl. Ex. VII at sec. 4)[14]; two-point electrical resistance testing reflected in the G2MT Report (*Id.*); and, voltage analysis reflected in the U.S. Corrosion Services Voltage Analysis (USCS Report) (Pl. Ex. V at 2–14).

In a version of the G2MT report dated April 17, 2019,[15] Dr. Jackson recorded that the 4-point test measured an electrical resistance of 70–120 milliohms (0.07–0.12 ohms) and the 2-point test measured 0.7–1.2 ohms.  Def. Ex. 11 at sec. 4; Pl. Ex. VII at sec. 4; Pl. Ex. IV (Jackson Tr. at 125:11–25).  As a result of these findings, Dr. Jackson concluded that the interior coating "provides slightly higher electrical resistance than an uncoated pipe but does not act as an insulator."  Def. Ex. 11 (G2MT Report dated 4/17/19 at sec. 6); Pl. Ex. IV (Jackson Tr. at 89:11–15).  Dr. Jackson testified that a material that provides a slight electrical resistance does not qualify as an electrical insulator and, in his opinion, the interior coating of the electrical conduit does not insulate against electricity.  Pl. Ex. IV (Jackson Tr. at 90:11–92:11, 100:15–102:21).

---

[14] Dr. Jackson created several versions of the G2MT report, all of which were obtained by the Government during discovery.  Shamrock attaches the latest version dated April 30, 2019 to its motion for summary judgment.  Pl. Ex. VII.  However, an earlier version of the G2MT report created on April 17, 2019 is attached as Defendant's Exhibit 11.

[15] Shamrock attached the G2MT Report, dated April 30, 2019, to its complaint in this action (*see* Compl.), however this version of the G2MT Report does not reflect the initial views or conclusions of Dr. Jackson.  Pl. Ex. IV (Jackson Tr. at 107:12–108:7).  After completing all testing and technical analysis, on April 17, 2019, Dr. Jackson submitted a version of the G2MT Report to Shamrock that Dr. Jackson considered to be final (G2MT Report dated 4/17/19).  *Id.* (Jackson Tr. at 80:20–82:4).

In addition to the analysis of electrical resistance, the G2MT report (dated April 17, 2019) noted that areas of the interior of the electrical conduit were not completely covered with the epoxy coating and that the interior coating had a thickness of 13 to 14 microns. *Id.* (Jackson Tr. at 86:5–87:10); Def. Ex. 11 (G2MT Report dated 4/17/19 at sec. 6). After submitting the G2MT report (dated April 17, 2019) to Shamrock, it was returned to Dr. Jackson with numerous handwritten revisions that removed the aforementioned conclusions, namely, the lack of electrical insulation provided by the interior coating; the imperfect coverage of the interior coating; and the thickness of the interior coating. Def. Ex. 12 (Revised G2MT Report); Pl. Ex. IV (Jackson Tr. at 107:12–110:4). These three conclusions were omitted from the final report that was attached to Shamrock's complaint in this action. Compl.; Pl. Ex. VII; Pl. Ex. IV (Jackson Tr. at 107:12–110:4). Nevertheless, Dr. Jackson testified that he stands by his initial opinion that the interior coating of the electrical conduit does not provide insulation against electricity. Pl. Ex. IV (Jackson Tr. 100:15–102:21).

In addition to the G2MT test results, Dr. Jackson conducted a second form of testing where he concluded that the interior coating of the electrical conduit produced a voltage drop of 1.55 volts when tested with a small battery. Pl. Ex. V at 2–10. Dr. Jackson again measured the thickness of the interior coating — this time on the sample used used for the USCS Report — and found it to be 35–60 microns thick. Pl. Ex. IV (Jackson Tr. at 156:16–22).

Dr. Jackson's findings do not support the conclusion that the interior coating provides electrical insulation. For instance, to provide electrical insulation, Dr. Meliopoulos determined that the interior coating would have to exhibit a very strong electrical resistance — between 20 to 92 billion ohms depending on the thickness of the coating. Def. Ex. 5 (Meliopoulos Aff. ¶ 25); Def. (Meliopoulos Report at 6). Thus, irrespective of which value of electrical resistance

measured by Dr. Jackson is considered — 0.07 to 0.12 ohms (four-point test) or 0.7 to 1.2 ohms (two-point test) — the interior coating is insufficient to provide electrical insulation. Dr. Jackson concedes as much. Pl. Ex. IV (Jackson Tr. at 100:15–102:21).

Furthermore, through his many decades of experience with power systems, Dr. Meliopoulos is familiar with the type of electrical wires that are routed through and contained in this type of electrical conduit. Def. Ex. 5 (Meliopoulos Aff. at ¶ 18) (Meliopoulos Report at Attachment A). These wires generate a minimum 120 volts of electricity and if an electrical fault occurred inside of the electrical conduit, the interior coating would not withstand the voltage supplied by the electrical wires but would disintegrate. *Id.* (Meliopoulos Aff. at ¶ 18) (Meliopoulos Report at 9–11). For example, Dr. Meliopoulos applied 0.1769 volts of electricity to the interior coating which resulted in a flow of 30 Amperes of electrical current through the coating. *Id.* (Meliopoulos Report at 12). Based upon this measurement, Dr. Meliopoulos was able to calculate that if 120 volts were applied to the interior coating, approximately 20,000 Amperes of electrical current would flow through it. *Id.* (Meliopoulos Aff. at ¶ 18) (Meliopoulos Report at 12).

Therefore, the fact that interior coating was found to cause a 1.55 voltage drop with the application of a small battery is consistent with the conclusion that it would not insulate against the electricity to which it would be subjected in the event of an electrical fault occurring inside the electrical conduit. Dr. Jackson does not dispute this conclusion. Dr. Jackson testified that he does not know whether the measurements of electrical resistance he recorded in the G2MT Report (0.12 ohms or 1.2 ohms) would be sufficient to insulate against electricity nor whether the interior coating would insulate against 120 volts of electricity. Pl. Ex. IV (Jackson Tr. at 134:1–135:10).

Thus, the electrical resistance testing performed by the experts from both parties demonstrates that the interior coating of Shamrock's electrical conduit does not provide insulation against electricity.  This fact is undisputed.

Notwithstanding these undisputed facts, Shamrock argues that any electrical resistance provided by the interior coating — regardless how slight — should qualify as insulation for purposes of classification in Heading 8547, HTSUS.  For example, Shamrock contends that the HTSUS does not set a "minimum resistivity threshold for a material to be considered 'insulating material'" and that the coating on its electrical conduit "does not have to meet the 'insulator' threshold that Dr. Meliopoulos alleges to be classified pursuant to Heading 8547."  Pl. Br. at 28, 29; *see also* Pl. Br. at 21 (arguing that Dr. Meliopoulos's classification of materials as insulators according to the range of electrical resistivity does "not represent the meaning dictated by the Tariff Schedule").  For Shamrock, the fact that the interior coating causes a voltage drop of 1.5 volts and exhibits 1.2 ohms of electrical resistance[16] is sufficient to be classified as insulating material of Heading 8547.  Pl. Br. at 32–33.

However, to qualify this minimal electrical resistance as electrical insulation is belied by the definitions cited by Shamrock in its brief and the testimony of its witnesses.  Indeed, the authorities discussed in the parties' briefing all require something more than a slight resistance to electricity to qualify as electrically insulating material.  For instance, Shamrock cites the following definitions of insulate: (1) "[to] prevent the passage of electricity to or from (something) by covering it in a nonconducting material;" (2) "to separate from conducting bodies by means of nonconductors so as to prevent transfer of electricity, heat, or sound;" and, (3)

---

[16] These measurements were determined by Shamrock's witness, Dr. Jackson.  Pl. Ex. V at 10; Pl. Ex. VII at sec. 4.

"stopping the flow of electrons by use of a material." Pl. Br. at 20. By using the words "prevent" or "stopping" with regard to the flow of electricity, these definitions indicate something more than merely resisting a small portion of the electricity applied to the material.

Shamrock's expert witnesses confirm this understanding. Dr. Jackson testified that a material providing a small electrical resistance is not the same as providing electrical insulation (Pl. Ex. IV (Jackson Tr. at 90:5–92:11)), and Dr. Gotro[17] testified that electrical insulation requires a material to stop the flow of electrons. Pl. Ex. II (Deposition Transcript of Dr. Jeffrey Gotro (Gotro Tr.) at 61:11–17).

Accordingly, for a material to qualify as insulating it must provide something more than a slight resistance to electricity. Rather, it must stop or prevent the flow of electricity.

## IV. THE COURT SHOULD DISREGARD THE CONCLUSIONS OF SHAMROCK'S PURPORTED EXPERT WITNESSES WITH REGARD TO THE ELECTRICAL PROPERTIES OF THE INTERIOR COATING

The Court should disregard the testimony of Shamrock's two purported expert witnesses as they fail to meet the criteria Federal Rule of Evidence 702 and *Daubert*.

### A. Dr. Joshua Jackson

Dr. Jackson was retained by Shamrock to analyze the insulating properties of the interior coating of the electrical conduit. Pl. Ex. IV (Jackson Tr. at 41:22–43:3). Specifically, Dr. Jackson analyzed the electrical resistance provided by the interior coating. *Id.* Dr. Jackson

---

[17] As explained further in the next section, Dr. Gotro is president of InnoCentrix, LLC a technical and management consulting company serving the polymer industry. Pl. Ex. I (Report prepared by Dr. Jeffery Gotro dated March 4, 2022 (Gotro Report) at 3). Dr. Gotro holds a Ph.D. in materials science and engineering. *Id.* Dr. Gotro was retained by Shamrock to characterize the chemical composition of the internal coating and provide opinions regarding the electrical properties of such coating. *Id.* (Gotro Report at 6).

conducted electrical testing on samples of the electrical conduit and recorded the results in two reports: the G2MT Report and the USCS Report. *Id.* (Jackson Tr. at 33:18–34:2).

The findings in Dr. Jackson's reports (Pl. Ex. V; Pl. Ex. VII) should be rejected because he fails to meet the standards required for the admission of "scientific, technical, or other specialized knowledge" under Rule 702. *See supra*, Def. Br. at 22–23. Indeed, Dr. Jackson is not qualified to provide evidence on the electrical properties of the interior coating. According to Rule 702, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *United States v. Frazier*, 387 F. 3d 1244, 1260–61 (11th Cir. 2004). By his own admission, Dr. Jackson lacks the requisite training, education, or experience in order to assess the electrically insulating properties of the interior coating of the electrical conduit.

For instance, Dr. Jackson is educated and experienced in metallurgy and materials science but does not have expertise in electricity or electrical engineering. Pl. Ex. IV (Jackson Tr. at 23:10–20; 25:18–26:7). Prior to this matter, Dr. Jackson had never conducted an analysis of a material to determine its electrical resistance or conducted an analysis of the electrical resistance of a coated metal. *Id.* (Jackson Tr. at 27:1–28:7). He further testified that this type of electrical testing is not a service typically offered by his laboratories — G2MT Labs and U.S. Corrosion Services. *Id.* Dr. Jackson testified that he reviewed the expert report prepared by Dr. Meliopoulos and that he is not qualified to confirm or deny Dr. Meliopoulos's findings and conclusions because it is outside his area of expertise. *Id.* (Jackson Tr. at 166:14–167:11).

Thus, Dr. Jackson testimony demonstrates that he is not qualified to conduct the electrical tests he performed or provide evidence regarding the electrical resistance provided by the interior

coating due to his lack of education or experience in the fields of electricity and electrical engineering.[18]

### B. Dr. Jeffery Gotro

Shamrock retained Dr. Jeffery Gotro to analyze the chemical composition of the interior coating of the electrical conduit. Pl. Ex. I (Gotro Report at 6). Dr. Gotro is educated and experienced in materials science with a specialty in polymer science. Pl. Ex. II (Gotro Tr. at 17:13–19:3, 33:14–21). In forming his opinion that the interior coating of the electrical conduit insulates against electricity, Dr. Gotro's technical analysis was limited to confirming the existence of epoxy, melamine, and silicone in the interior coating of the electrical conduit. *Id.* (Gotro Tr. at 109:6–113:4). Dr. Gotro did not conduct any electrical testing on the electrical conduit but rather his conclusion was drawn exclusively from his determination as to the chemical composition of the interior coating. *Id.* (Gotro Tr. at 109:6–113:4, 115:2–16:6).

Similar to Dr. Jackson, Dr. Gotro's opinion regarding the interior coating of the electrical conduit should be rejected because it fails to meet the standards required for the admission of expert evidence. First, Dr. Gotro is not qualified to opine whether the interior coating provides electrical insulation. As explained above, Rule 702 requires an expert to be qualified by training, education, or experience in a relevant field. *Frazier*, 387 F. 3d at 1260–61. By his own admission, Dr. Gotro lacks the requisite training, education, or experience in order to determine that the interior coating of Shamrock's electrical conduit insulates against electricity.

---

[18] We note, however, that as a metallurgist and materials engineer, Dr. Jackson is qualified to measure the thickness of the interior coating of the electrical conduit. Pl. Ex. V at 11–13; Def. Ex. 11 at sec. 5–6. The Government takes no issue with Dr. Jackson providing this evidence to the Court.

For instance, Dr. Gotro is educated in mechanical engineering and materials science, with a specialty in polymers. Pl. Ex. II (Gotro Tr. at 17:13–19:3, 33:14–21). His experience is limited to the field of materials science and polymers. *Id.* Dr. Gotro testified that he has no education or experience in electrical engineering and he does not have expertise in the electrical field. *Id.* (Gotro Tr. at 19:6–20, 32:12–33:21). In his work as a materials engineer, he indicated that he frequently needs to know the electrical resistance of a material. *Id.* (Gotro Tr. at 19:6–20:19). But, he also indicated that he would rely upon a qualified technician or engineer to perform that analysis, and that he would not measure it himself. *Id.*

Moreover, Dr. Gotro admitted that he is not qualified to rebut Dr. Meliopoulos's electrical analysis. He testified that he is not qualified to conduct the tests or calculations that Dr. Meliopoulos used to determine electrical resistance or resistivity, nor is he qualified to opine on the validity of Dr. Meliopoulos's conclusions with regard to the electrical properties of the subject interior coating. *Id.* (Gotro Tr. at 39:13–40:19, 73:21–75:22, 225:3–229:8). Simply put, although Dr. Gotro is qualified to determine the chemical composition of the interior coating, he is not qualified to analyze or determine whether the coating insulates against electricity.

Second, the methodology underlying Dr. Gotro's opinion that the interior coating provides electrical insulation is not reliable. To be reliable, the Supreme Court has held that expert testimony must consist of "scientific . . . knowledge" and that the "adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589–90. This requires the trial court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93. Accordingly, the trial court should evaluate the following factors when faced with the proffer of scientific

38

testimony to determine its reliability: "(1) the testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted." *Libas, Ltd. v. United States*, 193 F.3d 1361, 1367–68 (Fed. Cir. 1999).

Failure to test a hypothesis serves as a basis to find an expert's methodology unreliable. For example, in *Curry v. Royal Oak Enterprises, LLC*, 2013 WL 3196390 (E.D.P.A. 2013), the plaintiff's expert opined that defendant's product featured inadequate warnings that resulted in a flash fire and proposed alternative warning and instructions that he claimed would have prevented same. *Id.* at 5. However, the court found this opinion to be unreliable because the expert "used little, if any methodology beyond his own intuition" to reach his conclusions. *Id.* at 6. "He 'conducted no tests' of plaintiff's account of the accident to determine if it would in fact result in a flash fire" or "to determine whether his recommendations would or would not result in a flash fire." *Id.* Because his hypothesis was not tested, and was based simply on his own intuition, the court found the opinion was based upon unsupported speculation, which is not enough to render it reliable. *Id.*

Here, Dr. Gotro's methodology for determining whether the subject interior coating provides electrical insulation is not reliable because he performed no tests to verify his hypothesis and instead relied upon his own intuition to reach a conclusion. Dr. Gotro's experience in the field of materials engineering confirm this.

Dr. Gotro testified that he has extensive experience using polymers to insulate wires used in electronic devices. Pl. Ex. II (Gotro Tr. at 22:3–24:15). Dr. Gotro defines "insulating" in this context to mean preventing the flow of electrons through a material. *Id.* at 61:7–17. In his experience insulating electrical wires with polymers, Dr. Gotro testified that he would

recommend using a material with known insulating properties but that he would also ensure that the material would, in fact, insulate against the amount of electricity necessary under the circumstances by applying electricity and testing the material. *Id.* (Gotro Tr. at 30:4–32:11). Thus, Dr. Gotro's typical practice in his industry would be to start with a hypothesis regarding the correct material to use for a specific application, but would also have electrical testing conducted to determine the accuracy of that hypothesis. The Court should require nothing less in this matter.

Here, Dr. Gotro failed to adhere to the methodology he uses in his practice as a materials engineer when he opined that the interior coating of the electrical conduit insulates against the flow of electricity. Indeed, Dr. Gotro only confirmed through chemical analysis that the interior coating contains a mixture of epoxy, melamine, and silicone. *Id.* (Gotro Tr. at 112:4–114:18). Based solely upon that finding, he opined that the interior coating provides electrical insulation because those materials are "known" to be electrically insulating. *Id.* However, he did not perform electrical testing to confirm his hypothesis. *Id.* Dr. Gotro admitted that the conclusion in his report that the coating is an "electrically insulating material" is merely a deduction based upon the known chemicals in its composition. *Id.* (Gotro Tr. at 132:10–133:2).

What is more, the record shows that the interior coating contains substances in addition to epoxy, melamine, and silicone. Def. Ex. 7 (October 12, 2018 letter from Pinturas Diamex stating that the interior coating contains epoxy resin, melamine resin, silicone additives, among other materials). However, Dr. Gotro did not conduct testing to identify these other substances and admitted that certain metallic additives can render a material non-insulating. Pl. Ex. II (Gotro Tr. at 85:3–89:11; 111:2–114:18).

Because Dr. Gotro did not test his hypothesis to confirm its accuracy, it cannot be considered reliable. Similar to the expert opinion in *Curry*, without electrical testing to confirm the insulative properties, Dr. Gotro's opinion that the interior coating provides electrical insulation is simply based upon his own intuition. Without confirmatory testing, his methodology cannot be verified and the error rate cannot be established, as required by the first and third prongs of the *Daubert* analysis. Thus, his opinion should be rejected by the Court as unreliable.

Finally, for the same reasons that Dr. Gotro's opinion is unreliable, it is irrelevant to the factual inquiry at hand. Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (citations omitted). Here, Dr. Gotro's opinion is irrelevant because it will not assist the Court in determining whether the interior coating provides electrical insulation — which is the sole factual question to be resolved in this matter (*see* Def. Br. at 21–22).

For instance, Dr. Gotro testified that he was not asked to, nor did he, conduct any electrical testing on the subject interior coating. Pl. Ex. II (Gotro Tr. at 112:4–21, 183:3–17). Furthermore, he did not determine the volume resistivity of the coating, he does not know how much electricity the interior coating could insulate against, and he doesn't know whether it would be capable of insulating against 120 volts of electricity. *Id*. (Gotro Tr. at 115:5–117:10, 135:2–138:15, 142:5–12). Similarly, Dr. Gotro testified that he was not qualified to conduct the work performed by Dr. Meliopoulos, or opine on the accuracy of his tests and analysis. *Id*. (Gotro Tr. at 73:21–75:22).

41

The entirety of Dr. Gotro's work in this case consists of confirming that epoxy, melamine, and silicone are some of the chemical components that make up the interior coating — a fact the Government does not dispute. *Id.* (Gotro Tr. at 109:6–114:18). This finding, combined with Dr. Gotro's opinion that epoxy, melamine, and silicone are *known* to provide electrical insulation, are both irrelevant because they do not assist the Court in determining whether the interior coating of Shamrock's electrical conduit does, in fact, insulate against electricity.[19]

*     *     *     *     *

In sum, the reports provided by Drs. Jackson and Gotro (Pl. Ex. I; Pl. Ex. V; Pl. Ex. VII) should be disregarded by the Court because they fail to satisfy the standards set by the Supreme Court in *Daubert* for the acceptance of expert evidence.

## V.   THE ELECTRICAL CONDUIT IS EXCLUDED FROM CLASSIFICATION IN HEADING 8547 BECAUSE THE INTERIOR COATING IS DESIGNED TO PREVENT CORROSION, NOT TO PREVENT THE FLOW OF ELECTRICITY

Electrical conduit that is coated on the interior with a varnish to prevent corrosion is excluded from classification in Heading 8547 and appropriately classified in Section XV, which includes Heading 7306. Explanatory Note 85.47(B) ("Metal tubing simply coated with varnish to prevent corrosion is **excluded (section XV).**") (emphasis in original).

Varnish is defined as "a liquid preparation that when applied to a surface dries to form a hard lustrous typically transparent coating." https://www.merriam-webster.com/dictionary/varnish last visited August 11, 2022. A review of the samples produced

---

[19] Dr. Gotro testified that the statement in his report that compositions containing epoxy, melamine, and silicone are known to be electrically insulating does not pertain specifically to the interior coating of the electrical conduit but rather to materials in general that exhibit similar compositions. *Id.* (Gotro Tr. at 114:7–18).

in discovery (Def. Ex. 2) and documents produced by Shamrock indicate that the interior coating is considered a varnish. Def. Ex. 7 ("This type of materials [sic] are widely used in the formulation of insulating varnishes and resins.")

Furthermore, Shamrock's witnesses establish that the interior coating serves the purpose of corrosion prevention rather than electrical insulation. For example, Mr. Gambee testified that the interior coating provides protection against rust. Pl. Ex. VIII (Gambee Tr. at 86:16–19). Dr. Jackson, a metallurgist that specializes in corrosion, testified that rust is one of the most common manifestations of corrosion and that based upon the chemicals present in the interior coating it is his opinion that it provides protection against corrosion. Pl. Ex. IV (Jackson Tr. at 180:20–182:2). Similar conduit produced by Rymco — that Shamrock admits is the same product as the electrical conduit at issue — is advertised as being manufactured with an interior coating designed to prevent rust and provide lubrication during wire installation. Def. Ex. 14; Pl. Ex. VIII (Gambee Tr. at 58:8–59:1, 65:2–9).

That the interior coating serves to protect against corrosion is confirmed by the requirements of UL 797. UL 797 provides that the electrical conduit "is provided with a zinc, zinc-based, nonmetallic, or other alternate corrosion-resistant exterior coating and *an organic or zinc interior coating*." Def. Ex. 8 (UL 797 at sec. 1.1) (emphasis added). Shamrock describes the material of the interior coating as "organic epoxy enamel." Def. Ex. 1 (Pl. Resp. to Rogs. No. 3). The UL standard defines organic coating as "interior coating(s), other than one consisting solely of zinc, which, upon evaluation, has demonstrated the ability to provide the level of corrosion resistance necessary where the coating is not subject to physical damage." Def. Ex. 8 (UL 797 at sec. 3.3.

Because the interior coating does not provide electrical insulation (*see* Def. Br. at 18–35) but instead prevents corrosion, it is excluded from classification in Heading 8547 as per Explanatory Note 85.47(B) and is properly classified in Section XV, which includes Heading 7306.

## VI.   SHAMROCK'S RELIANCE ON ADMINISTRATIVE RULINGS IS MISPLACED

Shamrock cites multiple CBP rulings in support of its desired classification in this case. Pl. Br. at 25–27 (citing CBP Rulings HQ 966525 (September 17, 2004), N290590 (October 19, 2017), and N306508 (February 21, 2020)).  However, these rulings are not binding on the Court and are not relevant to the present set of circumstances.

In a civil action brought pursuant to 19 U.S.C. § 1515 contesting the denial of an administrative protest filed in accordance with 19 U.S.C. § 1514(a), a party invokes the jurisdiction of the Court under 28 U.S.C. § 1581(a).  Under 28 U.S.C. § 1581(a), the Court reviews CBP's classification determination *de novo* based on the pleadings and record before it. *See* 28 U.S.C. § 2640(a)(1).

Although CBP's rulings are relevant insofar as they have to the "power to persuade" (*United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)), they are not binding on the Court (*see MetChem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008)), and rulings are not entitled to deference when they do not pertain to the merchandise under consideration. *Lerner New York, Inc.*, 908 F. Supp. 2d at 1331.

Here, CBP Rulings HQ 966525 and N290590 are not relevant to the Court's analysis because they do not pertain to the merchandise under consideration.  Ruling HQ 966525 involves steel fittings lined with plastic insulating material and ruling N290590 pertains to cast iron connectors that are lined with thermoplastic insulators.

Furthermore, CBP Ruling N306508 supports interpreting Heading 8547 pursuant to the common meaning identified by the Government. In that proceeding, CBP determined that "the terms of heading 8547, [HTSUS], dictate that conduit tubing classified therein must be *electrically* insulting." N306508 (February 21, 2020) at 1 (emphasis added). Consequently, CBP considered the surrounding terms in the heading and the intended purpose of the material within the electrical field in interpreting the phrase "insulating." As for the facts, Ruling N306508 offers little guidance for this case as CBP did not have the benefit of electrical testing to determine whether the product at issue in that ruling did in fact insulate against electricity. *Id.* In this respect, the ruling is not helpful.

## **CONCLUSION**

For the foregoing reasons, this Court should deny plaintiff's motion for summary

judgment, grant the Government's cross-motion for summary judgment, and dismiss this case.

Respectfully,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

_____/s/ Justin R. Miller_____
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:      _____/s/ Peter A. Mancuso_____
PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-0484 or 9230
*Attorneys for Defendant*

Of Counsel:
MATHIAS RABINOVITCH
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: August 11, 2022

46

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Peter A. Mancuso, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Government's memorandum in support of defendant's cross-motion for summary judgment, dated August 11, 2022, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 13,445 words.

<u>/s/ Peter A. Mancuso</u>