**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

SHAMROCK BUILDING MATERIALS, INC.

        Plaintiff,

    v.

UNITED STATES,

        Defendant.

Court No. 20-00074

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

September 29, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4819

**SANDLER TRAVIS & ROSENBERG, P.A**.
675 Third Avenue, Suite 1805
New York, NY 10178
 (212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill
*Counsel to Plaintiff*

14013807–1

## <u>TABLE OF CONTENTS</u>

ARGUMENT ............................................................................................................. 2

DEFENDANT PROPOSES AN UNREASONABLE MEANING FOR THE STATUTORY
TERM "LINED WITH INSULATING MATERIAL" .............................................. 4

    A.   The Term "Insulating" Is Not Confined To Electrical Insulation .................... 4

    B.   The Statutory Requirements That Defendant Proposes With Regard To Electricity Are
Unreasonable ............................................................................................. 7

THE PURPOSE THAT THE EPOXY COATING PERFORMS IS REFLECTED IN
INDUSTRY STANDARDS AND PUBLICATIONS ................................................ 21

    A.   The Purpose Of The Epoxy Coating Is To Contribute To The Total Electrical Protection
Of The Electrical System As A Whole ........................................................ 21

    B.   The Purpose Of The Epoxy Coating Is Not To Provide Corrosion Protection ............. 23

THE COURT SHOULD GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT .. 27

    A.   The Subject Conduit Is *Prima Facie* Classifiable Pursuant To Heading 8547 ............. 27

    B.   The Epoxy Coating Meets Industry Definitions And Is Used For Electrically Insulating
Purposes .................................................................................................... 31

    C.   Defendant's Hearsay Objections Are Contrary to the Federal Rules of Evidence And
Should Be Overruled. ................................................................................. 33

SUMMARY JUDGMENT IN FAVOR OF DEFENDANT IS NOT WARRANTED ................ 35

THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS IS BASED ON TECHNICAL
KNOWLEDGE AND EXPERIENCE, IS HELPFUL TO THE TRIER OF FACT, AND IS
THEREFORE ADMISSIBLE ............................................................................... 40

    A.   The Expert Witness Admissibility Standard ................................................ 40

    B.   Dr. Jeffrey Gotro's Opinion Testimony is Admissible .................................. 42

    C.   Dr. Joshua Jackson Has Personal Knowledge Of The Electrical Properties Of The
Epoxy Coating ........................................................................................... 44

CONCLUSION ...................................................................................................... 47

CERTIFICATE OF COMPLIANCE ........................................................................ 48

## **TABLE OF AUTHORITIES**

**Cases** .......................................................................................................**Page(s)**

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
    607 F.3d 817 (Fed. Cir. 2010)....................................................................47

*Aves in Leather, Inc. v. United States*,
    28 CIT 565 (2004) .....................................................................................27

*B.F. Goodrich Co. v. United States*,
    38 Cust. Ct. 72 (1957).........................................................................12, 13

*CamelBak Prods., LLC v. United States*,
    649 F.3d 1361 (Fed. Cir. 2011)..................................................................27

*Daubert v. Merrell Dow Pharm. Inc.*,
    509 U.S. 579 (1993).............................................................................47, 50

*Dodd v. United States*,
    545 U.S. 353 (2005)...................................................................................21

*Dow Chem. Co. v. United States*,
    10 CIT 550, 647 F. Supp. 1574 (1986) ......................................................26

*Gussack Realty Co. v. Xerox Corp.*,
    224 F.3d 85 (2d. Cir. 2000)........................................................................48

*Inter-Maritime Forwarding Co. v. United States*,
    70 Cust. Ct. 133 (1973)............................................................14, 16, 17, 23

*Intercontinental Marble Corp. v. United States*,
    27 CIT 654, 264 F. Supp. 2d 1306 (2003) .................................................17

*Kahrs Int'l, Inc. v. United States*,
    33 CIT 1297 (2009) ...................................................................................51

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
    543 U.S. 61 (2004).....................................................................................22

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)...................................................................................47

*Lawrence v. Florida*,
    549 U.S. 327 (2007)...................................................................................23

*Lonza Inc. v. United States*,
  46 F.3d 1098 (Fed. Cir. 1995)............................................................................17

*McCarthy v. Bronson*,
  500 U.S. 136 (1991)............................................................................................22

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d. Cir.1995)..........................................................................47, 50

*Monsanto Co. v. David*,
  516 F.3d 1009 (Fed. Cir. 2008).................................................................39, 48, 49

*Montgomery v. Mitsubishi Motors Corp.*,
  448 F.Supp.2d 619 (E.D. Pa. 2006) ...................................................................48

*Naftone, Inc. v. United States*,
  67 Cust. Ct. 341 (1971)..............................................................................16, 17, 23

*Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ....................................................................47, 50

*Reser's Fine Foods, Inc. v. United States*,
  27 CIT 1389 (2003) ............................................................................................18

*Rocknel Fastener, Inc. v. United States*,
  20 CIT 900, 118 F. Supp. 2d 1238 (2000) ....................................................21, 26

*Rollerblade, Inc. v. United States*,
  24 CIT 812, 116 F. Supp. 2d 1247 (2000) ...........................................................18

*Rondout Valley Cent. School Dist. v. Coneco Corp.*,
  321 F.Supp.2d. 469 (N.D.N.Y. 2004).................................................................46

*SAS Institute Inc. v. Iancu*,
  138 S.Ct. 1348....................................................................................................23

*Sigma-Tau Healthscience, Inc. v. United States*,
  838 F.3d 1272 (Fed. Cir. 2016).....................................................................21, 29

*United States v. Fisher*,
  6 U.S. 358 (1805)...............................................................................................23

*United States v. Jeri*,
  869 F.3d 1247 (11th Cir 2017) ..........................................................................50

*Univ. of Texas Sw. Med. Center v. Nassar*,
  570 U.S. 338 (2013)............................................................................................23

*Victoria's Secret Direct, LLC v. United States*,
   35 CIT 1706 (Ct. Int'l Trade 2011) ....................................................................51

*Wheatland Tube Company v. United States*.
   567 F. Supp. 3d 1297 (Ct. Int'l Trade 2022) ........................................................9

*Williams v. Manitowoc Cranes, L.L.C.*,
   898 F.3d 607 (5th Cir. 2018) ..................................................................46, 49, 50

**Statutes**

Harmonized Tariff Schedule of the United States (HTSUS)

Heading 8546 ..........................................................................................................23

Heading 8547 ................................................................................................ *passim*

Subheading 8547.10 ........................................................................................17, 36

Subheading 8547.20 ........................................................................................17, 36

Subheading 8547.90 ................................................................................................9

Subheading 8536.50.70 ..........................................................................................23

Subheading 8516.80.40 ..........................................................................................23

Subheading 8516.90.75 ..........................................................................................23

Subheading 8516.90.7500 ......................................................................................11

**Other Authorities**

Ct. Int'l Trade R. 7 ..................................................................................................7

Ct. Int'l Trade R. 56 ................................................................................................7

Fed. R. Evid. 601 ..................................................................................................50

Fed. R. Evid. 602 ..................................................................................................44

Fed. R. Evid. 702 ........................................................................................46, 47, 51

Fed. R. Evid. 703 ................................................................................38, 39, 40, 47

Fed. R. Evid. 801 ..................................................................................................39

Fed. R. Evid. 802 ..................................................................................................39

Fed. R. Evid. 803 ........................................................................................................40

P. St. J. Langan, Maxwell on the Interpretation of Statutes (12th ed. 1969) ................................17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE TIMOTHY C. STANCEU, JUDGE**

|  |  |
|---|---|
| SHAMROCK BUILDING MATERIALS, INC. <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. |  Court No. 20-00074 |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 7 and 56 of the U.S. Court of International Trade ("USCIT") and the Court's August 31, 2022 Order, ECF No. 52, Plaintiff Shamrock Building Materials, Inc. ("Plaintiff") hereby responds to Defendant's Cross-Motion for Summary Judgment and Defendant's Memorandum of Law in Response to Plaintiff's Motion for Summary Judgment and in Support of the Government's Cross-Motion for Summary Judgment, Shamrock Building Materials, Inc. v. United States, No. 20-00074 (Aug. 11, 2022), ECF No. 48 ("Def. Br."). Plaintiff also replies in support of its Motion for Summary Judgment, Shamrock Building Materials, Inc. v. United States, No. 20-00074 (June 3, 2022), ECF No. 43 ("Pl. Br."). As discussed herein, the arguments made by Defendant are unpersuasive and should be rejected.

While we agree with Defendant that this case is ripe for summary judgment because there are no triable issues of fact, that is about all with which we agree. The undisputed facts in this case demonstrate that the RYMCO-brand electrical metallic tubing finished conduit ("EMT") and intermediate metal conduit ("IMC") that Plaintiff imported from Mexico and that are at issue in this matter (collectively "subject conduit") are properly classifiable pursuant to Heading 8547,

and more specifically Subheading 8547.90.0020 of the Harmonized Tariff Schedule of the United States ("HTSUS").  Defendant's Response to Defendant's Statement of Undisputed Material Facts, *Shamrock Building Materials, Inc. v. United States*, No. 20-00074 (Aug. 11, 2022), ECF No. 48-1 ("Def. Resp. to Pl. Facts"); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, *Shamrock Building Materials, Inc. v. United States*, No. 20-00074 ("Pl. Resp. to Def. Facts") (attached hereto).  For the following reasons, Plaintiff respectfully requests that the Court deny Defendant's Cross-Motion for Summary Judgment and grant Plaintiff's Motion for Summary Judgment.

**ARGUMENT**

The case here is simple.  The Court can and should grant Plaintiff's motion for summary judgment on two undisputed facts.  First, each piece of subject conduit is coated on the inside with epoxy resin ("epoxy coating").  Pl. Resp. to Def. Facts. at paras. 8, 11.  Second, epoxy is insulating.  Def. Resp. to Pl. Facts at paras. 72, 136.  These two facts alone demonstrate that the merchandise at issue is "electrical conduit … lined with insulating material."  Heading 8547, HTSUS.  Indeed, CBP itself has classified epoxy-lined EMT pursuant to Heading 8547 with nothing more.  N306508 (Feb. 21, 2020), Pl. Ex. XX.  But additionally, here, Defendant submitted that it is undisputed that, in addition to epoxy, the epoxy coating consists of melamine and silicone, Pl. Resp. to Def. Facts at para. 11; *see also* Def. Resp. to Pl. Facts at paras. 19-20, and admits that silicone is an insulator, Def. Resp.to Pl. Facts at paras. 73, 137.  It is undisputed that epoxy and silicone are insulating materials and undisputed that epoxy and silicone line the subject conduit.  Def. Resp. to Pl. Facts at paras. 66-73, 136-138.  The subject conduit is thus *prima facie* classifiable pursuant to Heading 8547.

There is no need for testing.  There is no need for experts.  There is not even much need for the Court to conduct any statutory interpretation beyond that which it has already done in

*Wheatland Tube Company v. United States*.  567 F. Supp. 3d 1297 (Ct. Int'l Trade 2022).  In

*Wheatland*, the Court noted that "electrical conduit tubing made of base metal and lined with an

insulating material is classified generally in subheading 8547.90, Harmonized Tariff Schedule of

the United States ("HTSUS")."  *Wheatland*, 567 F. Supp. 3d at 1299.  Because the subject

conduit is lined with materials that Defendant admits are insulators, the subject conduit is

properly classifiable pursuant to Heading 8547.

Despite this, Defendant unnecessarily complicates the issues involved to allegedly

classify the merchandise pursuant to the less-specific Heading 7306, which generally describes

"other tubes, pipes and hollow profiles… of iron or steel."  Def. Br. at 2-3, 11-12; *see also*

General Rules of Interpretation ("GRI") 3(a), HTSUS.  Specifically, Defendant (1) proposes an

unreasonable meaning for the statutory term "insulating material;" (2) relies on a demonstrably

false understanding of industry standards to support that the epoxy coating allegedly cannot be

"insulating," (3) blatantly ignores the purposes of the epoxy coating which Plaintiff has

explained repeatedly throughout this case and before the agency, and (4) exaggerates irrelevant

testing and hypothetical conclusions of its purported expert who lacks the required expertise to

opine on the material properties of the epoxy coating.  However, as demonstrated below, these

details alleged by Defendant are largely irrelevant to whether the materials that line the coating

individually or collectively are "insulating," and fail to dispute that insulating material lines the

subject conduit.

# I.

## DEFENDANT PROPOSES AN UNREASONABLE MEANING FOR THE STATUTORY TERM "LINED WITH INSULATING MATERIAL"

### A. The Term "Insulating" Is Not Confined To Electrical Insulation

In its motion for summary judgment, Plaintiff demonstrated that, pursuant to dictionary definitions, the term "insulate" commonly means "to protect (something) by interposing material," to "place in a detached situation," or "to protect someone or something from harmful experiences." Pl. Br. at 19.  The common meaning of "insulate" has several facets that include, but are not limited to, physical protection or the electrical context.  Pl. Br. at 20; Gotro Dep. at 61:21-62:9.  Defendant admitted its purported expert testified that the common meaning of the term "insulation," in lay terms is not confined to electrical insulation.  Def. Resp. Facts at paras. 133-135.  Defendant itself recognizes that "the term 'insulating' has several meanings."  Def. Br. at 14.  Thus, the common meaning of the term "insulating" as used in Heading 8547 is not limited to the electrical context.  Despite this, Defendant claims that the term "insulating" in Heading 8547 can only mean "to prevent the passage of electricity" and nothing else.

Defendant's position is unsupported.  The only reasons that Defendant gives for its assertion is allegedly because Chapter 85 of the HTSUS applies in part to "electrical equipment," and that the term "insulating material" is "used in conjunction with 'electrical conduit tubing.'" Def. Br. at 13-15.  Defendant is incorrect for several reasons.

First, the notion that, because Chapter 85 includes electrical equipment, all references to "insulation" in the entire chapter must be limited to electrical insulation is nonsensical.  Def. Br. 13-14.  There is no question that the subject conduit is electrical conduit tubing.  The question is whether that electrical conduit tubing is lined with insulating material, whether electrically insulating or otherwise insulating.  In addition to "electrical machinery and equipment," Chapter

4

85 covers "*sound* recorders and reproducers."  Chapter 85, HTSUS (emphasis added).

Additionally, subheading 8516.90.7500 covers parts for cooking stoves and ovens, specifically

"door assemblies incorporating… insulation."  8516.90.7500, HTSUS.  If the references to

"insulation" in Chapter 85 were limited exclusively to electrical insulation, then insulation on

sound recorders and reproducers could not refer to sonic insulation and insulation with regard to

stoves and ovens could not refer to thermal insulation.  Defendant's assertion that "insulation" in

Chapter 85 "must be interpreted" as it relates to electrical equipment is unreasonable and reads

other types of insulation out of the statute.

Second, Defendant's claim that the term "insulating" is limited to electrical insulation

because it is "used in conjunction with electrical conduit tubing" similarly lacks support.  As

described in the Explanatory Note to Heading 85.47, electrical conduit is "used in permanent

electrical installations (*e.g.*, house wiring) as *insulation and protection* for the wires."

Explanatory Note 85.47 (emphasis added), Pl. Ex. XI.  Additionally, UL 797, Article 358.2 of

the National Electric Code ("NEC"), and American National Standards Institute ("ANSI") C80.3

define electrical conduit tubing as "designed for the *physical protection* and routing of wire

conductors."  Def. Ex. 8 at § 3.6; Def. Ex. 9 at § 3.1; Def. Ex. 10 at Art. 358.2.  In fact, NEC

Article 358.100 specifies that steel electrical conduit "shall" be made with "protective coatings."

Def. Ex. 10 at Art. 358.100.  Consideration of the statute's context and purpose "as it relates to

electrical conduit" should recognize how materials protectively insulate the wires housed in the

conduit because the Explanatory Note to Heading 85.47 expressly contemplates that the purpose

of electrical conduit is to protect the wires.  Defendant is thus correct that the term "insulating"

should be interpreted "as it relates to electrical conduit" but misunderstands electrical conduit

and the multiple purposes of organic coatings on the interior of electrical conduit.

Defendant's argument is contrary to its own prior interpretations of the statutory term, "insulating," as used by Heading 8547 in relation to conduit.  In rulings N290590, N291623 and N291770, CBP classified *conduit* connectors pursuant to Heading 8547 because the "insulator served *to protect* the electrical conductors *from abrasion* as they emerge *from the conduit* raceway."  Ruling N290590 (Oct. 19, 2017), Pl. Ex. XIX (emphasis added); *see also* N291623 (Nov. 17, 2017) available at https://rulings.cbp.gov/ruling/N291623 (attached as **Pl. Ex. XXX**); N291770 (Nov. 20, 2017) available at https://rulings.cbp.gov/ruling/N291770 (attached as **Pl. Ex. XXIX**).  Defendant claims that Ruling N290590 is distinguishable because it relates to cast iron connectors.  Def. Br. at 44.  However, Defendant omits that the merchandise at issue in N290590 are cast iron *electrical conduit* connectors, specifically for rigid conduit and IMC.  IMC is at issue in this case and thus the meaning of insulating as it relates to IMC connectors equally applies here.

As Plaintiff noted in its motion for summary judgment, Google, Merriam-Webster, and the Cambridge Dictionary, as well as the Court in *B.F. Goodrich Co. v. United States*, each define "insulate" with broad references to protection and do not limit the term to electrical insulation alone.  38 Cust. Ct. 72 (1957); Pl. Br. at 19-20, 35.  While Defendant disagrees with the definition of insulating material from *Goodrich*, Defendant merely claims that applying the *Goodrich* definition here would allegedly be illogical given Heading 8547's use of "insulating" in conjunction with "electrical conduit."  Def. Br. 16-17.  Contrary to the Defendant's claim, the statutory subheading at issue in *Goodrich* was "insulating materials, wholly or partly manufactured, composed wholly or in chief value of rubber," which did not include a reference to weather stripping as insinuated by Defendant.  *Goodrich*, 38 Cust. Ct. at 73.  The Court in that case performed statutory construction of the term "insulating materials" and its common

meaning alone without additional statutory language.  Defendant's distinction is thus immaterial

because *Goodrich* nonetheless informs the Court that the common meaning of "insulating

material" is not limited to electricity and instead includes various aspects of protection.

But, even assuming Defendant's approach, if the *Goodrich* Court arrived at the protecting

against wind, dust, rain and vibrations definition of insulate because it interpreted the term with

regard to the weather stripping at issue, then the Court must consider the protective aspects of the

term "insulate" as it relates to electrical conduit here.  In rulings N290590, N291770, N291623

and NY I84073, the importers and CBP referred to insulating materials that were "insulating"

because they were plastic and protected wires from abrasion as they emerged from electrical

conduit.  It is undisputed that one of the purposes of the subject conduit and the interior coating

is to protect against damage to wires by reducing friction when the wires are pulled through the

interior of the steel tube, and that Plaintiff's product brochure states that the "interior coating

insulates wall to provide easy installation of wire."  Pl. Resp. to Def. Facts at paras. 9, 15.

Because the term "insulating" is understood to include physical protection from abrasion and has

been used as such by both CBP itself and importers of electrical conduit, conduit fittings and

conduit connectors, any reasonable interpretation of the statutory term as it relates to electrical

conduit must recognize that the term "insulating" includes protective applications within its

common meaning.

## B.  The Statutory Requirements That Defendant Proposes With Regard To Electricity Are Unreasonable

With regard to whether a material is electrically "insulating," which, again, is only one

facet of the term's common meaning, Defendant claims that the "common thread" among its

cited definitions is that "insulate" is defined as "stopping or preventing the flow of electricity."

Defendant's definition is faulty because it omits reference to the means by which a flow of

electricity is prevented.  All of the dictionary definitions cited in this case with regard to electricity note that the means by which the flow of electricity is prevented is a *material*, and most define that material to be a "nonconductor."  Def. Br. at 14; Pl. Br. at 20.  Whether a material is insulating is determined according to the *material's* resistivity.  Def. Resp. to Pl. Facts at paras. 60-64, 66-73, 142-147.  Defendant admits that Dr. Meliopoulos's expert report states, "the proper way to determine whether a material is electrically insulating is to measure the resistivity of the material."  Def. Resp. to Pl. Facts at para. 142.  Defendant also fails to genuinely dispute pursuant to USCIT R. 56(c)(1)(B) that materials are electrically categorized "according to the material's resistivity."  *Compare* Def. Resp. to Pl. Facts at para. 64, *with* Pl. Ex. III at 20:21-21:4 (testifying with a limited caveat that "yes" "materials are classified as insulating, semiconducting, conducting based on their electrical *resistivity*.") (emphasis added); Def. Ex. 5 at 3-5 (relying on estimated *resistivity* to allegedly categorize the epoxy coating as a semiconductor); Pl. Ex. IX at 4 (categorizing materials using *resistivity*); *see also* Gambee Dep. at 148:1-18.  The references in definitions of "insulate" to material are significant because electrical insulation occurs by means of a material.

Most definitions define "insulate" with reference to materials that are "nonconductors."  The Oxford English Dictionary, Merriam-Webster, and Google define "insulate" by qualifying the prevention of electrical flow with the use of a "nonconductor" or "nonconducting material."  Pl. Br. at 20; Def. Br. at 14.  Additionally, the Court has noted that the multiple definitions of "insulator" define it to be "a substance or material that is a non-conductor of electricity."  *Inter-Maritime Forwarding Co. v. United States*, 70 Cust. Ct. 133, 137-138 (1973).  This is because, for purposes of the common meaning of the term "insulate," lay people do not place colloquial significance on the differences between a material that is an "electrical insulator" or an

"electrical semiconductor" as those terms have been proposed by Dr. Meliopoulos.
Lexicographic sources evidently do not.

Testimony on the record supports that it is commonly understood that the definition of
"insulate" inherently includes the presence of a nonconductor as the means by which the
insulation is accomplished.  Defendant admits that both experts in this case testified that they
agreed with the definition of insulate that defines the term as to "prevent the passage of
electricity to or from 'something' by covering it in a *nonconducting* material."  Def. Resp. to Pl.
Facts at paras. 75-77 (emphasis added).  Dr. Gotro also testified that the same would be accurate
in the chemical and scientific community.  Def. Resp. to Pl. Facts at para. 76.  Other testimony
agrees that the definition includes "nonconducting material."  Jackson Dep. at 172:2-6; Gambee
Dep. at 146:10-147:21.  Defendant admits that Dr. Gotro testified that "the distinction between
insulators and semiconductors is arbitrary and from the point of view of metal-insulator
transitions, all semiconductors are insulators," and that, based on his experience, such testimony
is accurate in the chemical and scientific community.  Def. Resp. to Pl. Facts at paras. 53-54; *see
also* Pl. Ex. XXV.  In fact, Defendant does not present evidence to dispute that "the distinction
between insulators and semiconductor is arbitrary" or that there is a "point of view" in chemistry
that the "metal-insulator" dichotomy is a significant categorical distinction.  Def. Resp. to Pl.
Facts at paras. 53-54.  Thus, that the definition of "insulate" is diametrically posed opposite of
conductors is not coincidental, and that dichotomy is ingrained within the common meaning of
the word.  Meliopoulos Dep. at 21:14-18 (noting that insulating and conducting are mutually
exclusive).

The use of "insulating materials" in Heading 8547 reflects this dichotomy.  As noted by
Defendant, Def. Br. at 15, the Explanatory Note explains that Chapter 85 covers "materials

which are used in electrical apparatus and equipment because of their conducting *or* insulating

properties, such as… metal conduit tubing with an interior *insulating* lining (heading 85.47)."

General Explanatory Note to Chapter 85, HTSUS (emphasis added).  Accordingly, the

juxtaposition of materials with insulating properties compared to those with conducting

properties is significant and reasonably contemplated by the Explanatory Note, specifically with

regard to the materials that line the interior of electrical conduit.  Thus, that nonconductors are

the means by which electric flow is prevented or stopped is an important aspect of the term

"insulate" and should not be read out of its common meaning as defined in lexicographic

sources.

Even the Institute of Electrical and Electronic Engineers ("IEEE") definition proposed by

Defendant contrasts insulating materials to conductors.  Def. Br. at 14.  But the IEEE definition

differs from the common meaning of the word "insulate" by quantifying a specific conductivity

required to be an insulating material.  *Id.*  The specific threshold where a material becomes an

"electrical insulator" as compared to an "electrical semiconductor" is meaningless in the

common use of the word because people do not use the term "insulate" that way, if they

understand the distinction at all.  Def. Resp. to Pl. Facts. at paras. 128-29; Gambee Dep. at

93:15-18, 146:10-147:21; 225:22-226:2; 248:11-17; Jackson Dep. at 42:11-24, 90:24-91:25,

134:1-12; 192:24-193:8.  Plaintiff thus disagrees that the common meaning of "insulating

material" includes a requirement that "conductivity" be "zero," and notes that, "in practice,"

"insulating materials" conduct "small" amounts of electricity.  Def. Br. at 14; Def. Resp. at Pl.

Facts at paras. 79-82.

Defendant claims that *Inter-Maritime*, and *Naftone, Inc. v. United States*, 67 Cust. Ct. 341

(1971), are inapplicable and inapposite to the common meaning of the phrase "insulating

material" because both pre-date the current statutory language, Def. Br. at 17.  However, the Court in both cases was interpreting a different statutory term, "electrical insulators, of rubber or plastics."  *Inter-Maritime*, 70 Cust. Ct. at 134; *Naftone*, 67 Cust. Ct. at 342.  The Court's conclusions as to the definition and meaning of "insulating material" reflect the common meaning of the phrase rather than a specific statutory term that has been re-written.  Thus, the Court may refer to *Inter-Maritime* and *Naftone* and the specific facts at issue in those cases that led the Court to conclude that the electrical tape and polycarbonate resin film were insulating materials.  Regardless, the Court may consider cases that discuss the common meaning of terms under the Tariff Schedule of the United States for purposes of the HTSUS.  *Intercontinental Marble Corp. v. United States*, 27 CIT 654, 663, 264 F. Supp. 2d 1306, 1316 (2003) ("If it were the case that the term 'marble' had not been clearly invested with a common and commercial meaning under the TSUS, the Government's argument might have some merit."); *Lonza Inc. v. United States*, 46 F.3d 1098, 1107 (Fed. Cir. 1995) ("Absent clear evidence of legislative intent to embrace an alternative statutory definition, and in light of its historical pedigree, the Court cannot help but conclude that the TSUS definition of "drugs" survives as the common and commercial meaning of the term under the HTS.").  Both cases found a material to be "insulating" because it was composed of "nonconducting" materials, *Naftone*, 67 Cust. Ct. at 343; *Inter-Maritime*, 70 Cust. Ct. at 137, and corroborate the lexicographic definitions that define the term "insulate" accordingly.

### 1.   The Statute Defines Materials That Are Insulating

Heading 8547 lists two materials that are electrically insulating for purposes of the Heading.  Besides electrical conduit, Heading 8547 covers "insulating fittings… being fittings wholly of *insulating material*."  Heading 8547, HTSUS.  Then Heading 8547 lists "insulating fittings of ceramics" and "insulating fittings of *plastics*." 8547.10, HTSUS; 8547.20, HTSUS.

Heading 8547 expressly dictates that these two categories, namely plastics such as epoxy and melamine, are electrically insulating materials covered by the Heading.  Def. Resp. to Pl. Facts at paras. 8, 19-20; Pl. Resp. to Def. Facts at paras. 8, 11.  Testimony in this case explains that plastics are insulating.  Defendant admits that Dr. Gotro testified that "plastics are usually poor conductors of heat and electricity. Most are insulators with high dielectric strength," and that such testimony is accurate in the chemical and scientific community.  Def. Resp. Pl. Facts at paras. 51-52; Def. Ex. 24.

CBP has repeatedly defined "insulating material" with mere reference to plastics that are "insulating" because those materials inherently have electrically insulating properties, and are commonly understood as such.  In HQ 966525 and HQ 966526, CBP concluded that *electrical conduit* fittings were properly classified as lined with an "insulating material" simply because they were "*plastic*-lined."  HT 966525 (Sept. 17, 2004), Pl. Ex. XVII; HQ 966526 (Sept. 17, 2004).  Similarly, in N290590, N291770, and N291623, CBP found that the *electrical conduit* connectors were classifiable pursuant to Heading 8547 because they featured a "*thermoplastic* material."  N290590; N291623 (attached as **Pl. Ex. XXX**); N291770 (Nov. 20, 2017) (attached as **Pl. Ex. XXIX**).  CBP has found a washer comprised of glass laminate and epoxy resin to be a fitting "wholly of *insulating material*… insulating fitting of *plastic*."  N032378 (July 29, 2008) available at https://rulings.cbp.gov/ruling/N032378 (attached as **Pl. Ex. XXXI**).  The Court can and should consider the common meaning of the term insulating material, as that term has been understood by CBP.  *Reser's Fine Foods, Inc. v. United States*, 27 CIT 1389, 1391-1392 (2003) (looking to how Customs addressed the meaning of a term in a prior ruling); *Rollerblade, Inc. v. United States*, 24 CIT 812, 816, 116 F. Supp. 2d 1247, 1252 (2000) (quoting how CBP applied a statutory term in a ruling letter and noting that CBP claimed it was the common meaning).

While Defendant attempts to distinguish these rulings because they allegedly "do not pertain to the merchandise under consideration," Def. Br. at 44, these cases demonstrate the *common meaning* of "insulating material" as that term is understood in the conduit industry and how CBP has understood the term as it relates to electrical conduit,  Pl. Resp. to Def. Facts at paras. 6, 9, 13, 15-16; Def. Ex. 1 at 11.  Defendant failed to explain how "insulating materials" can be defined to include plastic when plastic lines *electrical conduit* connectors and *electrical conduit* fittings, but not when plastic (here, epoxy and melamine) lines electrical conduit itself.  Def. Resp. to Pl. Facts at para. 8, 19-20; Pl. Resp. to Def. Facts at paras. 8, 11.  The common meaning of "insulating" must recognize that *plastics* are explicitly an insulating material in both the Heading and the Explanatory Note.

Additionally, the Explanatory Note defines insulating material by listing materials that are insulating and expressly includes plastics.  The Explanatory Note states, "the insulating material may be special *electrically insulating varnish*, paper, rubber, *plastics*, etc."[1] Explanatory Note to Heading 85.47 (emphasis added).

"Electrically insulating varnish" is defined in the coating industry to commonly refer to organic polymeric resins.  The National Electrical Manufacturers Association ("NEMA") definition of "electrical insulating varnish," which was approved by the American National Standards Institute ("ANSI"), is "a *resin* dissolved in a volatile non-reactive liquid component," or "a *resin* dissolved in a reactive liquid component."  Def. Ex. 18 at Shamrock001527. Similarly, the American Society for Testing Materials ("ASTM") defines "electrical insulating varnish" as "a liquid *resin* system that is applied to and cured on electrical components providing

---

[1] Defendant admits that testimony on the record states that "electrical insulating varnishes are mostly epoxies."  Def. Resp. to Pl. Facts at para. 34.

electrical, mechanical and environmental protection." Def. Ex. 18 at Shamrock001527, **Pl. Ex. XXXV**. Accordingly, Defendant incorrectly asserts that the Explanatory Note confirms that "insulating material must provide electrical insulation," and its insinuation that the Explanatory Note's use of "electrically" in "electrically insulating varnish," means that the statutory term "insulating material" requires "full" electrical insulation is misplaced. Def. Br. at 16. Despite the nomenclature, "electrically insulating varnish" is a defined term in the coating industry that refers to "resins" that are applied "on electrical components" and that serve protective functions including a degree of "electrical protection."

> Merriam-Webster defines "resin" defines as:
>
> Any of various solid or semisolid amorphous fusible flammable natural *organic substances* that are usually transparent or translucent and yellowish to brown, are formed especially in plant secretions, are soluble in organic solvents (such as ether) but not in water, ***are electrical nonconductors***, and *are used chiefly in varnishes*, printing inks, *plastics*, and sizes and in medicine.

*Resin*, Merriam-Webster available at https://www.merriam-webster.com/dictionary/resin (attached as **Pl. Ex. XXXVI**) (emphasis added). Dictionary.com defines "resin" as:

> (1) Any of a class of nonvolatile, solid or semisolid *organic substances*, as copal or mastic, that consist of amorphous mixtures of carboxylic acids and are obtained directly from certain plants as exudations *or prepared by polymerization* of simple molecules: used in medicine and in the making of *varnishes and plastics*;
>
> (2) Any of numerous physically similar *polymerized* synthetics or chemically modified natural resins including thermoplastic materials and *thermosetting* materials.

*Resin*, Dictionary.com available at https://www.dictionary.com/browse/resin (attached as **Pl. Ex. XXXVII**) (emphasis added). Defendant admits that testimony explains that a coating industry source provides that "insulating varnishes are resins like epoxies." Def. Resp. to Pl. Facts at para. 40.

Thus, while Defendant claims that the "Explanatory Notes to Heading 8547 confirm that the insulating material must provide electrical insulation," Def. Br. at 16, Defendant mistakenly disregards the term as used in the coating industry, and misinterprets the purposes for which an electrically insulating varnish is applied to electrical components. *Rocknel Fastener, Inc. v. United States*, 20 CIT 900, 903, 910, 118 F. Supp. 2d 1238, 1241, 1247 (2000) ("The Court has consulted standards promulgated by ANSI, ASME, and many other standard-making bodies in numerous cases to inform the common and commercial meaning of tariff terms."). The Explanatory Note should not be read to limit the plain meaning of "insulating material" given that Heading 8547 expressly includes plastics and electrically insulating varnishes, *i.e.*, "resins" such as epoxy and melamine.[2]   *Sigma-Tau*, 838 F.3d at 1281 ("Although the examples in the Explanatory Notes are probative and sometimes illuminating, we shall not employ their limiting characteristics, to the extent there are any, to narrow the language of the classification heading itself."); *Dodd v. United States*, 545 U.S. 353, 357 (2005) (The "legislature says … what it means and means … what it says."); Gotro Report at 13-14.  Indeed, the definition of "epoxy" itself is: "Also called epoxy resin.  Any of a class of resins derived by polymerization from epoxides: used chiefly in adhesives, coatings, electrical insulation, solder mix, and castings." *Epoxy*, Dictionary.com available at https://www.dictionary.com/browse/epoxy (attached as **Pl.**

---

[2] Melamine is defined as "a white crystalline organic base $C_3H_6N_6$ with a high melting point that is used especially in melamine resins; a melamine resin or a plastic made from such a resin." *Melamine*, Merriam-Webster available at https://www.merriam-webster.com/dictionary/melamine (attached as **Pl. Ex. XLI**).  Silicone is defined as "any of various polymeric organic silicon compounds obtained as oils, greases, or plastics and used especially for water-resistant and heat-resistant lubricants, varnishes, binders, and electric insulators." *Silicone*, Merriam-Webster available at https://www.merriam-webster.com/dictionary/silicone (attached as **Pl. Ex. XLII**).

**Ex. XXXIX**); *Epoxy*, Collins Dictionary available at

https://www.collinsdictionary.com/us/dictionary/english/epoxy (attached as **Pl. Ex. XL**).

The common meaning of electrically insulating varnish as defined by the ASTM, ANSI, and NEMA equates to the common meaning of insulating material and demonstrates how the epoxy coating satisfies the plain language of the statute.  Lexicographic sources support that the common meaning of "insulate" is "to separate… conducting bodies by means of nonconductors," Def. Br. at 14, and the definition of "resin" is defined as "organic substances," specifically polymers, that "are electrical nonconductors," *Resin*, Merriam-Webster.  It follows that the industry definitions of "electrical insulating varnish," which define the term to mean a "dissolved resin" or a resin applied to an electrical component to provide protection, reflect the plain meaning of "insulating material."

### 2. Defendant Misreads The Statute In Light Of Its Context

Defendant would have the Court read the term "insulating" to require a coating on the interior of electrical conduit that "fully" prevents or stops the flow of electricity, and ultimately argues that the interior coating is not an insulating material based on this definition.  Def. Br. at 14, 28, 35.  Defendant claims to arrive at this interpretation because it allegedly reads the statute with "regard to the context or surrounding terms of the heading" and an "eye toward its intended purpose."  Def. Br. 16-17.  While Defendant is correct that "statutory construction is a 'holistic endeavor,'" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004), and that statutory language "must always be read in its proper context," *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991), Defendant's proposed interpretation of "insulating" neglects important aspects of statutory context that inform the meaning of the term as it applies specifically in the second clause of Heading 8547.

Defendant's argument that the statute requires the "insulating material" to "prevent the flow of electricity" when electricity is applied in the manner allegedly done by Dr. Melioupoulos misreads Heading 8547.  Heading 8547 covers "electrical conduit tubing… of base metal *lined with insulating material*."  Heading 8547, HTSUS.  The statute does not require that the electrical conduit be "insulat**ed**."  Where Chapter 85 requires articles to be insulated, it so states.  Heading 8544 covers "*insulated* (including enameled or anodized) wire, cable (including coaxial cable) and other *insulated* electric conductors."  Heading 8544, HTSUS.  Subheading 8536.50.70 covers "electric AC switches consisting of optically coupled input and output circuits (*insulated* thyristor AC switches)."  8536.50.70, HTSUS.  Subheading 8516.80.40 covers "electric heating resistors… assembled only with simple *insulated* former and electrical connections."  8516.80.40, HTSUS.  Subheading 8516.90.75 covers "door assemblies incorporating… *insulation*."  8516.90.75, HTSUS.  Heading 8546 covers "electrical *insulators* of any material."  Heading 8546, HTSUS; *Naftone*, 67 Cust. Ct. 341; *Inter-Maritime*, 70 Cust. Ct. 133.  The disparate terminology suggests that each has inherently distinct meaning.

The choice of language merely requiring that the electrical conduit be "lined with insulating material" rather than simply stating "insulated electrical conduit tubing" or "insulating electrical conduit tubing" is purposeful and significant.  The use of varying language within the statute "implies an intent to change" the meaning.  *United States v. Fisher*, 6 U.S. 358, 388, (1805); *see also Univ. of Texas Sw. Med. Center v. Nassar*, 570 U.S. 338, 353 (2013) ("Congress' choice of words is presumed to be deliberate"); *Lawrence v. Florida*, 549 U.S. 327, 333-334 (2007) ("The linguistic difference is not insignificant"); *SAS Institute Inc. v. Iancu*, 138 S.Ct. 1348, 1356 ("If Congress wanted to adopt {a different approach}, it knew exactly how to do so."); P. St. J. Langan, Maxwell on the Interpretation of Statutes 282 (12th ed. 1969) ("From

17

the general presumption that the same expression is presumed to be used in the same sense throughout an Act … there follows the further presumption that a change of wording denotes a change in meaning.").  Reading a requirement that the electrical conduit be insulat**ed** in order to be classified pursuant to Heading 8547 is unreasonable given the statute's explicit use of the term "insulated" where it so requires.  Thus the statute does not require that the material "insulate" the electrical conduit.  Rather, for electrical conduit to be classified pursuant to the plain meaning of Heading 8547 viewed in its context, (1) a material must have the property of being insulating, and (2) that material must line the conduit.  In other words, the focus of the statute is on the whether the lining material has insulating properties.

### 3.   Defendant's Interpretation Of The Statute Is Not Permissible

The statute's use of "electrical conduit lined with insulating material" rather than calling for "insulated electrical conduit" also evidences the drafter's understanding of the types of materials applied to electrical conduit and the functions that electrically insulating varnishes play in electrical systems.  Indeed, as noted by Defendant, Def. Br. 14, there is significance in the fact that the statutory term "insulating material" is used in conjunction with "electrical conduit tubing."  The terms must be read in conjunction, especially in light of the purposes that electrical conduit serves and the role that the interior coating plays in serving that purpose.  However, Defendant proposes an incorrect interpretation of the meaning of "insulating material" because it misunderstands *electrical conduit*.

Defendant proposes that the coating must "prevent the flow of electricity" and serve that function by ultimately rendering the electrical conduit "insulated."  *E.g.*, Def. Br. at 21, 33-34 ("The interior coating is insufficient to provide electrical insulation.").  By claiming that the statute requires the epoxy coating to *wholly* "prevent" or "stop" the flow of electricity, Defendant's proposed interpretation of the term "insulating material" incorrectly assumes a

specific application within electrical engineering and electrical systems that does not recognize the meaning of insulating material in the conduit industry, or significantly, the coating industry. In fact, Defendant's proposed statutory interpretation contradicts its own reading of the industry standards to which electrical conduit complies.

Contrary to Defendant's argument that the term "insulating material" means "preventing the flow of electricity" and that the epoxy coating must "stop the flow of electricity or provide electrical insulation" in order to be classifiable under Heading 8547, Def. Br. 21-35, Defendant also claims that industry standards preclude the use of insulating materials on the interior of electrical conduit.  Defendant claims UL 797, NEC Article 358.60, and ANSI C80.3 require electrical conduit to provide "system grounding."  Def. Br. 20; Pl. Resp. to Def. Facts at paras. 22-23.  Defendant claims that, for electrical conduit to provide system grounding, "the electrical resistance of the interior coating of the conduit must be low enough" to allow electrical current to flow "through the interior coating back to the source… in the event of {an electrical} fault." Def. Br. at 19-20; Pl. Resp. to Def. Facts at para. 19.  Defendant also notes that the industry standards allegedly require electrical conduit to be an "equipment grounding conductor" so that it can provide the electrical path to ground by conducting electricity in the event of a fault occurring inside the electrical conduit.  Def. Br. at 20; Pl. Resp. to Def. Facts at paras. 19, 22-23.

Defendant's argument is fallacious and demonstrates the unreasonableness of its proposed statutory interpretation.  On one hand, Defendant claims that the interior coating must provide electrical insulation to be classifiable pursuant to Heading 8547, but on the other hand, Defendant claims that electrical conduit cannot have electrical insulation *on the interior* because industry standards require the interior of the electrical conduit to be conductive.  *Compare* Def. Br. at 19-21, *with* Def. Br. at 21-35.  Both things cannot be true.  The plain meaning of

"electrical conduit tubing… *lined* with insulating material" contemplates that the insulating material coats the interior of the electrical conduit.[3]  The Explanatory Note states that Heading 8547 covers metal tubing "provided it has an *interior* lining of insulating material," and metal tubing "coated or lined *on the inside* with insulating material."  Explanatory Note to Heading 8547 (emphasis added).  Likewise, the General Explanatory Note to Chapter 85 notes that Chapter 85 covers "metal conduit tubing with an *interior* insulating lining."  Explanatory Note to Ch. 85, HTSUS (emphasis added).  Despite the plain language of the statute and the Explanatory Note, Defendant boldly asserts that: "it would be a disservice to {Plaintiff's} customers—and potentially dangerous" if an insulting material lined the subject conduit.  Def. Br. at 21.  Either the statute does not require the interior coating to provide electrical insulation to the degree proposed by Defendant, or industry standards do not define electrical conduit for use as an equipment grounding conductor.  Pl. Resp. to Def. Facts. at paras. 19, 22-23.

If electrical conduit is not permitted to have an insulating material on the interior wall, then the second clause of Heading 8547 is rendered superfluous and null.  It is well established that the Court should not interpret a statutory provision so that it is meaningless.  *Rocknel Fastener, Inc. v. United States*, 20 CIT 900, 908, 118 F. Supp. 2d 1238, 1245 (2000) ("{I}t is axiomatic in Customs law, and indeed all statutory construction exercises, that a Court not interpret one provision of a statute as to render meaningless another.");  *Dow Chem. Co. v. United States*, 10 CIT 550, 552-53, 647 F. Supp. 1574, 1578 (1986).  Defendant's proposed meaning for

---

[3] Google defines "line" to mean: "cover the inside surface of (a container or garment) with a layer of different material… form a layer on the inside surface of (an area); cover as if with a lining."  *Line*, Google available at https://www.google.com/search?q=lined+definition (attached as **Pl. Ex. XXXII**).  Dictionary.com defines "line" to mean: "to cover the inner side or surface of."  *Line*, Dictionary.com available at https://www.dictionary.com/browse/lined (attached as **Pl. Ex. XXXIII**).

the statutory term "insulating material" poses an unlawful double standard that cannot be accepted.  Def. Br. at 21-35.  The more reasonable interpretation of the statute is that the adjective "insulating" modifies only the term "material," and thereby requires merely that the material which lines the electrical conduit be a material with "insulating" material properties without regard to whether the lining "provides electrical insulation" or totally "prevents or stops the flow of electricity" as Defendant suggests.  *Id.*  Defendant's statutory interpretation is inconsistent with the uses of electrical conduit and industry standards.

## II.

### THE PURPOSE THAT THE EPOXY COATING PERFORMS IS REFLECTED IN INDUSTRY STANDARDS AND PUBLICATIONS

#### A.   The Purpose Of The Epoxy Coating Is To Contribute To The Total Electrical Protection Of The Electrical System As A Whole

Defendant's proposed statutory definition of "insulated" disregards the role that electrical conduit actually plays within electrical systems and the role that organic coatings play on electrical conduit.  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1368 (Fed. Cir. 2011) ("We are not so trusting of our own notions of what things are as to be willing to ignore the purpose for which they are designed and made and the use to which they were actually put.") (quoting *United States v. Quon Quon Co.,* 46 C.C.P.A. 70, 72 (1959));  *Aves in Leather, Inc. v. United States*, 28 CIT 565, 578 (2004).  Coatings applied to the interior of electrical conduit protect against damage to wiring during installation and afterwards during service by providing an insulating layer between the wiring and the interior surface of the steel tube.  Pl. Resp. to Def. Facts at paras 6, 9, 13, 15, 16; Def. Resp. to Pl. Facts at paras. 122-32.  Coatings on the interior of electrical conduit reduce the risk of electrical short circuits in the event of frayed or damaged wiring by limiting the flow of electrons across the coating surface or through the volume of the coating material.  Def. Resp. to Pl. Facts at paras. 84-109, 118, 128-129, 132, 138, 140-141, 155;

Gotro Dep. at 148:11-14; Def. Ex. 1 at 11.  The Explanatory Note contemplates that electrical conduit lined with insulating material serves these purposes.  It states that Heading 8547 "covers the metal tubing used in permanent electrical installations (*e.g.*, house wiring) as *insulation and protection for the wires*."  Explanatory Note to Heading 8547 (emphasis added).  The appropriate statutory interpretation of "insulating" with regard to electrical conduit must recognize the "insulation and protection for the wires" purpose noted in the Explanatory Note.

The coating on the interior of the conduit is critical to the performance of these functions.  As noted, the ASTM defines "electrical insulating varnishes" as "a liquid resin system that is applied to and cured on electrical components providing electrical, mechanical and environmental protection."  Def. Ex. 18 at Shamrock001527.  Importantly, as published by the IEEE, the purpose of "electrically insulating varnishes," which explicitly includes epoxies, is to form a protective film *over* structural components and insulations.  Def. Ex. 18 at Shamrock001527-28, Shamrock001531; **Pl. Ex. XXXV**.  Defendant admits both experts in this case agreed that:

> The purpose of an electrical insulating varnish is to *form a protective <u>resin</u> film over and throughout the main electrical structural components and insulations* of electrical apparatus in order to contribute to the total mechanical strength and the electrical, thermal, and chemical resistance.

Def. Resp. to Pl. Facts. at paras. 34-35, 141 (emphasis added).  Defendant admits that testimony explains that a coating industry source provides that "insulating varnishes… are applied over electrical conductors to provide *a layer* of electrical isolation."  Def. Resp. to Pl. Facts at para. 40 (emphasis added).

Despite the nomenclature, "electrically insulating varnishes" are described as "electrically insulating varnishes" because they coat and protect electrical apparatuses, not because they "fully" insulate them.  Rather, by providing an additional layer of "nonconductive"

material, insulating varnishes "*contribute* to the *total* electrical resistance" of the underlying

article on which they are applied, and electrical systems more generally.  Def. Ex. 18 at

Shamrock001528; **Pl. Ex. XXXV**.  It is a coating.  It is a varnish.  Def. Br. at 43.  It is not

"insulation" like that which typically lines electrical wires.  Importantly, electrically insulating

varnishes are actually applied as an extra layer of material *on top of the insulation* already

present in the electrical system.  Def. Ex. 18 (**Pl. Ex. XXXV**) at Shamrock001527 ("{Electrical

insulating varnishes} are used to coat the enameled wire, slot liners, phase and layer tapes and

wrappers, wedges, and other main constructional electrical insulations").  As such, electrically

insulating varnishes help the greater electrical system function as a whole.  Def. Ex. 18 at

Shamrock001527-28 ("Electrical insulating varnishes are an important category of protective

materials that contribute to the harnessing of electricity in electrical and electronic devices."); Pl.

Ex. 16 at Shamrock001933 ("Electrically insulative adhesives help prevent short circuits in many

electrical and electronic systems.").

### B.  The Purpose Of The Epoxy Coating Is Not To Provide Corrosion Protection

One important distinction between insulating and non-insulating materials for purposes of

Heading 8547 is whether the electrical conduit is coated simply "to prevent corrosion" or

whether the coating *protects from something other than corrosion*.  The Explanatory Note to

85.47 explains that "metal tubing *simply coated* with varnish *to prevent corrosion* is excluded."

Explanatory Note to 85.47 (emphasis added).  The Explanatory Note excluded coatings that were

"simply corrosion prevention," but did not exclude any other materials.  This omission is

significant because it recognizes the variety of protective functions that coatings play on

electrical conduit.  *See Sigma-Tau Healthscience, Inc. v. United States*, 838 F.3d 1272, 1280

(Fed. Cir. 2016) (noting that a particular vitamin that it ultimately found *prima facie* classifiable

pursuant to Heading 2936 was not excluded in a list of exclusions in the relevant explanatory

note).  Thus, materials that are provided to protect from something other than corrosion, such as a liquid *resin* system applied on electrical components to provide electrical, mechanical, and environmental protection (*i.e.*, the definition of "electrically insulating varnish"), are not excluded pursuant to the Explanatory Note.

The conduit industry codifies the distinction between coatings that "simply coat to prevent corrosion" or coat to protect from something other than corrosion.  Electrical conduit is either (a) lined on the interior with zinc or (b) it is lined on the interior with an organic coating. Def. Ex. 8 at § 1.1 ("electrical metallic tubing… is provided with… an organic or zinc interior coating.").  Defendant notes that UL 797 defines organic coating as an "interior coating, other than one consisting solely of zinc" that has demonstrated the ability to provide corrosion resistance, and claims that therefore the electrical conduit is "simply coated with varnish to prevent corrosion," which would allegedly be excluded from Heading 8547.  Def. Br. at 42-43. The codified dichotomy between zinc and organic coating on the interior of electrical conduit demonstrates an implicit recognition that organic coatings serve other functions in addition to corrosion prevention, and are therefore not excluded pursuant to the Explanatory Note.

That organic coatings serve functions other than corrosion prevention is recognized in the language of UL 797.  UL 797 distinguishes "organic coating" from "alternate corrosion-resistant coating."  *Compare* Def. Ex. 8 §3.2 *with* Def. Ex. 8 §3.3.  With regard to the exterior coating, UL 797 permits the use of "zinc coating" or "other alternate corrosion-resistant exterior coating." Def. Ex. 8 at §1.1.  Yet, when making a similar contrast regarding the interior coating, UL 797 uses different language.  It provides that the interior lining may be *either* "an organic or zinc interior coating."  Def. Ex. 8 at §1.1.  If the purpose of the organic interior coating was truly a mere corrosion preventative, UL 797 would not have used "organic coating" rather than "other

24

alternate corrosion-resistant coating."  The language implies that the organic coating is not an "other alternate corrosion-resistant coating," even though it has to *at least* provide corrosion resistance.[4]  If UL 797 contemplated that corrosion resistance was the *only purpose* that organic coating serves on electrical conduit, it would not have made the distinction between an "organic coating" and an "alternate corrosion-resistant coating."  Rather, the industry dichotomy demonstrates that organic coatings may serve a variety of functions, including electrical protection.

Additionally, UL 797 recognizes certain electrical conduit is lined with organic polymers (i.e., "resins")[5] which provide electrical, mechanical and environmental protection.  UL 797 requires the organic coating on the interior of electrical conduit to be a polymer and meet the applicable standard for polymers.  Section 6.2.1.4 states that "organic coating shall be subjected to the infrared spectroscopy (IR), thermogravimetric analysis (TGA) and differential scanning calorimetry (DSC) tests specified in the applicable standard for *polymeric materials*."[6]  UL 797 at § 6.2.1.4.  Merriam-Webster defines "polymer" as "a chemical compound or mixture of compounds formed by *polymerization* and consisting essentially of repeating structural units."  *Polymer*, Merriam-Webster available at https://www.merriam-webster.com/dictionary/polymer (attached as **Pl. Ex. XXXVIII**); Gotro Dep. at 58:20-60:18; Def. Resp. to Pl. Facts at paras. 8, 9, 19, 20.  "Plastics are always polymers," and while not all polymers are plastics, synthetic polymers are plastics and are referred to as "plastics" accordingly in the industry to distinguish

---

[4] Indeed, Dr. Jackson testified he has had samples of the RYMCO electrical conduit that Shamrock imported for years and that "there's no apparent corrosion on the interior," which "indicates" that the epoxy coating is "providing corrosion protection."  Jackson Dep. at 181:3-185:2; *see also* **Pl. Ex. XXVII**; **Pl. Ex. XLIII**; **Pl. Ex. XXVIII**; **Pl. Ex. XLIV**; **Pl. Ex. XLV**.

[5] *Resin*, Merriam-Webster; *Resin*, Dictionary.com.

[6] Dr. Gotro is an expert in materials science, polymers, and thermosets.  Gotro Dep. at 33:14-21.

them from other "biological" polymers, Gotro Dep. at Gotro Dep. at 59:17-60:18.  Thus, UL 797 actually requires organic coating, if it lines the interior of electrical conduit, to be a plastic, which is explicitly listed as an insulating material pursuant to Heading 8547.  8547.20.00, HTSUS.

Polymers serve many purposes other than simply to prevent corrosion.  Polymers resist electricity.  Def. Resp. to Pl. Facts at paras. 8-10, 22-52, 55-59, 66-73; Gotro Dep. at 21:16-24:15; 61:11-62:1.  Polymers resist heat.  Gotro Dep. at 35:1-10.  Polymers physically protect from abrasion.  Pl. Resp. to Def. Facts at paras. 6, 9, 15, 131, Gotro Dep. at 62:2-12.  Therefore, in practice, the conduit industry, as expressed in UL 797, distinguishes electrical conduit lined with organic polymers that serve a variety of purposes from electrical conduit merely lined with zinc, a corrosion preventative with no other purpose.  Def. Resp. to Pl. Facts at paras. 104-32.  CBP has likewise recognized that an organic coating on the interior of electrical conduit serves purposes other than mere corrosion prevention.  N306508 (Feb. 21, 2020), Pl. Ex. XX (noting that epoxy is an "organic resin" that would act as an electrical insulator); NY I84073 (Aug. 12, 2002), Pl. Ex. XXI (finding steel conduit lined with an interior Teflon coating "in order to *insulate and protect* the wiring" is classifiable pursuant to Heading 8547); *accord*, NY K82884 (Mar. 1, 2004) available at https://rulings.cbp.gov/ruling/K82884 (attached as **Exhibit XXXIV**) (noting that Teflon is a plastic).

Contrary to Defendant's argument, the corrosion prevention imparted by the epoxy coating is incidental and secondary to the electrical and mechanical protection that it provides the electrical system as a whole.  Corrosion prevention is not the purpose for which the organic epoxy coating, rather than zinc or another "alternate corrosion-resistant coating," is used.

Defendant is incorrect that the coating is a mere corrosion preventative excluded from Heading 8547.

## III.

### THE COURT SHOULD GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

#### A.  The Subject Conduit Is *Prima Facie* Classifiable Pursuant To Heading 8547

The subject conduit is *prima facie* classifiable pursuant to Heading 8547 because it is electrical conduit tubing of base metal lined with insulating material.  It is undisputed that the merchandise is metal conduit tubing of steel.  Pl. Resp. to Def. Facts at paras. 1, 2.  It is undisputed that epoxy resin, melamine resin, and silicone line the interior of the subject conduit.  Pl. Resp. to Def. Facts at paras. 8, 11; Def. Resp. to Pl. Facts at paras. 19, 20.  The only remaining issue is whether any one of those materials is insulating.  Each of them are.  Testimony and scientific and industry literature on the record indisputably demonstrate that all three components—epoxy, melamine and silicone—are materials that are electrically insulating.  Def. Resp. to Pl. Facts at para. 23.

Both experts in this case agree that the materials that line the conduit are electrically insulating.  Defendant admits that Dr. Meliopoulos testified epoxy is insulating and silicone is an insulator.  Def. Resp. to Pl. Facts at paras. 136-37.  Defendant admits that Dr. Gotro testified that epoxy resin, melamine and silicone are electrically insulating and avers that the testimony is a "statement about the properties of these materials."  Def. Resp. to Pl. Facts at para. 58-59, 74.  That is precisely the point:  epoxy, melamine, and silicone indisputably have the *material property* of being electrically insulating.  Thus, because they line the subject conduit, the subject conduit is lined with insulating material.

Both experts agree with scientific literature that explain epoxy and silicone are insulating materials.  Defendant admits that both experts testified that combinations of silicone and epoxy resins are strong, heat resistant, electrical insulating coatings, and that epoxy resin is a starting material for insulating coatings.  Def. Resp. to Pl. Facts at paras. 24-25, 30-32, 139-40. Defendant admits that both experts testified that, "the resins that are used today in solventless electrical insulating varnishes are mostly epoxies."  Def. Resp. to Pl. Facts at paras. 34-36, 141. Defendant admits that testimony corroborates sources that state epoxy and silicone have electrically insulating properties and are used as insulators.  Def. Resp. to Pl. Facts at paras. 41-48.

Testimony demonstrates that industry literature also demonstrates that epoxy is an insulating material.  Defendant admits that testimony explains one manufacturer publishes that "epoxy resins" have "excellent mechanical and electrical insulating properties," and notes that they are used in electrical insulating resins.  Def. Resp. to Pl. Facts at paras. 37-39.  Defendant also admits that testimony states another company documents that "insulating varnishes are resins like epoxies."  Def. Resp. to Pl. Facts at para. 40.

Defendant nonetheless claims that several of these authoritative sources allegedly "do not pertain to Plaintiff's electrical conduit."  Def. Resp. to Pl. Facts at paras. 24-52.  The alleged distinction fails because each industry article in fact addresses the relevant materials and their intrinsic material properties.  That is, Defendant complains that the articles do not pertain to epoxy, for example, but cannot provide evidence to dispute that epoxy has the material property of being electrically insulating.  Def. Resp. to Pl. Facts at para. 136.  Whether a material is insulating is determined according to the material's resistivity.  Def. Resp. to Pl. Facts at paras. 63, 142; Meliopoulos Report at 4.  Resistivity a *material* property.  Def. Resp. to Pl. Facts at

para. 60.  The resistivity of a material as a quality is immutable.  The same material, such as

epoxy, will have the same resistivity anywhere.  Def. Resp. to Pl. Facts at para. 69.  It stays the

same whether the material is a block, Pl. Ex. IX at 4, Figure 1, or a coating, Def. Resp. to Pl.

Facts at paras. 66-67.  It does not change if you use it in a circuit board or in the lining on a pipe.

Def. Resp. to Pl. Facts at 68.  Thus, as discussed in the cited testimony and literature, epoxy is an

insulating material, and Defendant failed to offer evidence that the epoxy as a material does not

have insulating properties.

Additionally, expert testimony from Dr. Gotro corroborated all of these above referenced

sources.  Dr. Gotro is experienced in polymers and specifically in developing and using epoxy

resins for electrical and electronic applications and applications of epoxy to the interior of steel

pipe.  Def. Resp. to Pl. Facts at paras. 6-7, 11-12; Gotro Dep. at 19:6-24:15, 41:1-42:8.  In fact,

Dr. Gotro noted some of these sources in his report, and in part, concluded that the electrically

insulating qualities of epoxy resin, melamine, and silicone apply to those same materials present

in the epoxy coating.  Gotro Report at 5:8-6:8, 6:33-7:8, 20:1-22:13; Def. Resp. to Pl. Facts at

paras. 22-59, 66-74.  Dr. Gotro even testified that the descriptions of epoxy in these materials

apply to the epoxy in the interior coating at issue in this case.  An industry white paper, by

Masterbond, states that "all epoxy systems are inherently good insulators, especially when

evaluated by dielectric strength, volume resistivity, dielectric constant and the dissipation

factor."  Def. Resp. to Pl. Facts at paras. 26-28, 31.  Dr. Gotro testified that the descriptions of

epoxy in the Masterbond white paper apply to the epoxy in the interior coating at issue in this

case.  Def. Resp. to Pl. Facts at para. 29.  Defendant admits that Dr. Gotro testified as such, but

denies that the statement is a material fact.  However, Defendant fails to cite evidence pursuant

to USCIT R. 56(c)(1)(B) that genuinely disputes the testimony that the descriptions of epoxy in the white paper apply to the epoxy in the interior coating of the subject conduit.

Epoxy, melamine and silicone have the volume resistivity necessary to qualify as insulators pursuant to the categories that Dr. Meliopoulos proposes.  Dr. Meliopoulos claims that materials must have volume resistivity of at least $10^{12}$ ohm-meters to qualify as an electrically insulating material.  Meliopoulos Report at 4.  It is not disputed that epoxy, melamine and silicone each have a volume resistivity of at least $10^{12}$ ohm-meters.  Def. Resp. to Pl. Facts at paras. 69-73.  Accordingly, epoxy, melamine and silicone qualify as electrically insulating materials pursuant to the requirements proposed by Dr. Meliopoulos.

Epoxy and melamine also are plastics, which are expressly materials that the statute contemplates as being insulating materials.  As explained, Heading 8547 lists two materials that are insulating pursuant to the Heading: ceramics and plastics.  Subheading 8547.10, HTSUS; 8547.20, HTSUS.  Likewise, the Explanatory Note lists materials that are insulating materials: electrically insulating varnishes, paper or paperboard, rubber, plastics, etc.  Explanatory Note to Heading 8547.  Defendant does not dispute that epoxy and melamine are plastics.  Def. Resp. to Pl. Facts at paras. 8, 49.  Thus epoxy and melamine, as plastics, expressly qualify as insulating materials pursuant to statute and the Explanatory Note.

Therefore, there is no dispute that insulating materials line the interior of the subject conduit.  The subject conduit is *prima facie* classifiable pursuant to Heading 8547 because it is electrical conduit lined with insulating material.  The Court should therefore grant Plaintiff's motion for summary judgment.

**B.  The Epoxy Coating Meets Industry Definitions And Is Used For Electrically Insulating Purposes**

The undisputed facts demonstrate that the coating on the subject conduit (1) meets the definition of an "electrically insulating varnish" and (2) serves the electrically insulating purpose of commercial resins.  The epoxy coating is a resin, which meets the industry definition of an "electrically insulating varnish."  Pl. Resp. to Def. Facts at para. 11; *compare* Def. Ex. 18 at Shamrock001528 (including epoxies in definition of "electrically insulating varnishes"), *with* Explanatory Note to Heading 85.47 ("insulating material may be special electrically insulating varnish").  Epoxy resins are used to line electrical components, such as circuit boards or electrical conduit, and thus provide a layer of electrical isolation and protection.  Def. Ex. 18 at Shamrock001527-28; Def. Resp. to Pl. Facts at paras. 34-36, 40, 141.  The point being to separate conducting bodies, i.e., metals such as zinc.  *Insulate*, Merriam-Webster.  The epoxy coating on the subject conduit accomplishes this purpose—based on undisputed facts—by contributing a level of electrical resistance to the subject conduit and the electrical system as a whole.  Def. Resp. to Pl. St. Facts at para. 138.

It is undisputed that "the material used to coat the interior of the electrical conduit consists of epoxy resin, melamine resin, and silicone additives, among other materials."  Pl. Resp. to Def. Facts at para. 11.  Dr. Gotro, in his expert report and in his deposition, repeatedly referred to the coating components as "epoxy resin" and "melamine resin."  *See, e.g.*, Gotro Report at 6:15-16, 13:3-8, 13:13-18, 14:9-21; Gotro Dep. at 85:19-22.

Undisputed testimony demonstrates that the purpose of an electrically insulating varnish (i.e., "resin") is to *contribute to* the *total electrical resistance* of the electrical system as a whole.  Def. Resp. to Pl. Facts at paras. 34-36, 40, 141.  Defendant admitted that "{t}he epoxy coating has a higher electrical resistance than the steel on which it is applied."  Def. Resp. to Pl. Facts at

para. 138.  Dr. Jackson's testing demonstrates that the conduit has a higher resistance to electricity with the epoxy coating than without it.  Def. Resp. to Pl. Facts at paras. 84-119.  Thus, it is undisputed that the epoxy coating serves its purpose—it "contribute{s} to the total… electrical, thermal, and chemical resistance" of electrical structural components and insulations. Def. Resp. to Pl. Facts at paras. 34-36, 141.

In addition to contributing to the total electrical resistance of the larger conduit system, the epoxy coating provides *another* type of insulation.  Again, the purpose of an electrically insulating varnish is to "form a protective resinous film over… electrical structural components *and insulations*."  Def. Resp. to Pl. Facts at paras. 34-36, 141.  The epoxy coating indisputably protects wires from abrasion.  Def. Resp. to Pl. Facts at paras. 122-35.  The epoxy coating serves its intended and required purpose, which is to provide multiple insulating properties.  This is why the conduit is sold with a coating in the first place.  *See also* Gambee Dep. at 96:15-22 ("{the coating} insulates the interior of the tubes… from the transfer of electrons, as well as damage to the wires being pulled through the runs of the conduit").

This multi-purpose use of the epoxy coating in the subject conduit is in accord with the industry definition of an "electrically insulating varnish," which "is applied to… electrical components {to provide} electrical, mechanical and environmental protection."  Def. Ex. 18 at Shamrock001527, **Pl. Ex. XXXV**.  The coating is meant to provide "a layer" of electrical protection, and it unequivocally does so.  Gotro Dep. at 146:20-147:3; *accord*, Meliopoulos Dep. at 34:22-25 (agreeing that the coating has a "higher electrical resistance than the steel on which it was applied").  In other words, the coating meets the definition of an "electrically insulating varnish" and serves the purpose of contributing to the total electrical resistance of structural electrical components and the greater electrical system that the electrical conduit houses.

**C. Defendant's Hearsay Objections Are Contrary to the Federal Rules of Evidence And Should Be Overruled.**

Additionally, Rule 703 of the Federal Rules of Evidence permits an expert witness to "base an opinion on facts or data" that are inadmissible.  Fed. R. Evid. 703.  The material on which an expert bases an opinion need not be admissible "{i}f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Id.*; *see also Monsanto Co. v. David*, 516 F.3d. 1009, 1016 (Fed. Cir. 2008) ("Rule 703 *expressly authorizes* the admission of expert opinion that is based on 'facts or data' that themselves are inadmissible") (emphasis added).

Contrary to Defendant's arguments that components of Plaintiff's expert witnesses' testimony are inadmissible because they referenced inadmissible hearsay, the Federal Rules explicitly carve out exceptions to the hearsay rule with respect to expert witness testimony. While it is true that out of court statements offered for the truth of the matters asserted are generally inadmissible as hearsay, Fed. R. Evid. 801, 802, the Federal Rules include exceptions for expert witness testimony and for particular statements to which Defendant has objected.

First, statements in "learned treatises" are admissible in conjunction with expert witness testimony if the statements are "called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." *Id.* at 803(18).

Here, in the statements to which Defendant has objected, the statements contained in learned treatises were either brought to Dr. Gotro's attention in examination, or he relied on them in his responses to examination.  For instance, Dr. Gotro was asked about a U.S. Department of Commerce National Bureau of Standards report by Defendant's counsel, Mr. Mancuso, during

his deposition.  Pl. Ex. II (Gotro Dep. at 155:4-17).  Later in Dr. Gotro's deposition, he

established the report as a reliable authority in the scientific community.  *Id.* at 204:8-19.  Thus,

Dr. Gotro's testimony with regard to the report has met both requirements of Rule 803(18).

Similarly, in another instance, Dr. Gotro was asked during his deposition about statements in a

technical bulletin published by the company MasterBond.  *Id.* at 173:10-175:14.  Again, he

established the publication as "authoritative."  *Id*. at 177:3-9.  Indeed, even if Dr. Gotro's

references to the MasterBond technical bulletin in his deposition are inadmissible under Rule

803(18), Dr. Gotro's opinions based on those references are admissible under Rule 703 because

he relied on the bulletin in writing his Expert Report.  Pl. Ex. I at 21;35, 22:3-9; Pl. Ex. II (Gotro

Dep.) at 176:21-177:2.

Second, statements in "ancient documents"—which the Federal Rules define as those

"prepared before January 1, 1998, and whose authenticity is established"—are not barred by the

rule against hearsay and are therefore admissible.  Fed. R. Evid. 803(16).  Thus, statements

published by the IEEE are admissible as statements contained in an ancient document.  **Pl. Ex.**

**XXXV**.

Defendant confuses testimony that includes hearsay statements, which is not permitted

under the Federal Rules, with *expert* testimony that *relies on* hearsay statements, which *is*

permissible under the Federal Rules.  However, even if this Court finds that some of Dr. Gotro's

statements do not satisfy Rule 803, his statements which relied on inadmissible evidence are still

admissible in themselves under Rule 703.  Defendant's hearsay objections in paragraphs 23–24,

27, 30–32, 34–35, 37–42, 44, 46, 49, 51, 53, 75, 77, 79, 80-81 of Plaintiff's statement of

undisputed facts are without merit and must be overruled.

## IV.

## SUMMARY JUDGMENT IN FAVOR OF DEFENDANT IS NOT WARRANTED

Defendant argues that the electrical conduit at issue is not *prima facie* classifiable pursuant to Heading 8547 because it is not lined with a material that provides electrical insulation.  Def. Br. at 21-35.  Specifically, Defendant claims that "by using the words 'prevent' or 'stopping' with regard to the flow of electricity," the common meaning of "insulating material" requires that the epoxy coating "provide electrical insulation."  *Id.* at 34 ("electrical resistance testing… demonstrates that the interior coating of {Plaintiff's} electrical conduit does not provide electrical insulation against electricity.").  Defendant's arguments fail to establish undisputed material facts that warrant judgment in its favor.

Defendant's whole case is based on the testimony and report of its purported expert, Dr. Meliopoulos.  For the reasons set forth in Plaintiff's Motion in Limine, Dr. Meliopoulos is incompetent to offer expert opinion testimony on the issue before the Court in this case.  Even if the evidence elicited from Dr. Meliopoulos were to be considered by the Court, that evidence is completely without merit and is irrelevant to whether the subject conduit is lined with insulating materials.

Defendant's argument rests on electrical resistance testing conducted by Dr. Meliopoulos.  Defendant claims that Dr. Meliopoulos tested the electrical resistance of the epoxy coating.  Def. Br. at 27; Meliopoulos Report at 8.  According to Defendant, the resulting electrical resistance measurements allowed Dr. Meliopoulos to "indirectly estimate" the volume resistivity of the epoxy coating.  Def. Br. at 28-29.  Using a formula, Dr. Meliopoulos purportedly concluded that the volume resistivity of the epoxy coating is $10^{-2}$ to $10^{0}$ ohm-meters.  Then, Dr. Meliopoulos allegedly determined that the epoxy coating was a semiconductor.  Def. Br. at 29.  Defendant also claims that Dr. Meliopoulos conducted "hypothetical computations" that determined that in

order to provide electrical insulation, the epoxy coating must allegedly provide 20 to 92 billion

ohms of electrical resistance.  *Id.* at 29-30.  Based on these findings, Defendant claims that the

epoxy coating "does not stop the flow of electricity or provide electrical insulation" because Dr.

Meliopoulos's testing of the epoxy coating allegedly shows that the epoxy coating is not an

insulator of electricity.  Def. Br. at 24, 30.  The tests from Defendant's purported expert are

fundamentally flawed and do not demonstrate that undisputed facts warrant summary judgment

for the Defendant.

   Dr. Melipoulos's testing of the electrical conduit was improper and did not actually yield

the resistivity of the epoxy coating.  It is undisputed that Dr. Meliopoulos states in his expert

report that the "proper way to determine whether a material is electrically insulating is to

measure the resistivity of the material."  Def. Resp. to Pl. Facts paras. 142.  Resistivity is

measured on a unit volume of material.  *Id.* at para. 66.  To measure the resistivity of a material,

a substantial amount of the material and precision equipment are needed.  *Id.* at para. 143.  It is

undisputed that testimony states that "you need to have enough material to have repeatable and

reliable measurement{s} of the coating material's electrical resistivity.  *Id.* at para. 145;

Meliopoulos Dep. at 71:12-14.  Dr. Meliopoulos indisputably testified that he "did not have

sufficient coating material to *determine* the coating material's electrical resistivity."  Def. Resp.

to Pl. Facts at para. 145 (emphasis added).  Critically, when asked by Plaintiff whether he could

"say with certainty that, had {he} had a one-inch cube of the material, it would definitely not

meet {his} definition of insulator," Dr. Meliopoulos testified, and Defendant admits that he

testified, that to do a "repeatable, acceptable measurement method to determine the resistivity of

the material," he would "need… more material."  *Id.* at para. 146.

Dr. Gotro agreed.  He testified that the method Dr. Meliopoulos used to supposedly "indirectly estimate" the coating's resistivity did not "measure the volume resistivity according to the standard definition" or the "typical way to measure volume resistivity."  *Id.* at para. 149. Resistivity is not measured on thin coating.  *Id.* at para. 148; Def. Ex. 18 at Shamrock001534 ("Included in the data sheets or brochures for the latent solventless varnishes are tensile strength, volume resistivity, percent shrinkage, and such.  Many of these test methods can only be performed on thick sections of resin composition rather than on thin films, the state in which varnishes are actually used.").  Thus, despite all of the alleged guess work, "indirect estimates," and "hypothetical computations"—as described by Defendant—Dr. Meliopoulos nonetheless reported that "the coating material has *unknown* resistivity," and then testified that it is "correct" that the "coating material has *unknown* resistivity."  Def. Resp. to Pl. Facts at paras. 147 (emphasis added).  While Defendant denies that Dr. Gotro is qualified to opine on this topic, Def. Resp. to Pl. Facts at paras. 148-49, Dr. Gotro is eminently qualified.  He has experience with electrical testing of polymers including epoxy, melamine, and silicone.  Gotro Dep. at 19:10-24:15.  It is undisputed that Dr. Gotro is a *materials scientist* who specializes in polymers used in electrical insulating applications and is well qualified to testify about how to properly test a polymer's *material properties*.  Def. Resp. to Pl. Facts at paras. 7, 10-12, 60, 63; Gotro Dep. at 33:19-21.  It is undisputed that volume resistivity is a *material* property.  Def. Resp. to Pl. Facts at para. 60.  Dr. Meliopoulos' conclusions are based on "improper" measurements, and do not actually yield the true resistivity of the epoxy coating.

Additionally, Plaintiff disputes that Dr. Meliopoulos tested the epoxy coating.  Dr. Meliopoulos made no effort to ensure that he tested the electrical resistance of the epoxy coating as opposed to the underlying steel.  At most, Dr. Meliopoulos allegedly varied the pressure of the

probes in his tests between "high," "low," and "very low" pressures.  Meliopoulos Report at 21.

However, the purported pressure variation does not demonstrate that the measurements of

electrical resistance were limited to the flow of electricity through the coating material alone.  As

shown in Figure 1 of Dr. Meliopoulos' report, a measurement and calculation of the volume

resistivity should measure material being tested alone, here the epoxy coating.  Meliopoulos

Report at 4.

Comparatively, Dr. Jackson, in both of his electrical tests established a control whereby

he ensured that the electrical measurements represented electrical properties of the epoxy

coating.  It is undisputed that Dr. Jackson testified that there was "no reading of electrical

conduction" when he applied 1600 grams of pressure in his voltage drop testing with U.S.

Corrosion Services, and that he further testified the readings were repeatable.  Def. Resp. to Pl.

Facts at paras. 90-93, 102-03; Pl. Ex. V at Shamrock000534-35, Shamrock00537.  It is also

undisputed that Dr. Jackson testified that he conducted testing to determine the amount of

pressure that it took to achieve a voltage through the coating.  Def. Resp. to Pl. Facts at paras.

94-103; Pl. Ex. V at Shamrock000536-37.  Defendant admits that, in his G2MT testing, Dr.

Jackson measured the electrical resistance of the coated electrical conduit and compared the

results to uncoated electrical conduit, or "rigid."  Def. Resp. to Pl. Facts at para. 107.

Accordingly, Dr. Jackson took detailed and documented efforts to ensure that the results of his

testing reflected electrical properties of the epoxy coating and not the conductive properties of

the steel conduit, and Defendant does not dispute that he testified about those efforts.  Defendant

dismisses Dr. Jackson's testing because, according to Defendant, he is allegedly not qualified to

conduct the testing.  Def. Resp. to Pl. Facts at paras. 84-108, 116.  However, Dr. Jackson is a fact

witness who is entitled to testify about matters with which he has personal knowledge, including

what he did to the electrical conduit that he tested and what he personally observed.  Fed. R. Evid. 602.

Unlike Dr. Jackson, Dr. Meliopoulos made no apparent effort to differentiate the electrical qualities of the conductive steel conduit from the epoxy coating.  In fact, Dr. Meliopoulos's report indicates that he tested the electrical conduit and not the coating material specifically.  Dr. Meliopoulos' report states the he injected current into the electrical conduit. Meliopoulos Report at 18.  He even states in his report that he ran the electrical current *through the steel*.  The report states, "the impedance between the conduit internal and external surfaces was measured."  Meliopoulos Report at 16.  Thus, unlike the "proper" test to determine the electrical resistivity outlined in Figure 1 of his report, which measures the resistivity of a given material alone, Dr. Meliopoulos' testing measured the electrical resistance to electricity that flowed through steel material then the coating material.  Dr. Meliopoulos failed to provide a control for the steel in his testing, which likely distorted or skewed the electrical resistance measurements.

The only issue in this case is whether the epoxy coating material is insulating and Dr. Meliopoulos, as Defendant admits, testified that he "did not have sufficient coating material to determine the coating material's electrical resistivity."  Def. Resp. to Pl. Facts at para. 142-47. Despite Defendant's claim that epoxy coating could disintegrate if a large enough voltage is applied to it, Def. Br. at 33, no testing has shown that the coating would disintegrate, Pl. Resp. to Def. Facts at para. 29.  Regardless, if an insulating material lined electrical conduit, that electrical conduit would still be prima facie classifiable pursuant to Heading 8547 because it meets the express elements of the statute.  Whether the epoxy coating would or could disintegrate in some hypothetical circumstance is irrelevant.

Defendant's arguments in this case neglect the *purpose* of the epoxy coating. Defendant claims that the epoxy coating serves merely to prevent corrosion. That is *not* the purpose of the epoxy coating. As noted, Defendant admits that the "purpose of an electrical insulating varnish" including the epoxy coating here, "is to form a protective resin film over the main electrical structural components in order to *contribute to the total mechanical strength and electrical resistance*. Def. Resp. to Pl. Facts at paras. 34-36, 40, 141; Def. Ex. 18 at Shamrock001527-28. The undisputed facts in this case demonstrate that the epoxy coating serves that function. The undisputed material facts of this case demonstrate that summary judgment in favor of Defendant is not reasonable. Defendant's cross-motion for summary judgment must be denied.

## V.

### THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS IS BASED ON TECHNICAL KNOWLEDGE AND EXPERIENCE, IS HELPFUL TO THE TRIER OF FACT, AND IS THEREFORE ADMISSIBLE

Defendant misstates the standard for admitting expert testimony, which Dr. Jeffrey Gotro clearly meets. As a matter of law, the Court should admit his testimony and as a matter of fact, the Court should weigh his testimony against other facts in evidence.

### A. The Expert Witness Admissibility Standard

Admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, which states in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Trial courts' "gatekeeping" function with respect to expert witnesses boils

down to two questions: (1) whether the witness qualified as an expert in either scientific,

technical, or specialized matters, and (2) whether the expert's testimony will assist the trier of the

facts.  *Rondout Valley Cent. School Dist. v. Coneco Corp*., 321 F.Supp.2d 469, 473 (N.D.N.Y.

2004).  A witness may be qualified as an expert based on experience in a given field and need

not have a specific educational background.  *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d

607, 624-25 (5th Cir. 2018) (warning against "label{ing} the needed expertise narrowly" so as to

exclude a specific expert's testimony); *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*,

326 F.3d 1333, 1343 (11th Cir. 2003) (upholding finding that expert was "qualified by his

experience and by his education, including his on-the-job education"); *McCullock v. H.B. Fuller

Co.*, 61 F.3d 1038, 1043-44 (2d. Cir.1995) (finding that "practical experience qualif{ies} as

'specialized knowledge' gained through 'experience, training, or education'" for the purpose of

Rule 702).  Thus, "{u}nlike an ordinary witness… an expert is permitted wide latitude to offer

opinions, including those that are not based on firsthand knowledge." *Daubert v. Merrell Dow

Pharm. Inc.*, 509 U.S. 579, 592 (1993).

Trial courts are entitled to great deference in admitting expert testimony.  *Kumho Tire

Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("a court of appeals is to apply an abuse-of-

discretion standard when it review{s} a trial court's decision to admit or exclude expert

testimony") (citation omitted).  Indeed, "the admission of evidence in a bench trial is rarely

ground for reversal, for the trial judge is presumed to be able to exclude improper inferences

from his or her own decisional analysis." *Advanced Magnetic Closures, Inc. v. Rome Fastener

Corp*., 607 F.3d 817, 831 (Fed. Cir. 2010) (quoting *Bic Corp. v. Far Eastern Source Corp*., 23

Fed. Appx. 36, 39 (2d. Cir. 2001)).

Additionally, Rule 703 permits an expert witness to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703. Importantly, the material on which an expert bases an opinion need not itself be admissible "{i}f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  *Id.*  As the Court of Appeals for the Federal Circuit ("Federal Circuit") has explained, "Rule 703 expressly authorizes the admission of expert opinion that is based on 'facts or data' that themselves are inadmissible, as long as the evidence relied upon is 'of a type reasonably relied upon by experts in the particular field in forming opinions.'"  *Monsanto Co. v. David*, 516 F.3d 1009, 1016 (Fed. Cir. 2008).

Thus, expert witnesses may rely on—and opine on—tests which they did not themselves conduct.  *Id.* at 1015 ("reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703."); *accord*, *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d. Cir. 2000) ("{A}n expert may rely on data that she did not personally collect.").  In fact, a trial court may find that a witness need not have conducted a scientific test *at all* in order to qualify as an expert on the matter at hand.  *Montgomery v. Mitsubishi Motors Corp.*, 448 F.Supp.2d 619, 629 (E.D. Pa. 2006).  This is because an expert's opinion can be formed on the basis of the expert's years of experience in a particular field.  *Id.*

### B.  Dr. Jeffrey Gotro's Opinion Testimony is Admissible

Dr. Gotro has a Ph.D. in materials science with a specialty in polymer science.  Pl. Ex. II at 18:8-11.  Dr. Gotro has forty years of experience in this field, where his work includes developing micron-thin organic polymers such as epoxy, melamine and silicone for electrical insulating applications.  *Id.* at 19:12-15, 26:8-30:20.  In addition, he is a member of the Institute of Electrical and Electronic Engineers.  *Id.* at 40:20-42:2.

Defendant dismisses Dr. Gotro's opinions because he allegedly "only" used "chemical analysis" and not did not conduct "electrical testing." Def. Br. at 40. However, the issue in this case is whether a micron-thin epoxy coating has the material property of being insulating. Dr. Gotro is most qualified to opine on this issue. Defendant admits that he has experience using epoxy coating as insulating material. Def. Resp. to Pl. Facts at para. 57. Contrary to Defendant's facile objections to Dr. Gotro's opinions, he did not fail to follow the methodology that he uses in his practice. *Compare* Def. Br. at 40, *with* Pl. Ex. II at 19:10-32:11. Dr. Gotro reviewed and relied upon the electrical testing conducted by Dr. Jackson. Dr. Gotro has overseen electrical testing of polymers by other technicians, and based upon Dr. Gotro's experience in developing insulating polymers, that electrical testing is commonly done by technicians much less capable than Dr. Jackson and rarely, if ever, would an electrical engineer be involved. Gotro Dep. at 20:10-22:15. This is not a case where a hypothesis went untested; rather, Dr. Jackson's testing confirmed Dr. Gotro's and vice versa. The Fifth Circuit has advised against the "absurdity" of "label{ing} the needed expertise narrowly" so as to exclude a specific expert's testimony. *Manitowoc Cranes*, 898 F.3d at 624-25 ("Such conception of expertise… could make expert certification decisions a battle of labels…. This would elevate labels over substance.") (internal quotations omitted). So long as there are "'sufficient indicia' that an individual will 'provide a reliable opinion' on a subject," that individual may qualify as an expert. *Id*.

Moreover, as noted above, expert witnesses may, in forming their own opinions, rely on tests which they did not conduct. *Monsanto Co.*, 516 F.3d. at 1015 (Fed. Cir. 2008). As Defendant has pointed out, Dr. Gotro frequently needs to know the electrical resistivity of a material in order to carry out his work. Def. Br. at 38 (citing Pl. Ex. II at 19:6-20:19). In the

course of his experience—as is permitted in giving expert testimony—Dr. Gotro has relied on

resistivity measurements taken by others in coming to conclusions about the resistivity of the

materials with which he works.  Pl. Ex. II at 19:10-20:11.  Indeed, during his deposition, Dr.

Gotro was asked extensively about Dr. Meliopoulous's electrical testing, on which Dr. Gotro

based his opinion, in part.  Pl. Ex. II at 15:1-22, 39:13-40:19, 72:19-75:22, 182:9-183:7, 190:12-

191:13, 225:3-227:18.

Defendant treats Dr. Gotro's testimony as a smoking gun rather than what it is: a straight

shot to Rule 703.  Defendant seeks to exclude Dr. Gotro's testimony rather than contest it in

court.  But, as the Fifth Circuit has opined, "quibbles about qualifications are better characterized

as arguments about the weight of {an expert's} testimony—not about its admissibility… This

battle should be fought with the conventional weapons of cross-examination and competing

testimony—not the nuclear option of exclusion." *Manitowoc Cranes*, 898 F.3d at 625.

Disputes as to the rigor of an expert's credentials, the persuasiveness of his methodology,

or the strength of his familiarity with the applicable literature "go to the weight, not the

admissibility, of his testimony." *McCullock*, 61 F.3d at 1044; *see also Quiet Technology*, 326

F.3d at 1345-46.  Such decisions are for the trier of fact to make.  As the Supreme Court

counseled in *Daubert*, 509 U.S. at 596, the "appropriate safeguards" for keeping out unreliable

evidence are "vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof," rather than "wholesale exclusion."

### C.  Dr. Joshua Jackson Has Personal Knowledge Of The Electrical Properties Of The Epoxy Coating

Dr. Jackson is a lay witness.  He has personal knowledge regarding the subject conduit

and the epoxy coating.  He is entitled to testify pursuant to Rule 601 and 602 as a lay witness

regarding the facts with which he has personal knowledge including what he did, what he

observed, and what the data results were without offering an opinion thereon.  *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) ("Just because a lay witness's position and experience *could* have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.'  Lay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses.") (citations omitted) (emphasis in original).  This Court need not qualify Dr. Jackson as an expert in order to allow him to testify as to the testing he personally observed, "despite whatever expertise {he} may or may not possess as a result of {his} experience."  *Victoria's Secret Direct, LLC v. United States*, 35 CIT 1706, 1707 (Ct. Int'l Trade 2011).  Rather, the Court may admit his testimony as lay testimony—as this Court has previously done with respect to lay witnesses with particularized knowledge.  In *Kahrs Int'l, Inc. v. United States*, this Court explained that it would "allow testimony by lay witnesses that have particularized knowledge by virtue of their experience."  33 CIT 1297, 1302 (2009).  This precedent is readily applicable here, where Dr. Jackson has "particularized knowledge" derived from his relationship with subject conduit.  *Id.*

Regardless, should the court believe it necessary to qualify Dr. Jackson, all of the foregoing arguments with respect to Dr. Gotro apply equally to Dr. Jackson.  Dr. Jackson has a master's degree and a Ph.D. in metallurgical and materials engineering.  Pl. Ex. IV (Jackson Dep.) at 23:18-25.  For ten years, he worked at G2MT Labs, and now owns U.S. Corrosion Services, a consulting firm that provides metallurgical analysis of given materials.  *Id.* at 20:19-21:13; 28:2-5; Pl. Ex. VI at Shamrock000530.  Dr. Gotro testified that technicians with far less experience and scientific background regularly conduct the type of testing Dr. Jackson performed.  Pl. Ex. II at 20:4-19 ("Technicians, in my experience, typically have associate's degrees…  They could also be… potentially, a new engineer.").  By complaining that Dr.

Jackson does not have the right kind of experience according to its own statement of the case, Def. Br. at 36, Defendant confuses an expert's qualifications for the purposes of Rule 702 with that expert's testimony as a piece of evidence.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully request that this Court reject Defendant's

Cross-Motion for Summary Judgment and grant Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

**Morris Manning & Martin LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4819

/s/ R. Will Planert
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**Sandler Travis & Rosenberg, P.A.**
675 Third Avenue, Suite 1805
New York, NY 10178
 (212) 549-0150

/s/ Patrick D. Gill
Michael S. O'Rourke
Patrick D. Gill

*Attorneys for Plaintiff*

Dated:  September 29, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 13,959 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ R. Will Planert
R. Will Planert

Dated:  September 29, 2022