UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*

_____

|  |  |  |
|---|---|---|
| | : | |
| SHAMROCK BUILDING MATERIALS, INC. | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00074 |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

**MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S RESPONSE TO
THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-0484 or 9230
*Attorneys for Defendant*

Of Counsel:
MATHIAS RABINOVITCH
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: November 10, 2022

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.    "INSULATING MATERIALS" OF HEADING 8547 IS DEFINED AS MATERIAL
THAT PREVENTS OR STOPS THE FLOW OF ELECTRICITY ................................ 2

III.    THE INTERIOR COATING OF THE ELECTRICAL CONDUIT DOES NOT
QUALIFY AS "INSULATING MATERIAL" OF HEADING 8547
BECAUSE IT CONDUCTS ELECTRICITY ................................................................ 6

    A.  The Record Evidence Demonstrates That The Interior Coating Conducts Electricity ..... 6

    B.  Plaintiff Cannot Establish The Material Properties Of The Interior Coating ................. 9

    C.  Plaintiff's Interpretation of Heading 8547 Is Without Support ..................................... 11

IV.    PLAINTIFF'S ANALYSIS OF THE EXPERT TESTIMONY
IS WITHOUT SUPPORT ............................................................................................ 12

    A.  Plaintiff's Criticism Of Dr. Meliopoulos's Work Is Unfounded .................................. 12

    B.  Plaintiff Ignores The Requirements Of Federal Rule Of Evidence 702 ......................... 15

V.    PLAINTIFF'S REMAINING ARGUMENTS ARE WITHOUT MERIT .................... 17

    A.  Electrical Industry Standards Do Not Support Classification in Heading 8547 ............ 17

    B.  The Interior Coating Provides Protection But Not Insulation ....................................... 19

CONCLUSION ........................................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*B.F. Goodrich Co. v. United States*,
38 Cust. Ct. 72 (1957) ............................................................................................................ 5

*Chemtall, Inc. v. United States*,
878 F.3d 1012 (Fed. Cir. 2017) ............................................................................................. 3

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ................................................................................................ 15

*EOS of N. Am., Inc. v. United States*,
911 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ........................................................... 2

*Kuhmo Tire Co., Ltd. v. Carmichael*,
527 U.S. 137 (1999) ........................................................................................... 15, 16

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ................................................................................. 16

**Harmonized Tariff Schedule Of The United States**

Chapter 73

    Heading 7306

        Subheading 7306.30.10 .................................................................................. 2

        Subheading 7306.30.50 .................................................................................. 2

Chapter 85

    Heading 8516

        Subheading 8516.90.75 .................................................................................. 5

    Heading 8546 ..................................................................................................... 11

    Heading 8547 .................................................................................................. *passim*

Explanatory Note (A) ................................................................................................. 4

Explanatory Note 85.47 ................................................................................... 4, 11, 19

Section XV ................................................................................................................ 11

Section XVI ................................................................................................................ 3

**Rules**

Fed. R. Evid. 702 ........................................................................................... 15, 16, 17

USCIT R. 56 ............................................................................................................... 1

**Other Authorities**

INSULATING, *Oxford English Dictionary* available at
https://www.oed.com/view/Entry/97228........................................................................ 3

INSULATING, *Merriam-Webster* available at https://www.merriam-
webster.com/dictionary/insulating ........................................................................... 3

INSULATE, *Cambridge Online Dictionary* available at
https://dictionary.cambridge.org/us/dictionary/english/insulating ............................................. 3

POLYVINYL CHLORIDE, *Merriam-Webster* available at https://www.merriam-
webster.com/dictionary/polyvinyl%20cloride;
https://dictionary.cambridge.org/us/dictionary/english/pvc ..................................................... 18

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*

_____

|  |  |  |
|---|---|---|
| | : | |
| SHAMROCK BUILDING MATERIALS, INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00074 |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

### MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, the United States (the Government), respectfully submits this memorandum of law in reply to plaintiff's response to, and in further support of, the Government's cross-motion for summary judgment.  We respectfully request that this Court enter judgment classifying the electrical conduit under Heading 7306 of the Harmonized Tariff Schedule of the United States (HTSUS), which covers "Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."

### I. INTRODUCTION

This case concerns the tariff classification of electrical metallic tubing conduit (EMT) and intermediate metallic conduit (IMC) (collectively referred to as electrical conduit) imported by plaintiff, Shamrock Building Materials, Inc. (Shamrock).  Compl. ¶ 8.  U.S. Customs and Border Protection (CBP) classified the electrical conduit at liquidation under Heading 7306, HTSUS, as "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."  Def. Br. at 2–3.  Plaintiff, however, contends that

the electrical conduit is classifiable under Heading 8547, HTSUS, which provides for "electrical conduit tubing and joints therefor, of base metal lined with insulating material."  Pl. Br. at 12–30.

As we demonstrated in our opening brief, plaintiff's proposed classification is erroneous. Def. Br. at 12–35.  The context within which the term "insulating material" is found in the tariff establishes that to be covered by Heading 8547, the subject electrical conduit must be lined with material that provides *electrical* insulation.  The common meaning of electrical insulation requires that the material stop or prevent the flow of electricity.  The undisputed facts show that the interior coating of the electrical conduit does not stop or prevent the flow of electricity.  This was confirmed by the electrical testing performed by witnesses from both parties as well as plaintiff's product brochure which advertises that the electrical conduit can provide system grounding.

Because the interior coating that lines plaintiff's electrical conduit does not provide electrical insulation, it is excluded from Heading 8547, HTSUS, and should be classified as liquidated, in either subheading 7306.30.10, HTSUS or under 7306.30.50, HTSUS (depending on wall thickness).

## II.  "INSUALTING MATERIAL" OF HEADING 8547 IS DEFINED AS MATERIAL THAT PREVENTS OR STOPS THE FLOW OF ELECTRICITY

In our opening brief, we demonstrated that the interior coating of the electrical conduit must prevent or stop the flow of electricity to qualify as "electrical conduit tubing . . . lined with insulating material" of Heading 8547.  Def. Br. at 12–18.  This requirement is reflected in the common meaning of the statutory term "insulating material."

"Tariff acts must be construed to carry out the intent of the legislature, which is determined initially by looking at the language of the statute itself."  *EOS of N. Am., Inc. v. United States*, 911 F. Supp. 2d 1311, 1318 (Ct. Int'l Trade 2013) (internal citation omitted).

Here, as we explained in our opening brief, the drafters of heading 8547 did not use the term

"insulating material" in isolation.  Rather, it was used in conjunction with "electrical conduit

tubing," which is a type of electrical equipment.  Heading 8547 is included within Chapter 85

and Section XVI, HTSUS.  Both Chapter 85 and Section XVI cover "Electrical Equipment."

Similarly, the General Explanatory Note to Chapter 85, which describes the "Scope and

Structure of the Chapter," provides that "[t]his Chapter covers all electrical machinery and

equipment."  EN (A) to Ch. 85, HTSUS.  Consequently, the term "insulating material" must be

interpreted as it relates to electrical conduit tubing and electrical equipment.

     Within the context of electrical equipment, the term "insulating" is commonly defined as

preventing the passage of electricity.  For example, the Oxford English Dictionary defines

"insulating," in relevant part, as "[t]o cut off or isolate from conducting bodies by the

interposition of non-conductors, so as to prevent the passage of electricity or heat."

https://www.oed.com/view/Entry/97228, last visited November 9, 2022.  Similarly, Merriam-

Webster defines "insulating," in relevant part, as "to separate from conducting bodies by means

of nonconductors so as to prevent transfer of electricity, heat, or sound (https://www.merriam-

webster.com/dictionary/insulating last visited November 9, 2022) and the Cambridge Online

Dictionary defines "insulate" as "to cover or surround something with a material or substance in

order to stop heat, sound, or electricity from escaping or entering."

https://dictionary.cambridge.org/us/dictionary/english/insulating, last visited November 9, 2022.

     Several explanatory notes in Chapter 85 confirm that "insulating material" of Heading

8547 refers to material that provides electrical insulation.  "The [Explanatory Notes] provide

persuasive guidance and are generally indicative of the proper interpretation, though they do not

constitute binding authority."  *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1019 (Fed. Cir.

2017) (internal quotations omitted).  Here, Explanatory Note (A) to Chapter 85 provides that "[t]his Chapter covers: . . . Certain articles and materials which are used in electrical apparatus and equipment because of their *conducting or insulating properties*, such as . . . *metal conduit tubing with an interior insulating lining (heading 85.47)*" (emphasis added).  The inclusion of both terms "conducting" and "insulating" in the explanatory note is persuasive guidance that "insulating" in Chapter 85 means preventing the flow of electricity.  Def. Br. at 15.  Moreover, Explanatory Note 85.47 explains that "[t]he insulating material may be *special electrically insulating* varnish, paper or paperboard, rubber, plastic, etc."  (emphasis added).

Plaintiff does not dispute that this is an appropriate definition of electrically insulating (Pl. Br. at 20), but contends that that our interpretation of "insulating material" of Heading 8547 is overly narrow.  Pl. Resp. Br. at 4 ("[T]he common meaning of the term 'insulating' as used in Heading 8547 is not limited to the electrical context.").

For plaintiff, "insulating" includes physical protection.  Pl. Resp. Br. at 5.  However, the explanatory notes indicate that protection and insulation are distinct features of electrical conduit and that the conduit can perform both functions.  Indeed, Explanatory Note 85.47 provides that electrical conduit is "used in permanent electrical installations (e.g., house wiring) as *insulation and protection* for the wires."  EN 85.47 (emphasis added).  The note also explains that insulating fittings of Heading 8547 are "designed for insulating purposes even though at the same time they have other functions (e.g., protection)."  *Id.*  This shows that insulation and protection as two different concepts — if "insulation" were meant to include physical protection for the wires, there would be no need to identify insulation as a separate function.

Plaintiff also claims that our interpretation of "insulating" is unreasonable because the term appears in other sections of Chapter 85 and context would indicate that the term should not

be "limited exclusively to electrical insulation." Pl. Resp. Br. at 5. For example, plaintiff cites subheading 8516.90.75, which covers parts for cooking stoves and ovens, specifically "[d]oor assemblies, incorporating more than one of the following: inner panel; outer panel; window; *insulation*." Subheading 8516.90.75, HTSUS (emphasis added). However, plaintiff's argument misconstrues our position. In our opening brief, we do not advocate for a universal interpretation of the term "insulating" without regard to the context within which it is found. Def. Br. at 14 ("Consequently, the term "insulating material" must be interpreted as it relates to electrical conduit tubing and electrical equipment."). Rather "insulation" of subheading 8516.90.75 should be interpreted with regard to the context of that subheading. Accordingly, plaintiff's reference to the insulation found in the door assemblies for cooking stoves and ovens is inapplicable because that term is used in a different subheading — and context — than that under consideration in this case. *See* Subheading 8516.90.75 (which covers "[d]oor assemblies, incorporating more than one of the following: inner panel; outer panel; window; insulation.")

Finally, plaintiff's attempt to directly compare "insulating material" of Heading 8547 with the statutory language at issue in *B.F. Goodrich Co. v. United States* is misplaced. Pl. Resp. Br. at 6–7. As discussed in our opening brief (Def. Br. at 16), in *B.F. Goodrich*, the customs court found that "auto weather stripping" was classifiable under a provision of the Tariff Act of 1930 that covered "insulating materials, wholly or partly manufactured, composed wholly or in chief value of rubber." *B.F. Goodrich Co. v. United States*, 38 Cust. Ct. 72, 72–73 (1957). Plaintiff argues that simply because the phrase "insulating material" is used in both Heading 8547, HTSUS, and "paragraph 1537(b) of the Tariff Act of 1930" (*Id.* at 73), that this Court should similarly interpret the term broadly, *i.e.¸* refuse to limit the term to electrical insulation alone. Pl. Resp. Br. at 6.

However, Plaintiff's reasoning misses the mark because it fails to acknowledge that the statutory language is not similar.  The phrase "insulating material" at issue in *B.F. Goodrich* was not linked to another tariff term, which are the circumstances presented in this case.  Here, the phrase "insulating material" further describes the physical features of the "electrical conduit" in Heading 8547.  Thus, plaintiff's application of *B.F. Goodrich* is mistaken as it reads the critical phrase "electrical conduit" out of the statute and ignores the context that the statute provides when interpreting "insulating materials."

### III. THE INTERIOR COATING OF THE ELECTRICAL CONDUIT DOES NOT QUALIFY AS "INSULATING MATERIAL" OF HEADING 8547 BECAUSE IT CONDUCTS ELECTRICITY

### A.  The Record Evidence Demonstrates That The Interior Coating Conducts Electricity

Although plaintiff contends that "insulating material" of Heading 8547 should not be "limited exclusively to electrical insulation" (Pl. Resp. Br. at 5), if it is, plaintiff appears to argue that the interior coating of the electrical conduit provides electrical insulation because it is a "nonconductor" of electricity.  Pl. Resp. Br. at 8.  For plaintiff, because Dr. Meliopoulos[1] opined that in terms of technical electrical resistivity values, the interior coating would be characterized as a semiconductor, the Court should conclude that the coating qualifies as insulating material.  *See id.* at 9 ("'the distinction between insulators and semiconductors is arbitrary and from the point of view of metal-insulator transitions, all semiconductors are insulators'") (quoting Pl. Ex.

---

[1] Dr. Sakis Meliopoulos holds a Ph.D. in electrical engineering from the Georgia Institute of Technology and is currently a professional electrical engineer, who teaches electrical engineering at the university level.  Over his career, Dr. Meliopoulos has more than 47 years of experience in power system analysis (which includes the use of electrical conduit).  The Government retained Dr. Meliopoulos to test the electrical properties of the imported merchandise and determine whether the interior coating of the electrical conduit insulates against electricity.  *See* Def. Ex. 5 (Meliopoulos Report at Attachment A).

II (Gotro Tr. at 207:1–6)).  Thus, plaintiff seeks to reduce the definition of electrically insulating to whether the material at issue has the properties of a "nonconductor."

Plaintiff's contention is based upon a false premise because it is an oversimplification of how the electrical properties of a material are measured.  Dr. Meliopoulos's testimony demonstrates that electrical properties of a material are measured on a continuum based upon electrical resistivity, with conductors and semiconductors sharing resistivity that are very close in value but exhibiting a large difference from insulators.  Def. Ex. 5 (Meliopoulos Report at 4).

| Insulators | Semiconductors | Conductors |
|---|---|---|
| $10^{12}$ to $10^{20}$ ohm.meters | $10^{-5}$ to $10^{1}$ ohm.meters | $10^{-8}$ to $10^{-6}$ ohm.meters |

**Table 1: Range of Resistivities for Electrical Classification of Materials**

This chart establishes that even those materials that are classified as semiconductors, do not exhibit the electrical resistivity to prevent or stop the flow of electricity.

Nevertheless, even if the Court were to adopt plaintiff's interpretation, which it should not, the record evidence establishes that the interior coating conducts electricity and therefore does not qualify as a "nonconductor."

First, it is undisputed that plaintiff advertises its electrical conduit as providing the benefit of "system grounding."  Def. Ex. 6; Pl. Resp. to Def. SOF ¶18.  System grounding refers to the flow of electrical current through the interior wall of the conduit back to the source, in the event of an electrical fault (*i.e.*, accidental contact between exposed wire contained inside the electrical conduit and the interior wall of the electrical conduit).  Def. Ex. 5 (Meliopoulos Aff. ¶ 28–30) (Meliopoulos Report at 9–10).  To provide "system grounding," the electrical resistance of the interior coating of the conduit must be low enough to allow the flow of a large current of electricity to circulate from the breaker to the wires inside the conduit and through the interior

coating back to the source.  *Id.*  The circuit breaker connects the electrical wires installed inside the conduit to the electrical power source and when a high level of electricity flows through the circuit breaker, the breaker will detect the fault and will disconnect the circuit in a very short amount of time.  *Id.*  This safety mechanism protects humans from electrocution and prevents property damage.  *Id.* (Meliopoulos Aff. ¶ 29).

In other words, if an electrical fault occurs within the electrical conduit, the interior wall will conduct electricity and allow the electricity to freely flow through the circuit breaker to disconnect the electrical circuit.  *Id.* (Meliopoulos Aff. ¶ 30) (Meliopoulos Report at 3, 9–10). Because the interior wall of the electrical conduit does not stop the flow electricity, the interior coating necessarily conducts electricity.  *Id.* (Meliopoulos Aff. ¶ 31) (Meliopoulos Report at 3). Plaintiff fails to genuinely dispute this explanation of system grounding or provide evidence to contradict it.  Pl. Resp. to Def. SOF ¶ 19.

Furthermore, regardless of the electrical resistivity assigned to the interior coating, electrical testing conducted by both parties found that it conducted electricity.  For instance, Dr. Meliopoulos applied electrical current to the interior coating and found that it provided "very slight" electrical resistance, which did not stop the flow of electricity.  Def. Ex. 5 (Meliopoulos Aff. ¶¶ 8, 14, 17) (Meliopoulos Report at 7, 21).  Dr. Jackson's[2] electrical testing produced similar results when he found that the "coated pipe provides slightly higher electrical resistance than an uncoated pipe but does not act as an insulator."  Def. Ex. 11 at sec. 6; Pl. Ex. IV at 89:11–15.

---

[2] Dr. Jackson is CEO and senior metallurgist at U.S. Corrosion Services and previously held the title of CEO at G2MT Laboratories.  Pl. Ex. IV (Jackson Tr. at 20:19–21:6).  Shamrock retained Dr. Jackson to conduct testing on the subject conduit.  *Id.* (Jackson Tr. at 41:22–42:8).

Therefore, even if the Court were to accept plaintiff's oversimplification that an insulator must be a "nonconductor" of electricity, the interior coating of the subject electrical conduit fails this test as well.

**B.  Plaintiff Cannot Establish The Material Properties Of The Interior Coating**

Plaintiff's classification rests upon the assertion that the interior coating consists of epoxy, melamine, and silicone.  Pl. Br. at 12–18.  For plaintiff, because the interior coating includes these materials, and epoxy, melamine, and silicone are plastics that provide electrical insulation, the interior coating must be electrically insulating.  Pl. Resp. Br. at 12 ("Heading 8547 expressly dictates that these two categories, namely plastics such as epoxy and melamine, are electrically insulating materials covered by the Heading."); *Id.* at 27 ("That is precisely the point: epoxy, melamine, and silicone indisputably have the *material property* of being electrically insulating."); *Id.* at 30 ("Epoxy, melamine and silicone have the volume resistivity necessary to qualify as insulators pursuant to the categories that Dr. Meliopoulos proposes.").

However, this reasoning fails because plaintiff has not established that the interior coating consists of epoxy, melamine, and silicone in its entirety.  Indeed, while it is undisputed that the interior coating contains epoxy, melamine, and silicone — and that in pure form these ingredients are electrical insulators — the record lacks evidence as to the complete constituent ingredients that make up the interior coating.

For example, the manufacturer of the interior coating material, Pintura Diamex, suggested in two letters submitted by plaintiff to CBP that the interior coating contained ingredients in addition to epoxy, melamine, and silicone.  Def. Ex. 7 (providing that the interior coating has the "main components" of epoxy, melamine, and silicone, "among others."); *see also* Pl. Resp. Br. at 31 ("It is undisputed that 'the material used to coat the interior of the electrical

conduit consists of epoxy resin, melamine resin, and silicone additives, *among other materials*.")
(emphasis added).  Dr. Gotro's[3] testing does not detract from this conclusion.  He testified that
the only chemical testing he conducted on the interior coating was to confirm the existence of
epoxy, melamine, and silicone but did not determine what other ingredients were included within
the material.  Pl. Ex. II (Gotro Tr. at 85:3–86:9, 111:2–112:7).  Dr Gotro admitted that if an
epoxy is filled with a metal additive it would be rendered electrically conductive and Dr.
Meliopoulos explained a process referred to as "doping," whereby an otherwise insulating
material is made electrically conductive by including additives.  *Id.* (Gotro Tr. at 89:1–11); Pl.
Ex. III (Meliopoulos Tr. at 30:14–31:5, 37:6–40:20); Def. Ex. 5 (Meliopoulos Report at 7)
(noting that Dr. Jackson found "aluminum, zinc, iron (probably from the substrate) and carbon"
when he measured the elements of the interior coating with energy dispersive x-ray spectroscopy
(EDS) and that these additives "will make the coating material conductive or semiconducting").

Moreover, the electrical testing performed by Dr. Meliopoulos and Dr. Jackson confirms
that the material that comprises the interior coating does not stop the flow of electricity.  Def. Ex.
5 (Meliopoulos Aff. ¶¶ 8, 14, 17) (Meliopoulos Report at 7, 21); Def. Ex. 11 at sec. 6; Pl. Ex. IV
(Jackson Tr. at 89:11–15).  Dr. Gotro did not conduct electrical testing on the interior coating,
therefore he has no knowledge on this point.  Pl. Ex. II (Gotro Tr. at 112:8–113:9).

Thus, although in pure form epoxy, melamine, and silicone may provide electrical
insulation, plaintiff has not provided evidence to confirm that the interior coating includes no
additional materials or whether the coating has been altered.  The record evidence supports the

---

[3] Dr. Gotro is president of InnoCentrix, LLC a technical and management consulting company
serving the polymer industry.  Pl. Ex. I (Gotro Report at 3). Dr. Gotro holds a Ph.D. in materials
science and engineering.  *Id.*  Dr. Gotro was retained by Shamrock to characterize the chemical
composition of the internal coating and provide opinions regarding the electrical properties of
such coating.  *Id.* (Gotro Report at 6).

conclusion that the interior coating has been "doped" with an electrically conductive material because electrical testing demonstrates that the interior coating does not stop the flow of electricity.

**C.  Plaintiff's Interpretation of Heading 8547 Is Without Support**

Plaintiff argues that "[t]he choice of language merely requiring that the electrical conduit be 'lined with insulating material' rather than simply stating 'insulated electrical conduit tubing' or 'insulating electrical conduit tubing' is purposeful and significant."  Pl. Br. at 17.  However, the explanatory notes to Heading 8547 demonstrate the error in plaintiff's interpretation of the heading.

Explanatory Note 85.47 provides that "[t]his group covers the metal tubing used in permanent electrical installations (e.g., house wiring) as *insulation* and protection for the wires, provided it has an interior lining of *insulating* material.  *Uninsulated* metal tubing, often used for the same purpose, is excluded (Section XV)."  (Emphasis added).  The ENs here explicitly compares "uninsulated metal tubing" with "tubing . . . lined with insulating material," indicating that the latter articles would be considered "insulated electrical conduit tubing."  This explanatory note uses the terms insulation, insulating, and uninsulated all to describe the same concept — the passage or prevention of the flow of electricity.

Additionally, the final paragraph of Explanatory Note 85.47 refers to "tubing wholly of *insulating* material" and lists as examples "rubber, plastics, braided textile yarn or glass fibre yarns."  EN 85.47 (emphasis added).  The note also indicates that these materials may constitute "an *insulator* of heading 85.46," where Heading 8546 covers "Electrical insulators of any material."  *Id.* (emphasis added).  In this context, electrical "insulators" are described as "insulating material."

Finally, Explanatory Note 85.47 provides that, in addition to rigid metal tubing coated or lined with insulating material, heading 8547 covers a "spiralled metal strip *wound on to an interior tube* of insulating material."  EN 85.47 (emphasis added).  These articles are not "merely required" to be lined with insulating material (*see* Pl. Br. at 17), but have a tube made of insulating material as a constituent part of the insulated electrical conduit tubing.

Therefore, it is evident that within the context of electrical equipment, the words insulating, insulator, insulated, and insulation all refer to the same idea, *i.e.*, preventing the flow of electricity, and the choice between these terms in the heading is not purposeful nor significant.

## IV. PLAINITFF'S ANALYSIS OF THE EXPERT TESTIMONY IS WITHOUT SUPPORT

### A.  Plaintiff's Criticism Of Dr. Meliopoulos's Work Is Unfounded

Plaintiff attacks the findings and conclusions of Dr. Meliopoulos because he stated in his report that the "proper way to determine whether a material is electrically insulating is to measure the resistivity of the material."  Pl. Resp. Br. at 36.  Plaintiff contends that, because Dr. Meliopoulos admits that he was provided with an insufficient amount of the material that comprises the interior coating in order to directly measure its electrical resistivity, his entire opinion is suspect.  *Id.*  ("The tests from Defendant's purported expert are fundamentally flawed and do not demonstrate that undisputed facts warrant summary judgment for the Defendant.").

Additionally, plaintiff takes issue with Dr. Meliopoulos's testing methods.  Plaintiff claims that Dr. Meliopoulos did not actually test the electrical resistance of the interior coating material but rather tested the underlying steel tube.  *Id.*  ("Dr. Meliopoulos made no effort to ensure that he tested the electrical resistance of the epoxy coating as opposed to the underlying steel.").  As will be demonstrated below, both arguments miss the mark.

First, as we showed in our opening brief, Dr. Meliopoulos is highly qualified in the field of electrical engineering.  Def. Br. at 23–24.  Plaintiff does not and cannot reasonably dispute his qualifications.  Furthermore, plaintiff has not proffered any qualified evidence to contradict Dr. Meliopoulos's work or findings.  Pl. Ex. IV (Jackson Tr. at 166:14–167:11) (Dr. Jackson admits that he is not qualified to confirm of deny Dr. Meliopoulos's findings and conclusions because it is outside his area of expertise); Pl. Ex. II (Gotro Tr. at 39:13–40:19, 73:21–75:22, 225:3–229:8) (Dr. Gotro testified that he is not qualified to conduct the tests or calculations that Dr. Meliopoulos used to determine electrical resistance or resistivity, nor is he qualified to opine on the validity of Dr. Meliopoulos's conclusions with regard to the electrical properties of the subject interior coating).  Accordingly, plaintiff has not produced competent evidence to support its criticism of the methods used by Dr. Meliopoulos to develop his opinion and draw the conclusion that the interior coating of the subject electrical conduit is not electrically insulating.

Furthermore, Dr. Meliopoulos's explanation in his report as to how he indirectly calculated the volume resistivity of the interior coating establishes that it was not the product of "guess work" as plaintiff alleges.  Pl. Resp. Br. at 37.  Dr. Meliopoulos explains that a material's known volume resistivity "can be used to compute the electrical resistance of any geometric form/shape of the material" using the following formula (resistance is "$R$"):

$$R = \rho \frac{\ell}{A},$$

*where*

$\rho$ is the resistivity of the material

$\ell$ is the thickness of the coating

$A$ is the surface of the coating material

Def. Ex. 5 (Meliopoulos Report at 4–5).

However, because plaintiff provided an insufficient amount of the material that constitutes the interior coating, Dr. Meliopoulos used the same formula to determine the electrical resistivity of the interior coating material using the values that were available. *Id.* (Meliopoulos Report at 8). For instance, because the size of the surface area (*A*), the electrical resistance (*R*), and the thickness of the coating (ℓ), are all known values based upon the measurements of Dr. Meliopoulos and Dr. Jackson, Dr. Meliopoulos was able to calculate the electrical resistivity using the same formula but solving for a different variable, *i.e.*, $\rho$ (resistivity) rather than *R* (resistance). *Id.*; Def. Br. at 29. Solving this equation resulted in Dr. Meliopoulos determining that "the indirect measurement of the coating material electrical resistivity is in the range of 0.3003 to 0.1386 ohms.meters," which is the equivalent to $10^0$ to $10^1$ ohms.meters. Def. Ex. 5 (Meliopoulos Aff. ¶ 23) (Meliopoulos Report at 8).

Irrespective of the electrical resistivity calculation, Dr. Meliopoulos's electrical resistance testing shows that the interior coating does not stop the flow of electricity. Ex. 5 (Meliopoulos Aff. ¶ 17) ("the interior coating resists a very slight amount of electricity"). This is consistent with the findings of Dr. Jackson that the interior coating "provides slightly higher electrical resistance than an uncoated pipe but does not act as an insulator." Def. Ex. 11 (G2MT Report dated 4/17/19 at sec. 6); Pl. Ex. IV (Jackson Tr. at 89:11–15, 100:15–102:21).

Finally, there is no basis to plaintiff's criticism that Dr. Meliopoulos should have followed the same pressure control method as Dr. Jackson in conducting the electrical resistance testing. Pl. Resp. Br. at 38 ("Comparatively, Dr. Jackson, in both of his electrical tests established a control whereby he ensured that the electrical measurement represented electrical properties of the epoxy coating."). Dr. Meliopoulos is an eminently qualified electrical engineer who is well versed in testing the electrical resistance of materials. Def. Br. at 23–24. In

comparison, Dr. Jackson admits that he has no expertise in electricity or electrical engineering, has never conducted electrical resistance testing prior to this case, and is not qualified to opine on the methods used by Dr. Meliopoulos.  Pl. Ex. IV (Jackson Tr. at 23:10–20, 25:18–28:7, 166:14–167:11).  Additionally, Dr. Jackson conceded that the pressure control test (of which, plaintiff uses in an effort to dispute the findings of Dr. Meliopoulos (Pl. Resp. Br. at 38–39)), was essentially created by him as a means to explain the difference in the findings between his tests and that of the CBP laboratory during the administrative protest process.  Pl. Ex. IV (Jackson Tr. at 151:22–154:21).

Thus, the Court should reject plaintiff's criticisms of the testing of the interior coating by Dr. Meliopoulos.

### B.  Plaintiff Ignores The Requirements Of Federal Rule of Evidence 702

Plaintiff contends that Dr. Jackson's testing of the electrical resistivity, and his related testimony, should not be subject to the requirements of Federal Rule of Evidence 702.  Plaintiff asserts that "Dr. Jackson is a lay witness.  He has personal knowledge regarding the subject conduit and the epoxy coating.  He is entitled to testify . . . as a lay witness regarding the facts with which he has personal knowledge including what he did, what he observed, and what the data results were without offering an opinion thereon."  Pl. Resp. Br. at 44–45.  In other words, plaintiff contends that simply because Dr. Jackson does not offer an opinion, his testimony is not subject to Rule 702.  However, this assertion reflects a misunderstanding of the rule and the case law applying it.

In our opening brief, we discussed the Supreme Court's interpretation of Rule 702 in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Def. Br. at 22.  To determine the admissibility of expert testimony, *Daubert* explains that Rule 702 requires a three-fold analysis:

(1) is the witness qualified in the relevant field; (2) is the witness's methodology reliable; and (3) is the proposed testimony relevant to a factual issue to be resolve in the case. *Id.* at 23.

After *Daubert* was decided, the Supreme Court later explained that the *Daubert* standard is not limited to "scientific expert testimony . . . but also to testimony based on 'technical' and 'other specialized' knowledge." *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In *Kuhmo Tire*, the plaintiff proffered the testimony of a mechanical engineer regarding the cause of a tire failure. *Id.* at 142. Upon a challenge to his methodology, the district court subjected his testimony to Rule 702 and the *Daubert* standard. *Id.* at 145. The Eleventh Circuit reversed because it concluded that "a *Daubert* analysis applies only where an expert relies on the application of scientific principles, rather than on skill- or experience-based observation." *Id.* at 146 (internal citations and quotations omitted). However, the Supreme Court reversed the circuit court and found that the *Daubert* standard applies to all scientific, technical, or specialized knowledge and "where such testimony's factual basis, data, principles, methods or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 150 (internal citations and quotations omitted) (alterations in original).

Indeed, the text of Rule 702 confirms this application:

> If *scientific, technical, or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a *witness qualified as an expert by knowledge, skill, experience, training, or education, may testify* thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702 (emphasis added).

Thus, Rule 702, *Daubert*, and *Kuhmo Tire*, require that a party proffering testimony about "scientific, technical or other specialized knowledge" establish that the witness is qualified

16

by "knowledge, skill, experience, training, or education" and that the testimony is relevant and reliable. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Such is the case regardless of whether that testimony is "an opinion or otherwise." Fed. R. Evid. 702.

Measuring the electrical resistance of the interior coating of the electrical conduit constitutes technical or specialized knowledge. Here, regardless of whether Dr. Jackson testified to an opinion or stated factual observations, because he is providing evidence about technical or specialized knowledge, his testimony is subject to Rule 702.

Accordingly, plaintiff must demonstrate that Dr. Jackson satisfies Rule 702 for the Court to consider his testimony regarding the electrical resistance testing. Plaintiff has failed to make this showing. Def. Br. at 36–37; Def. Reply Br. at 14. Based upon his own admission, Dr. Jackson is not qualified to conduct such testing.[4] Pl. Ex. IV (Jackson Tr. at 23:10–20, 25:18–28:7, 166:14–167:11).

## V. PLAINTIFF'S REMAINING ARGUMENTS ARE WITHOUT MERIT

### A. Electrical Industry Standards Do Not Support Classification in Heading 8547

In our opening brief, we explained that the electrical conduit at issue cannot be lined with electrically insulating material due to its compliance with industry standards that permit it to operate as an "equipment grounding conductor."[5] Def. Br. at 18–21. Plaintiff argues that our "statutory interpretation contradicts [our] own reading of the industry standards to which

---

[4] Plaintiff contends that Dr. Gotro's methodology is reliable because he "reviewed and relied upon the electrical testing conducted by Dr. Jackson." Pl. Resp. Br. at 43. However, because Dr. Jackson's electrical testing does not satisfy Rule 702, any opinion or testimony of Dr. Gotro that relies on these tests should be similarly rejected.

[5] As we explain above (Def. Reply Br. at 7–8), in the event of a fault occurring inside the electrical conduit, an equipment grounding conductor will conduct the stray electricity and run it back to the source.

electrical conduit complies."  Pl. Resp. Br. at 19.  To plaintiff, our contention that an equipment grounding conductor and electrical insulation are mutually exclusive concepts renders Heading 8547 "superfluous and null."  *Id.* at 20.

Plaintiff's argument is incorrect.  The industry standards cited in our opening brief — UL 797, NEC Art. 358.60, and ANSI C80.3 — apply to one type of electrical conduit, namely electrical metallic tubing.  *See* Def. Ex. 8, 9, 10.  The electrical conduit at issue complies with these standards.  Def. Ex. 6; Pl. Ex. VIII (Gambee Tr. at 122:13–123:20, 155:4–17, 162:18–163:18, 171:14–22); Def. Ex. 1 (Pl. Resp. to Rogs. No. 11).

However, there are other types of electrical conduit, not at issue here and presumably manufactured to different industry standards, that are not suitable to provide system grounding because the interior lining is electrically insulating.  Indeed, Dr. Meliopoulos testified that he has experience with electrical conduit that is lined with PVC material,[6] which would provide electrical insulation by stopping the flow of electricity.  Pl. Ex. III (Dr. Meliopoulos Tr. at 32:10–33:3).  Thus, simply because plaintiff's electrical conduit is made to certain industry standards that exclude it from classification in Heading 8547 does not mean that our interpretation of "equipment grounding conductor" and "insulating material" renders Heading 8547 meaningless.  Certainly, there are other types of electrical conduit that may be classifiable in this heading.

---

[6] "PVC" is an abbreviation for "polyvinyl chloride" and it is defined as a plastic material "especially used for electrical insulation, films, and pipes."  https://www.merriam-webster.com/dictionary/polyvinyl%20cloride last visited October 31, 2022; https://dictionary.cambridge.org/us/dictionary/english/pvc last visited October 31, 2022.

**B.  The Interior Coating Provides Protection But Not Insulation**

Plaintiff states that "[c]oatings applied to the interior of the electrical conduit protect against damage to wiring during installation and afterwards during service by providing an insulating layer between the wiring and the interior surface of the steel tube."  Pl. Resp. Br. at 21. Inherent in this statement is the contention that the interior coating provides both protection and insulation.  However, despite this assertion, Plaintiff conflates the two concepts of protection and insulation and argues that protection alone is satisfactory for classification in Heading 8547. Def. Br. at 22 ("'electrically insulating varnishes' are described as 'electrically insulating varnishes' because they coat and protect electrical apparatuses, not because they 'fully' insulate them").

As discussed above (Def. Reply Br. at 4), the explanatory notes make clear that insulation and protection are distinct concepts and that electrical conduit classifiable in Heading 8547 provide both functions.  EN 85.47 (Heading 8547 "covers the metal tubing used in permanent electrical installations (e.g., house wiring) as *insulation and protection* for the wires.") (emphasis added).  Indeed, if protection against abrasion during wire installation was considered insulation, the explanatory notes would not have identified both functions separately.

Here, the record evidence establishes that the interior coating of the electrical conduit serves a protective purpose but does not provide insulation.

First, there is no evidence that the interior coating of the subject electrical conduit provides insulation against electricity.  For instance, the parties' respective experts agree that the interior coating does not insulate against electricity.  Def. Br. at 24–27, 31; Def. Ex. 5 (Meliopoulos Aff. ¶ 8) (Meliopoulos Report at 3); Def. Ex. 11 at sec. 6; Pl. Ex. IV (Jackson Tr. at 89:11–15, 100:15–102:21).  Although Dr. Gotro opined that material comprised of epoxy,

19

melamine and silicone would qualify as an electrical insulator, he produced no direct evidence that the interior coating of the subject conduit performs this function.  Pl. Ex. II (Gotro Tr. at 112:4–114:18, 132:10–133:2).

Second, the record evidence demonstrates that the purpose of the interior coating is to provide physical and corrosion protection.  For example, plaintiff advertises in its product brochure that its electrical conduit has a "[s]mooth interior coating [that] insulates [the] wall to provide easy installation of wire," which refers to the physical protection provided by the coating to prevent damage to the electrical wires during installation in the electrical conduit.  Def. Ex. 6; Pl. Ex. VIII (Gamebee Tr. at 121:2–122:12).  There is no evidence that plaintiff publicizes to its customers that the interior coating of the electrical conduit provides any additional function, including electrical insulation.  Def. Ex. 6.

Beyond its product brochure, the UL listing for the electrical conduit identify the conduit's specifications.  Pl. Ex. VIII (Gambe Tr. at 157:3–15, 160:2-10); Def. Ex. 3 (Pl. Resp. to RFP No. 22).  UL 797, which applies to the subject electrical conduit, requires that interior organic coating have "the ability to provide the level of corrosion resistance necessary where the coating is not subject to physical damage."  Def. Ex 8 at Sec. 3.3.  Plaintiff's witnesses confirm that the interior coating serves this purpose.  Pl. Ex. VIII (Gambee Tr. at 86:16–19); Pl. Ex. IV (Jackson Tr. at 180:20–182:2).

Thus, the evidence submitted in this matter establishes that the purpose of the interior coating of the subject merchandise is to provide protection, and not insulation, which are two distinctly different attributes.  To be classifiable in Heading 8547, the lining of the electrical conduit must be insulating.  Plaintiff's electrical conduit falls short of this test.

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiff's motion for summary

judgment, grant the Government's cross-motion for summary judgment, and dismiss this case.

<div style="margin-left: 40%;">

Respectfully,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:      /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

      /s/ Peter A. Mancuso
PETER A. MANCUSO
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-0484 or 9230
*Attorneys for Defendant*

</div>

Of Counsel:
MATHIAS RABINOVITCH
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection


November 10, 2022

## **CERTIFICATE OF COMPLIANCE**

I, Peter A. Mancuso, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Government's memorandum in reply to plaintiff's response to defendant's cross-motion for summary judgment, dated November 10, 2022, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 6,136 words.

/s/ Peter A. Mancuso